



_____
Honorable Lloyd King
United States Bankruptcy Judge

**Entered on Docket**
**December 20, 2013**

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

\* \* \* \* \* \*

| | | |
|---|---|---|
| In re: | ) | Case No.: BK-S-12-13906 |
| | ) | |
| HORIZON RIDGE MEDICAL & | ) | Chapter 11 |
| CORPORATE CENTER, L.L.C., | ) | |
| | ) | Date:  September 16 & 17, 2013 |
| Debtor. | ) | |
| _____ | ) | |

**MEMORANDUM DECISION CONCERNING DENIAL**
**OF CONFIRMATION OF DEBTOR'S**
**SECOND AMENDED PLAN OF**
**REORGANIZATION[1]**

## INTRODUCTION

A plan confirmation hearing ("Confirmation Hearing") concerning two

competing reorganization plans in the above-referenced case was conducted on

_____

[1] In this Order, all references to "Section" shall be to provisions of the Bankruptcy Code, 11 U.S.C. section 101 et seq., unless otherwise indicated.  All references to "Code" shall be to the United States Bankruptcy Code, 11 U.S.C. § 101, et. seq.  All references to "FRCP" shall be to the Federal Rules of Civil Procedure.  All references to "FRBP" or "Rule" shall be to the Federal Rules of Bankruptcy Procedure.

September 16 and 17, 2013.[2]  Talitha Gray Kozlowski, Esq., and Teresa M.
Pilatowicz, Esq., of Gordon Silver, appeared for Debtor.  John Robert Weiss, Esq.,
and Dominica C. Anderson, Esq., of Duane Morris, appeared for Bank of America,
N.A.[3] ("BofA" or "Lender")

After the filing of post-hearing memoranda, final arguments were heard on
October 22, 2013.  On that date, the Court advised counsel that confirmation of
Debtor's Second Amended Plan of Reorganization would be denied, and that
Lender's Liquidation Plan would be confirmed.  Counsel for Lender was told to
file proposed findings of fact and conclusions of law.

This opinion concerns only the denial of Debtor's Second Amended Plan of
Reorganization.  A separate opinion will address confirmation of Lender's
Liquidation Plan.


**FACTS**

Debtor owns and operates the Horizon Ridge Medical & Corporate Center,
an office building located at 2610 W. Horizon Ridge Parkway, Henderson, NV (the
"Property").[4]

---

[2] Three disputed matters were considered at the Confirmation Hearing:
(i) Final approval of the Debtor's Disclosure Statement (Dkt. #116) that was conditionally
    approved on November 14, 2012 (Dkt. #159);
(ii) Confirmation of Debtor's Second Amended Plan of Reorganization (Dkt. #284), Ex. 2; and
(iii) Confirmation of Bank of America, N.A. as Trustee's Liquidation Plan for the Property
    (Dkt. #126), Ex. 7.

[3] Bank of America, N.A. is the successor by merger to LaSalle Bank National
Association, as trustee for the registered holders of GMAC Commercial Mortgage Securities,
Inc., Commercial Mortgage Pass-Through Certificates, Series 2003-C1.

[4] Debtor is a single-asset real estate entity: its sole asset is the Property and improvements
comprising the Medical Center building.  The Property is managed by Dr. Rick Abelson.
(Second Amended Plan, ¶ 5.7; Dkt#284, p. 22).

Debtor filed a voluntary Chapter 11 petition on April 2, 2012.  (Dkt. #1).

The Court has determined the value of Debtor's Property to be $3,975,000. (Order Determining Value of Debtor's Real Property for Purposes of Confirmation, Dkt. #223).

The Court has also determined that Lender holds a secured claim in the amount of $3,975,000 and an unsecured claim in the amount of $369,314. (Findings of Fact and Conclusions of Law and Order Regarding Debtor's Objection to Proof of Claim, etc., Dkt. #313).

Chandrakant Patel ("Patel") and Dr. Rick Abelson ("Abelson") own the equity interests in Debtor.  Abelson manages the Property.

**DEBTOR'S PLANS AND DISCLOSURE STATEMENT**

On October 12, 2012, Debtor filed an Amended Plan of Reorganization, Dkt. #115, and a Disclosure Statement.  (Dkt. #116).

On November 14, 2012, pursuant to Local Rule 3017, the court entered an Order conditionally approving the Debtor's Disclosure Statement.[5]  The court found that Debtor's Disclosure Statement contained "adequate information" within the meaning of Section 1125 of the Code and established procedures for the Debtors' solicitation of votes on Debtor's then-existing reorganization plan

_____

The "Property is approximately 2.2 acres of land, and the Center consists of a two-story office building situated on the Real Property with approximately 29,142 sq. ft., containing six first-floor suites, and seven second-floor suits, one of which has been subdivided into nine suites, for a total of twenty-one suites. Debtor maintains its management office in one of the eight subdivided suites, as well as a community conference room, thereby leaving nineteen leasable suites." (Disclosure Statement, Dkt. #116, at p. 15).

[5] The Disclosure Statement provides that BofA's claim is secured.  (Disclosure Statement, Dkt. #116, at p. 11).  Debtor disputed the scope of BofA's secured claim, and reserved the right to object to the claim amount.  (Id.).

3

("Original Reorganization Plan").[6]  (Disclosure Statement Order, Dkt. #159).  A confirmation hearing was, eventually, set for September 16, 2013.

On September 13, 2013, one business day before the confirmation hearing, Debtor filed its Second Amended Plan of Reorganization ("Second Amended Plan").  (Dkt.#284)  That is the Plan which is the subject of this opinion.  The Second Amended Plan was not accompanied by a disclosure statement.  When Debtor's Second Amended Plan was filed, discovery had already closed, and the parties had filed trial memoranda concerning confirmation of the Original Reorganization Plan, filed by Debtor in October, 2012.

By the time of the September, 2013, confirmation hearing, the November, 2012 Disclosure Statement was inaccurate in several respects.  Tenant occupancy was overstated.  The Disclosure Statement reported 97% occupancy.  At the time of the confirmation hearing, occupancy was 77%.  Unsecured claims were stated to be approximately $9,000, which fails to take account Lender's unsecured claim in excess of $300,000.  The Disclosure Statement alleges that administrative claims are $29,000.  At the confirmation hearing, Abelson testified that such claims are about $350,000.

The Second Amended Plan differs from the Original Reorganization Plan in two significant respects.  The Second Amended Plan subdivides Lender's Class 1 into two separate classes: Class 1A and Class 1B.  Class 1A includes only BofA's secured claim.  Class 1B includes only BofA's unsecured deficiency claim. (Second Amended Plan, Dkt. #284, at pp. 11-12).  Debtor's Second Amended Plan proposes to pay Lender's Class 1A secured note and Class 1B unsecured note on the same seven year schedule.  That payment schedule call for interest-only

---

[6] Debtor's Amended Plan of Reorganization. (Dkt. #115).

payments for the first two years, with principal and interest payments thereafter on a thirty-year amortization schedule for the next five years, with a final balloon payment at the end of year seven.  Approximately 8% of Lender's claim will be paid down over the seven year plan period, leaving 92%, or approximately $4,000,000 of the claim to be paid at the end of the seven-year note period.

The Second Amended Plan also includes a new, contingent[7] guaranty ("Guaranty") by Patel and Abelson regarding the payment of monthly debt service payments on the Class 1A and Class 1B promissory notes (the "Notes") and the payment of the Reorganized Debtor's Property operating expenses during the seven-year term of the Plan.  (Second Amended Plan, Sections 1.1.40, and 3.2.2, Dkt. #284).  The obligation to make the debt service payments and/or pay the operating expenses payments is triggered by a written payment request from the Reorganized Debtor.  The Guaranty does not guarantee payment of the unpaid principal balance or balloon amount of the Notes on the Maturity Date.

Pursuant to its Second Amended Plan, Debtor intends to retain the Property. Debtor proposes to finance the first seven years of the  reorganization process with monthly income from the rent revenues obtained from the tenants of the Property. (Second Amended Plan, Dkt. #284, Section 7.2 at p. 3).  At the end of the seven year period, when the large balloon payment to Lender comes due, Debtor hopes to refinance that debt or to sell the property in order to repay Lender.

In exchange for the contingent agreement to pay the Reorganized Debtor's operating expenses and monthly debt service obligations under the Plan, Patel and Abelson will retain their equity interest in the Reorganized Debtor.  (Second

---

[7] If the Reorganized Debtor does not make a request for payment, Patel and Abelson have no obligation to contribute any funds to the Reorganized Debtor.

Amended Plan, Dkt. #284, Section 4.6).

The Second Amended Plan gives Patel and Abelson the exclusive right to acquire the equity. The Plan does not establish a market value for the equity being retained by Patel and Abelson, nor does it otherwise propose to test the "market" to see if there is any interest by third parties in acquiring the equity.

The Debtor intends to sell or to refinance the Property prior to the Maturity Date. (Second Amended Plan, Dkt. #284, Sections 4.1.1.(g), and 4.2.1(g), at pp. 13-14).

Mr. Nelson, Debtor's Interest Rate Expert, noted in his Report that:

> Although there is substantial lender activity in connection with multi-family commercial properties, including ones of this nature, those loans usually consist of private party loans and commercial loans limited to qualified borrowers, with good credit, appropriate loan to value ratios (typically around 70-75% or lower), with substantial down payments. (Timothy W. Nelson Report, Ex. 11, at p. 5).

On the Maturity Date Debtor's Property will have a loan-to-value ratio of roughly ninety percent (90%) of the court-established value of the Property. (Post Hearing Brief, Dkt. #308, at p. 6; Response, Dkt. #312, at pp. 3-4).

Abelson's optimistic testimony about future rents and operation expenses was unsupported. No tenant on a month-to-month lease testified or gave a declaration that they would stay in the Property for an extended period of time. No tenant with a lease expiring in the next two years testified or gave a declaration that it intended to renew its lease when it expired.

Debtor's cash flow projections (Ex. 4) for the Property are unreasonable. Debtor projects an increase in rental income by 6.66% in 2014 and by 4.63% in 2015, while operating expenses only increase 1.23% and 1.24% during those same years. (Timothy W. Nelson Report, Ex. 11 at p. 11). The projections also assume

that property taxes would remain the same during the seven-year Plan period.  The projections were not altered after the loss of the Property's largest tenant.

Debtor proposes an interest rate of five percent (5%) for the Plan, comprised of the Prime Rate (3.25%) and a risk premium of 1.75%. (Timothy W. Nelson Report, Ex. 11 at pp. 7-10).

Debtor sought out commercial lenders concerning loans on the Property to pay BofA in full and exit the bankruptcy case.  No lender was willing to lend the Debtor the funds to pay off the BofA Note.  One of those lenders stated that:

> With over 50% of your building's leases expiring in 2014 and over 70% expiring in 2015, there is no way I could even get a short-term loan approved.  Especially given the uncertainty of where market rates may be over the next few years upon lease renewal. (Ex. 17).

Commercial lenders are charging nearly five percent (5%) interest on loans to clients with good credit ratings, sizable down payments and a 70% to 75% loan-to-value ratio.  (Timothy W. Nelson Report, Ex. 11, at p. 7).  The Reorganized Debtor is not a qualified borrower, does not have good credit, nor does it have a sizable down payment.

Distressed property lenders are charging ten percent (10%) to eleven percent (11%) on loans with a 65% loan-to-value ratio.  (Ex. #18)

BofA's projections for the Property are more realistic than Debtor's, and reflect lower rent rate increases as well as higher increases in operating expenses and taxes than are proposed by Debtor.  (Keith Bierman Report, Ex. #12).

BofA proposed an interest rate of 6.75% for the Plan, based upon the Prime Rate (3.25%) plus a risk premium of 3.50% (composed of default risk, interest rate and loan duration risk, and security risk).  (Keith Bierman Report, Ex. #12, p. 10).

Debtor's proposed interest rate of five percent (5%) is not adequate to

7

compensate Lender for all of the risks incumbent in the Debtor's 100+% financed reorganization Plan. BofA's suggested interest rate of six and three quarters percent (6.75%) is unreasonably high. An appropriate interest rate in this case is between six percent (6%) and six and one quarter percent (6.25%)

## DISCUSSION

Confirmation of a plan of reorganization is governed by Section 1129 of the Bankruptcy Code. 11 U.S.C. § 1129. Under section 1129, the court has an affirmative duty to ensure that the plan satisfies all of the requirements for confirmation. Liberty Nat'l Enters. v. Ambanc La Mesa Limited Partnership (In re Ambanc La Mesa), 115 F.3d 650, 653 (9th Cir.1997), cert denied, 522 U.S. 1110 (1998).

In determining whether the standard has been met, the court may take into account all previous proceedings and matters on record in the case. See In re Acequia, Inc., 787 F.2d 1352, 1358 (9th Cir.1986).

Generally, a plan of reorganization can be confirmed in one of two ways. Initially, if all sixteen subsections of Section 1129(a) are satisfied by the plan proponent, a plan can be confirmed consensually under Section 1129(a). RadLAX Gateway Hotel, LLC v. Amalgamated Bank ("RadLAX"), 132 S.Ct. 2065, 2069, 182 L.Ed.2d 967 (2012). See also United States ex rel. Farmers Home Admin. v. Arnold & Baker Farms (In re Arnold & Baker Farms), 177 B.R. 648, 654 (B.A.P. 9th Cir.1994).

In the instant case, BofA voted against confirmation in Class 1A.[8] (Ballot

---

[8] Class 1B, BofA's unsecured deficiency claim, appears for the first time in Debtor's Second Amended Plan. As such, Class 1B did not exist at the time Debtor's ballots were distributed to creditors. BofA voted against confirmation for Class 1A, and its reasonable to presume that BofA would have voted similarly if had been able to separately vote Class 1B.

8

Summary, Dkt. #192).  Accordingly, Debtor's Second Amended Plan cannot be confirmed consensually under Section 1129(a).

If a plan proponent satisfies all paragraphs of Section 1129(a) except the unanimous voting requirement of Section 1129(a)(8), then the court may still confirm the plan as long as the plan "does not discriminate unfairly" against and "is fair and equitable" towards each impaired class that has not accepted the plan.  11 U.S.C. § 1129(b)(1).  RadLAX, supra, 132 S.Ct. at 2069; Bank of America Nat'l Trust Ass'n v. 203 North LaSalle St. P'ship ("203 North LaSalle"), 526 U.S. 434, 441 (1999); In re Ambanc La Mesa, supra, 115 F.3d at 653.  This second, nonconsensual, method of confirmation is commonly referred to as "cramdown."[9] RadLAX, supra, 132 S.Ct. at 2069; 203 North LaSalle, 526 U.S. at 441.

Given that Lender's Class 1A[10] rejected the Debtor's Second Amended Plan, the only method of confirmation available to the Debtor is nonconsensual cramdown under 11 U.S.C. § 1129(b).

Although BofA does not attack the Debtor's Second Amended Plan regarding each element of Section 1129(a), the court has a duty to consider each element of Section 1129 when considering a plan for confirmation.  In re Ambanc La Mesa,

---

[9] "Courts use "cramdown" and "cram down" and "cram-down" interchangeably to refer to nonconsensual confirmation.  Indeed, Justice Douglas once combined different forms in the same paragraph.  Blanchette v. Connecticut Gen. Ins. Corps., 419 U.S. 102, 167, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974) (Douglas, J., dissenting).  The hyphenated version appears to have been the first locution used by a court. New England Coal & Coke Co. v. Rutland R.R. Co., 143 F.2d 179, 189 n. 36 (2d Cir.1944).  The earliest print references to the term use either the two-word or the hyphenated form. Compare Robert T. Swaine, Present Status of Railroad Reorganizations And Legislation Affecting Them, AM. BAR ASS'N, PROCEEDINGS OF THE SECTION ON COMM. LAW 15, 15 (1940) (two-word form) and Warner Fuller, The Background and Techniques of Equity and Bankruptcy Railroad Reorganizations-A Survey, 7 Law & Contemp. Probs. 377, 389, 390 (1940) (hyphenated form)." In re Shat, 424 B.R. 854, 585 fn. 7 (Bankr. D. Nev.2012).

[10] As noted earlier in fn. 8, BofA never had a chance to vote its Class1B claim.

supra, 115 F.3d at 653.

Under Section 1129(a), the court shall confirm a plan only if each of the sixteen subsections are met. 11 U.S.C. § 1129(a). Sections 1129(a)(1) and (a)(2) require the court to consider whether the Debtor's Second Amended Plan and the Debtor have complied with the Code. 11 U.S.C. §§ 1129(a)(1) & (2).

**Section 1129(a)(1) - Plan compliance with applicable provisions of the Bankruptcy Code.**

Pursuant to Section 1129(a)(1) the court may not confirm a plan unless "[t]he plan complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1). Stated differently, if the court finds any of BofA's Plan objections meritorious, the Plan would also have violated Section 1129(a)(1) and cannot be confirmed.

**Section 1129(a)(2) - Plan proponent's (Debtor's) compliance with applicable provisions of the Bankruptcy Code.**

Pursuant to Section 1129(a)(2) the court may not confirm a plan unless "[t]he proponent of the plan complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(2). "The legislative history of the Section indicates that Congress was concerned "that the proponent of the plan must comply with the applicable provisions of title 11, such as ... disclosure and solicitation requirements of sections 1125 and 1126." 7 Collier on Bankruptcy ¶ 1129.02[2], at p. 1129-19 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.2009); see also, In re Idearc, Inc., 423 B.R. 138, 163 (Bankr. N.D. Tex. 2009).

Section 1125 requires the disclosure statement to provide "adequate information" to the creditors in order for them to make an "informed judgement about the plan." 11 U.S.C. § 1125(a)(1).

"While including false information is a more serious matter than a mere lack of information, 'the determination of what is adequate information is subjective and

10

made on a case by case basis.  This determination is largely within the discretion of the bankruptcy court.' "  Computer Task Group, Inc v. Brotby (In re Brotby), 303 B.R. 177, 193 (B.A.P. 9th Cir.2003) (quoting, In re Texas Extrusion Corp., 844 F.2d 1142, 1157 (5th Cir.1988)).

The adequacy of the disclosure statement information has been evaluated using numerous factors, including the present condition of the debtor while in Chapter 11, the classes and claims within the reorganization plan, the estimated administrative expenses (including attorneys' fees), financial information and projections relevant to the decision to accept or reject the debtor's plan, information relevant to the risks posed to creditors under the debtor's plan.  In re Reilly, 71 B.R. 132, 1334-35 (Bankr. D. Mont.1987).  7 Collier on Bankruptcy ¶ 1125.2[2], at p. 1125-10 to 1125-11 (Resnick & Henry J. Sommer eds., 16th ed. rev.2010).

Class 2, Other Secured Claims, and Class 5, Membership Interests in the Debtor,[11] are unimpaired.  (Second Amended Plan, Section 3.1, at p. 11, Dkt. #284). Pursuant to Section 1126(f), the members of Classes 2 and 5 are conclusively presumed to have accepted the Plan.  11 U.S.C. § 1126(f).

Members of Class 1, BofA's Claim, and Class 4, General Unsecured Claims, are impaired, receive distributions under the plan, and were solicited to vote on Debtor's then-existing plan of reorganization.

Classification of claims is governed by Section 1122(a).[12]  11 U.S.C. § 1122(a).  The Code does not mandate that all similar claims be classified together,

---

[11] Abelson controls the Debtor.  As such, Abelson is an "insider" pursuant to Section 101(31)(B)(iii), and is not permitted to vote on Debtor's plan.  11 U.S.C. § 1129(a)(10).

[12] Section 1122(a) provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a).

11

provided that there is a reasonable basis for not doing so.[13]  However, Section 1122(a) requires that dissimilar claims cannot be placed into the same class.  The bankruptcy court has broad discretion in classifying claims under Section 1122(a). Wells Fargo Bank v. Loop 76, LLC (In re Loop 76), 465 B.R. 525, 536 (B.A.P. 9th Cir.2012).  A bankruptcy court's finding that a claim is or is not substantially similar to other claims constitutes a question of fact reviewable under the clearly erroneous standard.  Id.

Debtor failed to properly divide BofA's claim into its secured and unsecured components, lumping them together under the Original Reorganization Plan and for voting purposes.  11 U.S.C. § 506(a)(1).

A third-party source of funding will render a lender's deficiency claim dissimilar to the unsecured trade creditor claims.  In re Loop 76, supra, 465 B.R. at 536; Barakat v. Life Ins. Co. of Va. (In re Barakat), 99 F.3d 1520, 1526 (9th Cir.1996).  Given the Guaranty, BofA's unsecured deficiency claim is not substantially similar to the unsecured claims comprising Class 4, General Unsecured Claims, so separately classifying the claims was not improper.

Notwithstanding the Guaranty, BofA's unsecured deficiency claim should have been separately classified from BofA's secured claim under Debtor's Original Reorganization Plan.[14]  Debtor did not send BofA a ballot to vote its unsecured deficiency claim.  At the time of balloting, BofA's deficiency claim would have

---

[13] "The separate classification of otherwise substantially similar claims and interests is acceptable as long as the plan proponent can articulate a 'reasonable' justification for separate classification."  7 Collier on Bankruptcy ¶ 1122.03[1][a], at p. 1122-7 (Resnick & Henry J. Sommer eds., 16th ed. rev.2010).  In re Adelphia Comm. Corp., 368 B.R. 140, 246-247 (Bankr. S.D.N.Y. 2007) (separate classification of substantially similar claims is permissible if there is a reasonable basis for doing so).

[14] Debtor's Amended Plan of Reorganization. (Dkt. #115).

been at least $200,000.00 dollars.[15]  Thus, Debtor's Disclosure Statement fails to provide accurate information regarding the number, scope, and type of claims and classes of claims under the Debtor's Second Amended Plan.

Debtor's Disclosure Statement stated that the Administrative Claims were approximately $29,000.  At the Confirmation Hearing the Administrative Claims were disclosed to be approximately $350,000.00.  Thus, Debtor's Disclosure Statement failed to provide accurate information regarding the scope of Debtor's Administrative Claims.

The Disclosure Statement stated that the Property had an occupancy rate of ninety-seven percent.  (Disclosure Statement, Dkt. #116, at p. 15) At the Confirmation Hearing the Property had an occupancy rate of Seventy-Seven percent.  (Ex. 57, June 2013, Monthly Operating Report).  Thus, Debtor's Disclosure Statement failed to provide accurate information regarding the Property's tenant occupancy rate.

Debtor's Disclosure Statement provides no information regarding the Property's long-term tenant occupancy rate or the risk to creditors that is posed by the seven percent guaranteed occupancy beyond 2015.  (Ex. 57, June 2013, Monthly Operating Report).  Thus, Debtor's Disclosure Statement fails to provide accurate information regarding the Property's long-term occupancy rate and the risk that such a low occupancy rate poses to creditor under the Debtor's Second Amended Plan.

Because BofA never received a ballot to vote its unsecured deficiency claim, and because the Disclosure Statement did not accurately reflect the number, type

---

[15] Debtor's Amended Schedule D reflects that the unsecured portion of BofA's claim was $200,000.00 on the petition date.  (Dkt. #13)

and size of the various claims against Debtor's estate, the Property's occupancy rates, the amount of Debtor's administrative claims at the time of the Confirmation Hearing, or the relevant risk incumbent with the lack of long-term tenants in the Property, the court concludes that Debtor's Disclosure Statement does not contain "adequate information" that would enable a hypothetical investor to make an informed judgment about the Debtor's Second Amended Plan and that Debtor has not complied with the applicable provisions of section 1125 of the Bankruptcy Code.

Because Debtor has not complied with Section 1125 of the Code, and the requirements for adequate disclosure, the Debtor's Second Amended Plan is not confirmable under section 1129(a)(2).  Regardless, the court will review the remaining aspects of Plan under Section 1129.

### Section 1129(a)(3) - Plan proposed in good faith and not by any means forbidden by law.

Section 1129(a)(3) requires that "[t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).  Section 1129(a)(3) does not define good faith.[16]  Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.), 314 F.3d 1070, 1074 (9th Cir.2002), cert. denied, 538 U.S. 1035 (2003). Beal Bank USA v. Windmill Durango Office, LLC (In re

---

[16]A legal distinction exists "between the good faith that is a prerequisite to filing a Chapter 11 petition and the good faith that is required to confirm a plan of reorganization." Pacific First Bank v. Boulders on the River, Inc.(In re Boulders on the River, Inc.), 164 B.R. 99, 103 (B.A.P. 9th Cir.1994); In re Stolrow's Inc., 84 B.R. 167, 171 (B.A.P. 9th Cir.1988).  Under § 1112(b), a Chapter 11 petition may be dismissed for cause "if it appears that the petition was filed in bad faith." In re Stolrow's Inc., supra, 84 B.R. at 170. "Bad faith [in filing a Chapter 11 petition] exists if there is no realistic possibility of reorganization and the debtor seeks merely to delay or frustrate efforts of secured creditors." In re Boulders on the River, supra, 164 B.R. at 103.

Windmill Durango Office, LLC), 481 B.R. 51, 68 (B.A.P. 9th Cir.2012).

A plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the Code.  In re Sylmar Plaza, L.P., supra, 314 F.3d at 1074; In re Windmill Durango Office, LLC, supra, 481 B.R. at 68.  "Good faith" under Section 1129(a)(3) is determined on a case-by-case basis, taking into account the totality of the circumstances of the case.  In re Sylmar Plaza, L.P., supra, 314 F.3d at 1074-75;[17] In re Windmill Durango Office, LLC, supra, 481 B.R. at 68; Stolrow v. Stolrow's, Inc. (In re Stolrow's, Inc.), 84 B.R. 167, 172 (B.A.P. 9th Cir.1988).

The creation of an impaired class in "an attempt to gerrymander a voting class of creditors is indicative of bad faith" for purposes of § 1129(a)(3).  In re Windmill Durango Office, LLC, 481 B.R. at 68 (citing Conn. Gen. Life Ins. Co. v. Hotel Assocs. of Tucson (In re Hotel Assocs. of Tucson), 165 B.R. 470, 475 (B.A.P. 9th Cir.1994)).

Prior to the creation of Class 1B in the Second Amended Plan, Debtor had no impaired accepting class.  BofA's unsecured deficiency claim would have controlled the vote of the General Unsecured Creditor Class, Class 4.  The sequence of events related to the last minute timing of the creation of BofA's Class 1B unsecured deficiency claim constitutes indicia of bad faith.

Debtor has shifted virtually all of the risk of failure of the Property's reorganization to BofA.  BofA's combined claims exceed the value of the Property.

---

[17] In Sylmar Plaza, the Ninth Circuit rejected the use of per se rules in determining whether good faith exists, and upheld a finding of good faith where the debtor invoked a provision of the Code preventing a creditor from receiving a higher default interest rate under a loan agreement.  In re Sylmar Plaza, L.P., supra, 314 F.3d at 1074–76.  The court in Sylmar concluded that the debtor's filing for bankruptcy relief was consistent with the objectives and purposes of the Code, even though the case dealt primarily with a single creditor.  Id.

If the Debtor's reorganization efforts fail, BofA will shoulder all of the loss. If the reorganization succeeds, the Reorganized Debtor and its insiders will benefit. Shifting the risk of loss in such a manner is evidence of bad faith.

The combination of the timing of Debtor's docketing of its Second Amended Plan and the allocation of substantially all of the risk of failure of that Plan to BofA results in the conclusion that the Debtor did not file its Second Amended Plan in good faith.

### Section 1129(a)(4) - Payments to professionals and others.

Section 1129(a)(4) requires that fees for those working on a debtor's case be submitted to the court and be approved as reasonable. 11 U.S.C. § 1129(a)(4). Debtor's Plan includes these provisions, and all fees approved to date have been allowed as interim, not final. Future requests will likewise be submitted to the court for approval. This section of the Code was satisfied.

### Section 1129(a)(5) - Debtor's future officers and directors.

A Chapter 11 plan may not be confirmed if the continuation in management of the persons proposed to serve as officers or managers of debtor is not in the interests of creditors and public policy. 11 U.S.C. § 1129(a)(5)(A)(ii). See e.g., In re Beyond.com Corp., 289 B.R. 138, 145 (Bankr. N.D. Cal.2003). Continued service by prior management may be inconsistent with the interests of creditors and public policy if it "directly or indirectly perpetuates incompetence, lack of discretion, inexperience or affiliations with groups inimical to the best interests of the debtor." In re Linda Vista Cinemas, L.L.C., 442 B.R. 724, 735-36 (Bankr. D. Ariz.2010) (citing In re Beyond.com Corp., 289 B.R. 138, 145 (Bankr. N.D. Cal.2003)).

16

Section 1129(a)(5)[18] compels a number of disclosures relating to post confirmation management of the reorganized debtor. "Section 1129(a)(5)(A)(i) requires the plan proponent to disclose two attributes of post confirmation management: their identity; and their "affiliations." ... The required disclosure must be of the 'director[s], officer[s], or voting trustee[s].' This leaves out analogous management for partnerships or limited liability companies." 7 Collier on Bankruptcy ¶ 1129.02[5][b], p. 1129-31 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.2009).

According to Debtor's Second Amended Plan, "Reorganized Debtor will continue to be managed by Debtor's pre-petition manager, Dr. Rick Abelson, which management may subsequently be modified to the extent provided by Reorganized Debtor's articles of organization, by-laws, and operating agreement (as amended, supplemented, or modified). Dr. Rick Abelson may also retain a property management company to assist in Reorganized Debtor's day-to-day operations." (Second Amended Plan, Dkt. #284, at p. 17).

There has been no proof of mismanagement by Abelson. The disclosure is adequate.

### Section 1129(a)(6) - Regulatory bodies.

Section 1129(a)(6) does not apply to Debtor's Plan.

---

[18] 11 U.S.C.§ 1129(a)(5) provides that:

"(A)(i) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

(ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

(B) the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider."

17

**Section 1129(a)(7) - Best interests of creditors**.

Under Section 1129(a)(7), creditors with impaired claims must either accept the proposed Plan or receive as much from the Plan as they would under liquidation.  11 U.S.C. § 1129(a)(7)(A).  The Debtor's Plan includes four impaired classes, classes 1A, 1B, 3, and 4. (Second Amended Plan, Dkt. #284, at p. 11). Only Class 4 accepted the proposed Plan.  Classes 1B, 3, and 4 receive at least as much through the Plan as they would from liquidation.  As more fully explained below, Class 1A does not retain under Debtor's Second Amended Plan on account of its claim property of a value as of the effective date of the Debtor's Revised Plan that is not less than the amount that the Lender would receive if the Debtor were liquidated under Chapter 7.

Class 4, General Unsecured Creditors, will be paid 100% of its allowed claims within six months the effective date of the Plan.  Class 4 voted 100% to accept the Plan.  In a liquidation, Class 4 would likely receive nothing.  Members of Class 4 will receive more under the Plan than they would under liquidation.

Class 3, Priority Unsecured Creditors, will be paid in full within roughly ninety days (90) from the effective date of the Plan.  (Second Amended Plan, Section 4.4 at p. 15).  In a liquidation, Class 3 would likely receive nothing. Members of Class 3 will receive more under the Plan than they would under liquidation.

Class 1A, BofA's secured claim, will not be paid in full under the Plan, as the Debtor's proposed 5% interest rate does not provide BofA with the present value of the amount of its claim.  Class 1A, BofA's secured claim, will not receive as much under the Plan as it would on liquidation.

Class 1B, BofA's unsecured claim, will not be paid in full under the Plan, as

the Debtor's proposed 5% interest rate does not provide BofA with the present value of the amount of its claim.  In a liquidation, BofA's unsecured claim would receive nothing.  Class 1B will realize more under the Plan than it would on liquidation.

Since the Second Amended Plan does not provide BofA with the present value of its Class 1A claim, the Plan fails to comply with Section 1129(a)(7).

## Section 1129(a)(8) - Impairment and Acceptance

Under Section 1129(a)(8), for a plan to be confirmed, each class of claims or interests must either be unimpaired by the proposed plan, or it must accept the treatment proposed by the plan.  BofA has voted its Class 1A claim against confirmation of Debtor's Plan.  (Ballot Summary).  Accordingly, Section 1129(a)(8) has not been met in this case.

A plan may be confirmed even where Section 1129(a)(8) is not met, if "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1).  Whether the Debtor's Plan is "fair and equitable" under Section 1129(b)(1) is discussed below.

## Section 1129(a)(9) - Administrative Claims

"Section 1129(a)(9)(A) requires that holders of administrative claims and gap claims be paid 'cash equal to the allowed amount of such claim' on the 'effective date of the plan[.]' "  7 Collier on Bankruptcy ¶ 1129.02[9][a], p. 1129-43 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.2010) (footnotes omitted).  The Plan pays all administrative claim arising under Section 507(a)(1) in full on the effective date of the Plan or as soon as practicable thereafter, unless the claimant elected some alternative treatment.  (Second Amended Plan, Section 2.2, at p. 10).  Accordingly, Section 1129(a)(9) has been satisfied.

## Section 1129(a)(10) - Acceptance by at Least One Impaired Class

The General Unsecured Creditor class, Class 4, unanimously accepted the Debtor's Plan.  Accordingly, Section 1129(a)(10) has been satisfied.

## Section 1129(a)(11) - Feasibility/Future Liquidation

Section 1129(a)(11) requires that confirmation of the plan is not likely to be followed by liquidation, or the need for further financial reorganization of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.  11 U.S.C. § 1129(a)(11).  Sherman v. Harbin (In re Harbin), 486 F.3d 510, 517 (9th Cir.2007).  Section 1129(a)(11) essentially looks at the feasibility of the Debtor's Plan.

The feasibility requirement set forth in Section 1129(a)(11) requires that:

> "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor ... unless such liquidation or reorganization is proposed in the plan." In re Harbin, 486 F.3d 510, 517 (9th Cir.2007); In re Roberts Rocky Mountain Equip. Co., Inc., 76 B.R. 784, 790 (Bankr.D.Mont.1987). The Ninth Circuit BAP has defined feasibility as a factual determination, and "as whether the things which are to be done after confirmation can be done as a practical matter under the facts."

In re Jorgensen, 66 B.R. 104, 108 (B.A.P. 9th Cir.1986) (citing In re Clarkson, 767 F.2d 417 (8th Cir.1985)); see also In re Ambanc La Mesa Ltd. P'ship, 115 F.3d at 657.

Debtor bears the burden of establishing the feasibility of its Plan by a preponderance of the evidence.  In re Indian Nat'l Finals Rodeo, 453 B.R. 387, 402 (Bankr. D. Mont.2011); Danny Thomas Prop. II Ltd. P'ship v. Bank (In re Danny Thomas Prop. II Ltd. P'ship), 241 F.3d 959, 963 (8th Cir.2001); see also In re Young Broadcasting Inc..,430 B.R. 99, 128 (Bankr. S.D.N.Y.2010).

The Court has a duty under Section 1129(a)(11) to protect creditors against "visionary schemes." Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.), 761 F.2d 1374, 1382 (9th Cir.1985); In re Linda Vista Cinemas, L.L.C., supra, 442 B.R. at 737; In re Las Vegas Monorail, 462 B.R. 795, 801 (Bankr. D. Nev.2011); In re Windmill Durango Office, LLC, supra, 481 B.R. at 67; In re Loop 76, LLC, supra, 465 B.R. at 544.

While a reorganization plan's success need not be guaranteed, the court cannot confirm a plan unless it has at least a reasonable chance of success. In re Danny Thomas Prop. II Ltd. P'ship, 241 F.3d at 963; In re Acequia, Inc., supra, 787 F.2d at 1364; In re Brotby, supra, 303 B.R. at 191-92.[19] "Some possibility of liquidation or further reorganization is acceptable and often unavoidable." In re DBSD North America, Inc., supra, 634 F.3d at 106-7.

To establish the feasibility of a plan, the debtor must present proof through reasonable projections that there will be sufficient cash flow to fund the plan. However, such projections cannot be speculative, conjectural, or unrealistic. M & S Assocs., supra, 138 B.R. at 849. A plan proponent, however, need only demonstrate that there exists a reasonable probability that the plan provisions can be performed. T-H New Orleans, supra, 116 F.3d at 801 (quoting Landing Assocs., supra, 157 B.R. at 820).

Just as speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility. Cajun Elec., supra, 230 B.R. at 745. The mere prospect of financial uncertainty cannot defeat confirmation on feasibility

---

[19] See also In re DBSD North America, Inc., supra, 634 F.3d at 106-7, Fin. Security Assurance, Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship), 116 F.3d 790, 801 (5th Cir.1997), United States v. Haas (In re Haas), 162 F.3d 1087, 1090 (11th Cir.1998).

21

grounds since a guarantee of the future is not required. Cajun Elec., supra, 230 B.R. at 745; In re U.S. Truck Co., Inc., 47 B.R. 932, 944 (E.D. Mich.1985), affd, 800 F.2d 581 (6th Cir.1986).

Reorganization plans:

> need not completely amortize reorganization debt to be confirmed. But if refinancing is anticipated, the plan proponent has to produce some credible evidence about the likelihood of that refinancing. "[S]ection 1129(a)(11) requires the plan proponent to show concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan." S & P, Inc. v. Pfeifer, 189 B.R. 173, 183 (N.D. Ind. 1995) (quoting In re SM 104 Ltd., 160 B.R. 202, 234 (Bankr. S.D. Fla.1993)). Against this background, courts have refused to confirm plans whose feasibility turned on future sales of property, or future refinancings, absent an adequate showing that such sales or refinancings would be likely to occur."

In re Las Vegas Monorail, supra, 462 B.R. at 800; In re Vanderveer Estates Holding, LLC, 293 B.R. 560 (Bankr. E.D.N.Y.2003).[20]

The likelihood of a future sale can be demonstrated by other evidence in certain circumstances. See In re Made in Detroit, Inc., 299 B.R. 170, 179–80 (Bankr. E.D. Mich.2003) (plan not confirmed when proponent made inadequate showing of ability to obtain financing); In re Walker, 165 B.R. 994 (E.D.Va.1994) (similar regarding future sale of property).

Bankruptcy courts consider several factors when evaluating whether a particular plan is feasible, including: (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of

---

[20] Even so, there are decisions finding proposed plans feasible without evidence of marketing efforts or a firm offer to purchase. See, e.g., In re T–H New Orleans Ltd. P'ship, supra, 116 F.3d at 801–02 (plan proposing to repay secured creditor out of revenues, with a sale of collateral if in default, was feasible without evidence of a sale offer or marketing efforts); In re Barnes, 309 B.R. 888, 895 (Bankr. N.D. Tex.2004) (plan calling for future sale of assets was feasible when those assets had been increasing in value).

1  management; (5) the probability of the continuation of the same management; and
2  (6) any other related matters which determine the prospects of a sufficiently
3  successful operation to enable performance of the provisions of the plan.  In re
4  Linda Vista Cinemas, L.L.C., supra, 442 B.R. at 738; In re Las Vegas Monorail,
5  supra, 462 B.R. at 802; 7 Collier on Bankruptcy ¶ 1129.02[11], p. 1129-52 (Alan N.
6  Resnick & Henry J. Sommer eds., 16th ed. rev.2009).

7       It is likely that the Reorganized Debtor would be able to obtain the capital it
8  needs to operate the Property during the seven-year Plan period.  Although the
9  Reorganized Debtor does not have earnings power beyond its tenant rent revenues,
10 the Guaranty provides some level of assurance that the Reorganized Debtor can
11 obtain operating capital if it needs to do so during the seven-year Plan.

12      Although it is likely that the Reorganized Debtor will be able to obtain the
13 operating capital it needs during the course of the 7-year Plan, it is very unlikely
14 that the Debtor will be able to find a lender to refinance BofA's loan at the end of
15 the 7-year Plan period.  Absent an unforeseen significant real estate property value
16 recovery in the region, the Property will have a loan-to-value ratio of roughly 90%
17 when the balloon payment on the Notes come due in seven years.  Commercial
18 lenders are unwilling to refinance properties with such heavy debt burdens.  The
19 Debtor's capital structure is inadequate to successfully negotiate reorganization.

20      Debtor attributes the inability of the Property to generate a profit to the
21 economic downturn that overwhelmed the Las Vegas area.  The Debtor is confident
22 that existing management can manage the Property in such a manner that it will be
23 profitable going forward during the course of the 7-year Plan.  Although the court is
24 not as confident as the Debtor about the economic recovery, the court finds that the
25 problems leading up to Debtor's bankruptcy filing were not directly attributable to
26 poor management.

Debtor leaves open the possibility of bringing in an outside manager to manage the Property. While this may be a good idea, especially when compared with Abelson engaging in long-distance property management from California, the cost of such a manager is not otherwise accounted for in Debtor's Plan. Thus, hiring outside management would likely make the Debtor's Plan even more financially untenable. Although the problems leading up to Debtor's bankruptcy filing were not directly attributable to poor management, the court is not as confident as the Debtor that Abelson can manage the Property remotely from California.

The court finds the Reorganized Debtor's prospects of successful operations unlikely. The Debtor has underestimated both the likely operating cost increases that it faces and the interest expense reasonably necessary to compensate BofA for the risk of financing the Property for another seven years. More importantly, Debtor's current tenant occupancy situation is perilous. Debtor's largest tenant recently moved out. Several other tenants are on month-to-month leases, and can leave on short notice. When the leases that expire in 2014 and 2015 are included in the analysis, the Property will have only seven percent guaranteed tenancy at the end of 2015. Even if the existing tenants all decide to stay, Debtor has provided no information regarding the likely rent revenues that the Property can be expected to generate after 2015.[21] Thus, the court concludes that Debtor has not demonstrated its ability to generate sufficient cash flow to meet the payments required during the Plan period.

Even assuming Debtor's proposed cost structure and interest rate were

---

[21] The Guaranty's monthly payment backstop, alone, does not satisfy the court that the Reorganized Debtor will generate sufficient rent revenues to stay in business during the 7-year Plan period.

24

adopted as reasonable, which they were not, Debtor has no more than a slim chance of finding a lender willing to refinance the BofA Notes that will come due at the end of the seven-year Plan. The court concludes that the Debtor has not demonstrated its ability to make these two balloon payments.

The Guaranty provides some level of assurance that the Reorganized Debtor can obtain operating capital if it needs to do so during the Plan period. However, at the end of that time frame, there will remain a loan-to-value ratio of roughly 90%.[22] Given the testimony that commercial lenders are generally not willing to make such loans, allowing the Debtor's Plan to go forward merely acts to delay the inevitable sale of the Property in order to pay off the two BofA's Notes.

When the court is dealing with an intermediate time frame like the seven years after which the balloon payment comes due in this case, the level of proof required from the Debtor will be somewhat less than that necessary to show it can operate the property during the next two years, but more than that when trying to extrapolate to financing twenty-years into the future. Here the court has evidence concerning the value of the property, the loan-to-value ratio of the Property during the Plan period, and the views of commercial lenders when considering the refinancing of Property in seven years. In this context, the court bases its feasibility finding on sufficiently specific proof to conclude that Debtor would be unlikely to avoid reorganization or liquidation after seven years. see, e.g., In re DBSD North America, Inc., supra, 634 F.3d at 106-108.

The Second Amended Plan shows that Debtor also recognizes that it may

---

[22] The Plan proposes to make interest only payments for the first two years of the Plan period, which buys Debtor breathing room to shore up its position before it becomes necessary to commence paying the principal and interest on the BofA Notes. The delayed principal payments simultaneously contributes to the situation where the Reorganized Debtor is left with significant debt and very little equity in the Property.

need a future bankruptcy case.  Paragraphs 4.1.1(h) and 4.2.1(h) of the Plan both provide that the filing of voluntary or involuntary petitions in bankruptcy by or against Debtor are not events of default under the notes given to Lender on account of its Class1A and 1B claims.

Debtor's Second Amended Plan is not feasible.  There is a probability of default on Debtor's secured and unsecured obligations to BofA, and any such default would lead to the type of liquidation or financial reorganization that Section 1129(a)(11) seeks to avoid.

### Section 1129(a)(12) - Fees

All required court and U.S. Trustee's fees have been paid and are current. Thus, Section 1129(a)(12) has been satisfied.

### Sections 1129(a)(13), (14), (15), and (16) - Retirement Benefits, Domestic Support Obligations, Individual Debtors, Transfers of Property.

These provisions do not apply in this case.

### Section 1129(b)(1) - 'Unfair Discrimination' and 'Fair and Equitable'

A plan is "fair and equitable" under Section 1129(b)(1) if:

(A) With respect to a class of secured claims, the plan provides--

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the

26

> effective date of the plan, of at least the value of such
> holder's interest in the estate's interest in such property;
>
> (ii) for the sale, subject to section 363(k) of this title, of any
> property that is subject to the liens securing such claims, free
> and clear of such liens, with such liens to attach to the proceeds
> of such sale, and the treatment of such liens on proceeds under
> clause (i) or (iii) of this subparagraph; or
>
> (iii) for the realization by such holders of the indubitable
> equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A)(i) - (iii) (West 2010). The Debtor did not attempt to confirm the Second Amended Plan under Section 1129(b)(2)(A)(ii) or (iii).

Debtor's Plan purports to employ the first alternative means of fair and equitable treatment, making deferred cash payments equal to the present value at the effective date.[23] 11 U.S.C. § 1129(b)(2)(A)(i)(II).

BofA argues, and the court agrees, that Debtor's Plan is not fair and equitable to BofA's secured claim because it does not provide BofA with the present value of the amount of its secured claim and because it unfairly shifts the risk of failure of the Plan to BofA while simultaneously preserving the benefits for success for the Debtor's insiders. Thus, Debtor's Plan does not meet the requirements of Section 1129(b)(2)(A)(i)(II). 11 U.S.C. § 1129(b)(2)(A)(i)(II).

Debtor's proposed five percent (5%) interest rate does not provide BofA with deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's

---

[23] The proper date to value collateral for purposes of plan confirmation is the date of confirmation. See 11 U.S.C. § 506(a); Yaissle and Cornerstone Invest. v. Unsecured Creditors Comm. (In re Heritage Highgate, Inc.), 449 B.R. 451, 457-58 (D. N.J.2011), aff'd, 679 F.3d 132, 143 n. 9 (3d Cir.2012). See also 4 Collier on Bankruptcy 506.03[10], p. 506-92 to 506-94 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.2013).

interest in the estate's interest in such property.  11 U.S.C. § 1129(b)(2)(A)(i)(II).

Two experts testified regarding the appropriate interest rate.  The court finds that BofA's expert, Mr. Bierman,[24] has considerably more experience and was more persuasive than the Debtor's expert, Mr. Nelson.[25]  Mr. Nelson proposed an interest rate of 5%, while Mr. Bierman proposed an interest rate of 6.75%.  The court concludes that an appropriate interest rate would be six to six and one quarter percent (6.0% - 6.25%).

The Plan's insider Guaranty provides some level of assurance that the Reorganized Debtor can make the required debt service and operating expense payments during the seven-year Plan period.  However, the debt load is significant at the Maturity Date.  On the Maturity Date, the Property will have a loan-to-value ratio no lower than roughly 90%.[26]  Given the testimony that commercial lenders are generally not willing to make loans with such heavy loan-to-value ratios, the risk of nonpayment on the Notes when they come due on the Maturity Date is shifted to BofA.    No new lender can reasonably be expected to loan the Debtor enough to refinance BofA's Notes on the Maturity Date.

Debtor's Plan is not fair and equitable to BofA's unsecured claim because it fails to meet the requirements of Section 1129(b)(2)(B) and provide BofA with the present value of the amount of its unsecured claim.  11 U.S.C. § 1129(b)(2)(B).

A plan is "fair and equitable" under Section 1129(b)(2)(B) if:

> (i)    the plan provides that each holder of a claim of such class
> receive or retain on account of such claim property of a

---

[24] Keith Bierman Report, Ex. 12.

[25]Timothy W. Nelson Report, Ex. 11.

[26] The loan-to-value ratio becomes even heavier when the Debtor's projected cash flow is analyzed in the context of 6% interest on both BofA's secured and unsecured Notes.

value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii)  the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.

11 U.S.C. § 1129(b)(2)(B).

The Debtor's Second Amended Plan does not provide that BofA will receive or retain on account of its unsecured claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim.  The 5% interest rate proposed for the Class 1B Note is too low to make the present value of the proposed payments under the Class 1B Note equal to the allowed amount of the Lender's Unsecured Claim.  As noted above, the court concludes that 6%-6.25% is a fair and reasonable interest rate.  Accordingly, the Plan fails to meet the requirements of Section 1129(b)(2)(B)(i).  11 U.S.C. § 1129(b)(2)(B)(i).

The Second Amended Plan does not meet the requirements of Section 1129(b)(2)(B)(ii).  11 U.S.C. § 1129(b)(2)(B).

Section 1129(b)(2)(B)(ii) requires that "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section." 11 U.S.C. § 1129(b)(2)(B)(ii)

"In plainer English the provision bars old equity from receiving any property via a reorganization plan 'on account of' its prior equitable ownership when all

29

senior claim classes are not paid in full."  Bonner Mall P'ship v. U.S. Bancorp
Mortg. Co. (In re Bonner Mall P'ship), 2 F.3d 899, 908 (9th Cir.1993), mot. to
vacate denied and cert. dismissed, 513 U.S. 18 (1994) (citing, Snyder v. Farm Credit
Bank of St. Louis (In re Snyder), 967 F.2d 1126, 1130 (7th Cir.1992)).[27]

This provision is known as the "absolute priority rule," and it generally
requires that all unsecured creditors be paid in full before equity security holders are
allowed to retain any ownership interest in the debtor.  See In re Ambanc La Mesa
Ltd. P'ship, supra, 115 F.3d at 654; In re Bonner Mall P'ship, supra, 2 F.3d at
906-07.

There is a corollary to the absolute priority rule known as the "new value
exception."  The new value exception to the absolute priority rule allows junior
interest holders (e.g. shareholders of a corporate debtor) to receive a distribution of
property under a plan if they offer "value" to the reorganized debtor that is: (1) new;
(2) substantial; (3) money or money's worth; (4) necessary for a successful
reorganization; and (5) reasonably equivalent to the value or interest received.  In re
Ambanc La Mesa Ltd. P'ship, supra, 115 F.3d at 654 (citing In re Bonner Mall
P'ship, supra, 2 F.3d at 908).

In 1999 the United States Supreme Court had an opportunity to discuss both
the absolute priority rule and the new value corollary to that rule in Bank of America
Nat'l Trust and Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434 (1999) ("203
N. LeSalle").  The Court determined that old equity could acquire or retain its equity
interest only if it paid full value, meaning "top dollar" for that property interest.  But,

_____

[27] Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck
Co.), 800 F.2d 581, 588 (6th Cir.1986); Prudential Ins. Co. v. F.A.B. Indus. (In re F.A.B. Indus.),
147 B.R. 763, 768–69 (C.D.Cal.1992), appeal docketed, No. 93–55055 (9th Cir. Jan. 13, 1993);
In re Pullman Construction Indus, 107 B.R. 909, 944 (N.D. Ill.1989).

1  old equity could not satisfactorily demonstrate that it had paid top dollar for the
2  property under a plan giving it exclusive rights to buy such equity and absent a
3  competing plan of some sort.  The court noted that "... the best way to determine
4  value is exposure to a market." 203 N. LeSalle, supra, 526 U.S. at 458.

5          The Court stopped short of saying how the market-based valuation should be
6  discerned.  The Court did, however, note that "plans providing junior interest
7  holders with exclusive opportunities free from competition and without benefit of
8  market valuation fall within the prohibition of § 1129(b)(2)(B)(ii)." 203 N. LeSalle,
9  supra, 526 U.S. at 458.

10         The Second Amended Plan does not establish a market value for the equity
11  being retained.  The Plan gives Abelson and Patel an exclusive right to retain/acquire
12  the equity.  The Plan does not otherwise propose to test the "market" to see if there is
13  any interest by third parties in acquiring the equity.

14         The insider Guaranty is not (1) new value (the Guaranty is contingent so there
15  is no guarantee that any funds will be paid); (2) substantial (the Guaranty is
16  contingent there is no guarantee that anything will ever be paid to the estate); (4)
17  necessary for a successful reorganization (the Guaranty is contingent and may never
18  be called upon by the Reorganized Debtor; even if called upon it does not address
19  the balloon payments at the end of the Plan period); and (5) reasonably equivalent to
20  the value or interest received (Debtor has made no effort to establish a value on the
21  equity). In re Ambanc La Mesa Ltd. P'ship, supra, 115 F.3d at 654 (citing In re
22  Bonner Mall P'ship, supra, 2 F.3d at 908).

23         Debtor's Plan provides junior interest holders with exclusive opportunities
24  free from competition and without benefit of market valuation to retain their equity
25  position.  This clearly falls within the prohibition of Section 1129(b)(2)(B)(ii).
26

1

**Section 1129(c) - only one Plan of Reorganization may be confirmed.**

2    Pursuant to Section 1129 (c), the court may confirm only one plan.  11 U.S.C.

3  § 1129(c).  If subsections (a) and (b) are met as to more than one plan, the court shall

4  consider the preferences of creditors and equity security holders in determining

5  which plan to confirm.[28]  Id.  As noted above, Debtor's Second Amended Plan is not

6  confirmable, so Section 1129(c) does not apply in this case.

7

**Section 1129(d) - Avoidance of Taxes or Application of the Securities**
8  **Act of 1933**

9    Pursuant to Section 1129 (d), the court may not confirm a plan if the principal

10  purpose of the plan is to avoid taxes or avoid application of Section 5 of the

11  Securities Act of 1933.  11 U.S.C. § 1129(d).  No such issues have been raised in

12  this case and Section 1129(d) does not apply in this case.

13    **Section 1129(e) - Small Business Case.**

14    The instant case is not a small business case, so Section 1129 (e) does not

15  apply in this case.

16

17  **CONCLUSION**

18    Debtor's Second Amended Plan of Reorganization cannot be confirmed

19  because of numerous failures to comply with the requirements of sections 1129(a)

20

21    [28] In cases with multiple confirmable plans, the court "shall consider the preferences of

22  creditors and equity security holders in determining which plan to confirm." 11 U.S.C. §
1129(c). In other cases involving multiple confirmable plans, courts have applied a four-factor

23  analysis, considering "(1) the type of plan; (2) the treatment of creditors and equity security

24  holders; (3) the feasibility of the plan; and (4) the preferences of creditors and equity security
holders." In re ASARCO LLC, 420 B.R. 314, 326-27 (Bankr.S.D.Tex.2009) (citing, In re

25  Internet Navigator Inc., 289 B.R. 128, 131 (Bankr. N.D. Iowa 2003)); In re Holley Garden
Apartments, Ltd., 238 B.R. 488, 493 (Bankr. M.D. Fla.1999).

26

1  and (b) of the Bankruptcy Code.

2      The plan fails to comply with the applicable provisions of the Bankruptcy

3  Code.  §1129(a)(1).  This will be explained in detail, below.

4      Debtor, the plan proponent, has failed to comply with applicable provisions of

5  the Bankruptcy Code.  §1129(a)(2).  Debtor has not disclosed "adequate

6  information" regarding Debtor's Second Amended Plan, as required by §1125.

7      The belated filing of the Second Amended Plan and the placing of all risk of

8  loss, in the event of plan failure, upon Lender provide evidence that the plan was not

9  proposed in good faith, as required by §1129(a)(3).

10     The plan does not meet the 'best interests of creditors' requirement, because it

11 fails to give Lender, on account of its Class 1A claim, as much as it would receive in

12 a Chapter 7 liquidation.

13     The requirements of §1129(a)(8) are not met, because Lender's Class 1A

14 claim is impaired and has been voted against the plan.

15     The plan is not feasible, because Debtor will be unable to make the balloon

16 payment that will come due at the end of the seven-year note period, and further

17 reorganization of Debtor will be necessary.  §1129(a)(11).

18     The plan is not 'fair and equitable' with respect to Lenders Class 1A

19 SECURED claim.  §1129(b)(1).  Because of the too low 5% interest rate in the plan,

20 Lender does not receive the value of its secured claim as of the effective date of the

21 plan.  The plan also shifts the risk of the probability of failure of the Plan to Lender,

22 while saving the possible benefits of success for Debtor's insiders, who do not

23 contribute value for the retention of their equity interests and have not exposed

24 equity to competing bids.  Failure is probable, because Debtor will be unable to

25 make the balloon payment due at the end of the seven-year note period.

26     The plan is not 'fair and equitable' with respect to Lender's Class 1B

33

UNSECURED claim.  §1129(b)(2).  The 5% interest rate is too low and the plan violates the 'absolute priority rule' of section 1129(b)(2)(ii) by allowing the junior interests of the equity holders to be retained, when Class 1B is impaired.

Unfortunately, Debtor and its insiders lack any resources to contribute toward a successful Chapter 11 plan of reorganization.

Orders will be entered denying approval of Debtor's disclosure statement and denying confirmation of Debtor's Second Amended Plan of Reorganization.

**IT IS SO ORDERED**

Copies noticed through ECF to:

DOROTHY G. BUNCE on behalf of Interested Party Rick Abelson
    1bankruptcy@cox.net

TALITHA GRAY KOZLOWSKI on behalf of Debtor HORIZON RIDGE
    MEDICAL & CORPORATE CENTER, LLC
    bankruptcynotices@gordonsilver.com; bknotices@gordonsilver.com

KIRK D. HOMEYER on behalf of Debtor HORIZON RIDGE MEDICAL &
    CORPORATE CENTER, LLC

BANKRUPTCYNOTICES@GORDONSILVER.COM,

BKNOTICES@GORDONSILVER.COM

TERESA M. PILATOWICZ on behalf of Debtor HORIZON RIDGE MEDICAL
    & CORPORATE CENTER, LLC Bankruptcynotices@gordonsilver.com,
    bknotices@gordonsilver.com

U.S. TRUSTEE - LV - 11, 11

34

USTPRegion17.lv.ecf@usdoj.gov

JOHN ROBERT WEISS on behalf of Interested Party BANK OF AMERICA,
    N.A. AS SUCCESSOR BY MERGER TO LASALLE BANK NATIONAL
    ASSOCIATION, AS TRUSTEE jrweiss@duanemorris.com,
    maolins@duanemorris.com; jjohnson3@duanemorris.com

MATTHEW C. ZIRZOW on behalf of Debtor HORIZON RIDGE MEDICAL &
    CORPORATE CENTER, LLC mzirzow@lzlawnv.com, susan@lzlawnv.com;
    tiffany@lzlawnv.com; carey@lzlawnv.com; mary@lzlawnv.com

and sent to BNC to:

    All parties on BNC mailing list

# # #