GORDON SILVER
GERALD M. GORDON, ESQ., NV Bar No. 229
E-mail: ggordon@gordonsilver.com
TALITHA GRAY KOZLOWSKI, ESQ., NV Bar No. 9040
E-mail: tgray@gordonsilver.com
TERESA M. PILATOWICZ, ESQ., NV Bar No. 9065
E-mail: tpilatowicz@gordonsilver.com
3960 Howard Hughes Pkwy., 9th Floor
Las Vegas, Nevada 89169
Telephone (702) 796-5555; Facsimile (702) 369-2666
Attorneys for Debtor

**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>HORIZON RIDGE MEDICAL & CORPORATE CENTER, L.L.C.,<br><br>          Debtor. | Case No.: BK-S-12-13906-LBR<br>Chapter 11 |

**MOTION TO AMEND OR VACATE ORDERS AND TO REOPEN EVIDENCE PURSUANT TO FED. R. BANKR. P. 9023 AND 9024**

Horizon Ridge Medical & Corporate Center, L.L.C. ("Debtor") hereby respectfully submits, pursuant to FRBP[1] 9023 and 9024, its motion to reopen evidence[2] and to amend or vacate the: (i) *Order Denying Confirmation of Debtor's Second Amended Plan of Reorganization* [ECF No. 353] (the "Confirmation Order"); (ii) *Order Denying Approval of Debtor's Disclosure Statement* [ECF No. 351] (the "Disclosure Statement Order"); and (iii) *Memorandum Decision Concerning Denial of Confirmation of Debtor's Second Amended Plan of Reorganization* [ECF No. 349] (the "Memorandum," and together with the Confirmation Order and the Disclosure Statement Order, the "Orders"). This Motion is made and based on the pleadings, papers, and other records on file with the clerk of the above-captioned Court, judicial notice of which is hereby requested, the supporting declaration of Dr. Rick Abelson (the "Abelson Decl.") filed

---

[1] Unless otherwise stated, all Chapter and Section references are to Title 11 of the U.S. Code (the "Bankruptcy Code"), all references to the FRBP refer to the Federal Rules of Bankruptcy Procedure, and all references to the FRCP refer to the Federal Rules of Civil Procedure.

[2] For the avoidance of doubt, to the extent necessary, the request to reopen evidence constitutes a motion for a new trial under FRBP 9023.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103876-001/2156945_3.doc

concurrently herewith, the request for judicial notice (the "RJN") filed concurrently herewith, and the argument of counsel entertained by the Court at the time of the hearing on the Motion.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I. INTRODUCTORY STATEMENT**

Debtor owns and operates the Horizon Ridge Medical Center located in Henderson, Nevada, near St. Rose Hospital, which Medical Center contains six first-floor suites and seven second-floor suites, one of which has been subdivided into nine suites. Just prior to the Confirmation Hearing, all but four of the suites were leased. As of the Confirmation Hearing on September 16 and 17, 2013, Debtor had entered into two additional new leases for Suites 102H and 205, thereby leaving only two of the suites vacant, being Suites 105 and 206. As a result, as of the Confirmation Hearing, the Medical Center was 83% leased.

Suite 105, a medical office space and one of the two vacant suites as of the Confirmation Hearing, had previously been leased to Associates for Women's Health, whose lease, despite the tenant's request to renew, was not renewed upon its expiration in July 2013 due to the tenant's history of delinquent payments even after rent concessions were provided. See Ex. "1" to RJN, pp. 24:8-25:7. As Dr. Abelson[3] testified at the Confirmation Hearing, Suite 105, which Debtor's broker described as the "sweetest suite," was cleaned-up and prepared for re-leasing in August 2013 and within the first ten days of being listed, three separate medical groups had already shown interest. See id., pp. 25:8-14 and 33:2-13.

On December 21, 2013, Debtor executed a new lease with United HealthCare Services, Inc. ("United HealthCare") for Suite 105 for a 5-year term, with two 3-year options to extend (the "United Lease"). See Abelson Decl. ¶ 3 (the United Lease is filed under seal as Ex. "1"). Not only is the United Lease an important lease as Suite 105 is the largest suite, being 3,278 rentable square feet, United HealthCare is a very strong tenant as it is one of the largest health care companies and undeniably has the financial wherewithal to meet its lease obligations over the 5-year term. See id. ¶ 4. Having United HealthCare's doctors at the Medical Center will also

---

[3] Dr. Abelson is one of Debtor's members, its manager, and its designated representative.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103876-001/2156945_3.doc

2

continue to elevate the status of the Medical Center, both encouraging the retention of current tenants at higher lease rates upon renewal and attracting new tenants. See id.

On December 4, 2013, Debtor also executed a new 5-year lease with Kato Las Vegas Inc. dba Salon Fontana ("Salon Fontana") for Suite 102 commencing on February 1, 2014 with one 3-year option to extend (the "Salon Lease," and together with the United Lease, the "Leases"). See id. ¶ 5 (the Salon Lease is filed under seal as Ex. "2"). Salon Fontana is affiliated with Salon Triage, the current occupant of Suite 102, whose lease was set to expire in 2014. Salon Fontana has decided to move its operations from the Green Valley Sports Club to the Medical Center and, given its affiliation with Salon Triage, will take over the current space such that there is no period of vacancy for Suite 102. Additionally, as the Salon Lease is also guaranteed by three separate people, there is ensured performance under the Salon Lease for the full term of the lease. See id. ¶ 6.

With these two new leases, the Medical Center is presently 95% leased as more fully set forth in the following chart. It would be manifestly unjust to not reopen evidence to consider the Leases that were entered into during the brief period between the submission of evidence on September 16 and 17, 2013 and the Court's entry of the Orders on December 20, 2013 when such change further demonstrates Debtor's ability to successfully reorganize rather than liquidate through an amorphous forced sale by the secured lender.[4]

| Suite No. | Sq. Ft. | Tenants as of the Conf. Hearing | Approximate Length of Tenancy as of the Confirmation Hearing | Tenants as of the Filing of the Motion |
|---|---|---|---|---|
| 100 | 2,815 | VIP Medical Clinic & Wellness (Dr. Lee) | 12 years (Current lease expiration is 4/30/15) | VIP Medical Clinic & Wellness (Dr. Lee) |
| 101 | 2,448 | VIP Medical Clinic & Wellness (Dr. Lee) | 12 years (Current lease expiration is 4/30/15) | VIP Medical Clinic & Wellness (Dr. Lee) |
| 102 | 1,295 | Salon Triage | 7 years | Salon Fontana (5-year lease through 1/31/19 with 1 3-year option to extend) |
| 103 | 2,964 | Madame et Monsieur | 6 years (Current lease expiration is 10/31/15) | Madame et Monsieur |
| 104 | 1,294 | Jaget, Ltd. (Chiropractic Group) | 2 years (3-year lease with 1 3-year extension, current lease expiration is 12/31/14) | Jaget, Ltd. (Chiropractic Group) |

---

[4] While the secured lender filed a plan of liquidation [ECF No. 126], the plan is devoid of any details with respect to how the sale liquidating all of Debtor's assets will be conducted. See Debtor's Post-Confirmation Brief, ECF No. 308, at pp. 30-35.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103876-001/2156945_3.doc

3

| Suite | Sq Ft | Current Tenant | Lease Term | Projected Tenant |
|---|---|---|---|---|
| 105 | 3,278 | Vacant | | United HealthCare Services (5-year lease through 12/31/18 with 2 3-year options to extend) |
| 200 | 2,500 | Dr. Srinivas Vuthoori | 12 years (Current lease expiration is 7/31/14) | Dr. Srinivas Vuthoori |
| 201 | 522 | Common Lobby for Suites | | Common Lobby for Suites |
| 201A | 161 | Dr. Nancy Sylvanie, Inc. | Month-to-month since 2013;[5] tenant for 7 years | Dr. Nancy Sylvanie, Inc. |
| 201B | 158 | Conference Room | N/A | Conference Room |
| 201C, D, & E | 752 | Nathco Services, Inc. (Medical Equipment Provider) | Month-to-month since 2007; tenant for 11 years | Nathco Services, Inc. (Medical Equipment Provider) |
| 201F | 265 | Key Search International | Month-to-month since 2004; tenant for 10 years | Key Search International |
| 201G | 253 | Leasing and Management Office | N/A | Leasing and Management Office |
| 201H | 178 | XIM Technologies, Inc. (Related to Nathco Services, Inc.) | Executed 7/13 - 1-year term (Current lease expiration is 7/31/14) | XIM Technologies, Inc. (Related to Nathco Services, Inc.) |
| 202 | 2,003 | Anthem Periodontics | 11 years (Current lease expiration is 4/30/17) | Anthem Periodontics |
| 203 | 2,415 | Upper V. Capital Inc. (Liposuction Group) | 2 years (3-year lease with 1 3-year option to extend, current lease expiration is 2/28/14)[6] | Upper V. Capital Inc. (Liposuction Group) |
| 204 | 665 | Deblanc Music | 2 years (current lease expiration is 1/31/14)[7] | Deblanc Music |
| 205 | 2,300 | R2H Engineering | Executed 9/13 - 5-year term (1 3-year option to extend, current lease expiration is 9/30/18) | R2H Engineering |
| 206 | 1,294 | Vacant | | Vacant[8] |
| % Tenancy | | **83% (incl. conference room and common areas as leased space)** **81% (excl. conference rooms and common areas as leased space)** | | **95% (incl. conference room and common areas as leased space)** **93% (excl. conference rooms and common areas as leased space)** |

See Abelson Decl. ¶ 7 and Exs. "1" and "2" filed under seal; see also Ex. "1" to RJN, pp. 30:15-39:12; Ex. "2" to RJN.

---

[5] Tenant is currently month-to-month due to the pending Chapter 11 proceedings. The tenant will renew her lease if Debtor maintains ownership of the Medical Center.

[6] Debtor and tenant are in negotiations regarding the 3-year extension of the current lease. These negotiations will be finalized prior to expiration of the current lease.

[7] Debtor does not intend to renew this lease due to noise complaints by other tenants. Several doctors have already expressed interest in leasing Suite 204 and it is anticipated that it will be re-leased within 60 days. With the vacature of this tenant, Debtor's leased and occupancy rate will remain 93%.

[8] In December 2013, two medical groups expressed interest in leasing Suite 206 and discussions remain on-going with these potential tenants.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103876-001/2156945_3.doc

4

In addition to the need to reopen evidence to consider the Leases, the Orders should be vacated or amended to address the following factual errors derived from the Court's incorrect reliance on the July 2013 MOR (although incorrectly described as the "June 2013" MOR in the Memorandum), which did not include the two additional leases for Suites 201H and 205 that were signed prior to the Confirmation Hearing.

- The Memorandum states that occupancy was 77% as of the Confirmation Hearing [See Memorandum, p. 4:13]; however, as demonstrated above, the lease and occupancy rate was 83% as of the Confirmation Hearing[9] and has continued to increase since the Confirmation Hearing to 95%.

- The Memorandum further states that there is only "seven percent guaranteed occupancy beyond 2015" [See id., p. 13:16-17]; however, this fails to account for the R2H Engineering lease for Suite 205 entered into prior to the Confirmation Hearing, which increases the percentage of leases extending into and past 2017 to 16%, and, with the additional Leases entered into in the fourth quarter of 2013, the percentage of leases extending into and past 2017 is increased to 32%.

- The Memorandum also incorrectly states that Dr. Abelson testified that the administrative claims are about $350,000 [See id., p. 4:16-17]. Dr. Abelson actually testified that the administrative claims were around "$150,000 to $175,000" [Ex. "1" to RJN, p. 20:16-17].

The foregoing factual errors are material as the Court utilized its incorrect understanding of Debtor's tenancy and administrative claims to make its determination that: (i) Debtor's Disclosure Statement [ECF No. 116] did not contain accurate information and therefore, Debtor's Plan [ECF No. 284] did not meet the requirements of Section 1129(a)(2) [See Memorandum, p. 13]; (ii) Debtor's Plan shifted the risk to the secured lender and was therefore not filed in good faith in violation of Section 1129(a)(3) and was not fair and equitable under Section 1129(b) [See id., pp.16 and 27]; and (iii) Debtor's Plan was not feasible under Section

---

[9] See also ECF No. 332, September 2013 MOR, p. 6 of 9 (providing a lease and occupancy rate of 86%).

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103876-001/2156945_3.doc

5

1129(a)(11) [See id., p. 24].

Debtor additionally requests that the Court reconsider the following legal conclusions that are premised on a misunderstanding of Debtor's Plan's provisions.

- To further establish the feasibility of Debtor's Plan, Debtor's members agreed to contribute such funds as may be necessary to ensure that Debtor can meet its monthly debt service obligations and operating expenses over the term of the Plan (the "Equity Contribution"). See Plan, ECF No. 284 § 1.1.40 and 5.5. The Equity Contribution was misinterpreted by the Court as "new value" [See Memorandum, pp. 5:21-6:5 and 29:19-31:25]. However, Debtor's Plan is not a "new value plan;" rather, under Debtor's Plan, Debtor's equity is retaining its interest because all senior claims are being paid in full.

- While Debtor's Plan provided an interest rate for the Class 1A Claim and the Class 1B Claim of "5.00% per annum, or such other interest rate as determined by the Bankruptcy Court in conjunction with the Confirmation Hearing in the event the Bankruptcy Court must determine a fair and equitable interest rate pursuant to Section 1129(b) of the Bankruptcy Code [See Debtor's Plan, ECF No. 284 § 1.1.73]," the Court did not utilize its determined interest rate of 6.0% to 6.25%, instead finding that Debtor's Plan failed to meet: (i) Section 1129(a)(7)'s best interest test because the Plan provided for an interest rate of 5.00%; and (ii) Section 1129(b) because the Plan provided for an interest rate of 5.00%. See Memorandum, pp. 18:21-19:5 and 29:8-16.

- While the Court determined that Debtor would have a "loan-to-value ratio of roughly 90%" at the end of the Plan term[10] and thus be able to sell the Medical Center to satisfy its debt obligations and generate a profit for equity, the Court erroneously concluded that a sale of the Medical Center at the end of the seven-year Plan term rendered the Plan not feasible under Section 1129(a)(11). See id., pp. 25:5-26:8.

. . .

. . .

---

[10] Debtor disputes the loan-to-value ratio determined by the Court and reserves all rights to appeal the finding.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103876-001/2156945_3.doc

6

## II. LEGAL ARGUMENT

**A.    FRCP 59 and 60 Authorize This Court to Consider Additional Evidence and to Amend or Direct the Entry of a New Judgment.**

Under both FRCP 59 and 60, made applicable by FRCP 9023 and 9024, "a bankruptcy court has wide latitude to reconsider and vacate its own prior decisions." See In re Walker, 332 B.R. 820, 832 (Bankr. D. Nev. 2005) (quoting Bialac v. Harsh Inv. Corp. (In re Bialac), 694 F.2d 625, 627 (9th Cir. 1982)). Specifically, FRCP 59 provides that "[a]fter a nonjury trial, the court may, on motion for a new trial, open the judgment if one has been entered, ***take additional testimony,*** amend findings of fact and conclusions of law or make new ones, ***and direct the entry of a new judgment."*** Fed. R. Civ. P. 59(a)(2) (emphasis added). FRCP 60 provides that a judgment may be set aside whenever there is a showing of: (1) a mistake, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud; (4) a void judgment; (5) a satisfied or discharged judgment; or (6) "any other reason that justifies relief."[11] Thus, while FRCP 59 imposes more stringent time limitations (requiring that a motion be brought within 14 days verses 1 year or longer under FRCP 60), FRCP 59 is not controlled by the same substantive requirements; thus, the Court has "considerable discretion" in granting relief under FRCP 59. See Lavespere v Niagara Machine & Tool Works, Inc., 910 F.2d 167, 174 (5th Cir. 1990); see also Texas A&M Research Foundation v. Magna Transportation, Inc., 338 F.3d 394, 401 (5th Cir. 2003).

FRCP 59 and 60 "incorporate and recognize the need 'to preserve the delicate balance between the sanctity of final judgments and the incessant command of a court's conscience that justice be done in light of all the facts.'" See Walker, 332 B.R. at 832 (quoting In re Kieffer–Mickes, Inc., 226 B.R. 204, 209 (8th Cir. B.A.P. 1998)); see also Lavespere, 910 F. 2d at 174 (where a motion is brought under FRCP 59, "two important judicial imperatives clash: the need to bring litigation to an end and the need to render just decisions on the basis of all the facts. The

---

[11] FRCP 60(b)(6) provides that "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for … any other reason that justifies relief." FRCP 60(b)(6) thus provides a court the power to vacate judgments "whenever such action is appropriate to accomplish justice." See United States v. Sparks, 685 F.2d 1128, 1130 (9th Cir. 1982) (citing Klapprott v. United States, 335 U.S. 601, 615 (1949)). Debtor also moves for relief under FRCP 60(b)(6).

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103876-001/2156945_3.doc

7

task of the district court in such a case is to strike the proper balance between these competing interests."). Thus, FRCP 59 and 60 are intended to be "construed liberally to do substantial justice." Rosebud Sioux Tribe v. A&P Steel, Inc., 733 F.2d 509, 515 (8th Cir. 1984) (quoting Edgar v. Finley, 312 F.2d 533, 538 (8th Cir. 1963)).

While FRCP 59 does not include any specific requirements for relief, courts have held that reconsideration of a judgment under FRCP 59(e) is appropriate: (i) to **correct manifest errors of law or fact** upon which the judgment is based; (ii) to allow the moving party to present newly discovered or **previously unavailable evidence**;[12] (iii) to **prevent manifest injustice**; (iv) due to intervening changes in controlling law; and (v) where there are other, highly unusual circumstances that warrant amendment. See In re Walker, 332 B.R. at 831-32 (quoting 11 Charles Alan Wright, Arthur R. Miller & Mary K. Kane, Federal Practice & Procedure: Civil 2D § 2810.1 (1995)); see also Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc., 5 F.3d 1255, 1263 (9th Cir. 1993). Here, Debtor seeks to reopen the evidence to present and consider the new Leases, which constitute previously unavailable evidence, and to obtain relief from the Orders to correct the manifest errors of law and fact upon which the Orders are based.

B.   **Justice Necessitates that the Evidence be Reopened to Consider the Leases.**

As the Supreme Court has explained, the "policy of Chapter 11 is to permit successful rehabilitation of debtors," thereby enabling a troubled enterprise to operate successfully in the future. See National Labor Relations Board v. Bildisco and Bildisco, 465 U.S. 513, 527 (1984); see also United States v. Whiting Pools, Inc., 462 U.S. 198, 204 (1983). "By permitting reorganizations, Congress anticipated that the business would continue to provide jobs, to satisfy creditors' claims, and to produce a return for its owners," as well as to maximize the value of the bankruptcy estate for such creditors and owners. See Whiting Pools, Inc., 462 U.S. at 204; Toibb

---

[12] The Ninth Circuit has opined that the proper approach to seek relief from judgment because of a **post-trial** change in the factual circumstances surrounding a case is a motion to reopen to hear additional proof. See First Beverages, Inc. of Las Vegas v. Royal Crown Cola Co., 612 F.2d 1164, 1172 (9th Cir. 1980). "[S]uch reopening is within the discretion of the trial court[.] . . . [T]he evidence requested should both be important as a matter preventing injustice and reasonably be available." Keith v. Volpe, 858 F.2d 467, 478 (9th Cir. 1988); see also Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 331 (1971) ("Like a motion under Rule 15(a) to amend the pleadings, a motion to reopen to submit additional proof is addressed to the [trial judge's] sound discretion.").

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103876-001/2156945_3.doc

8

v. Radloff, 501 U.S. 157, 163 (1991).

Debtor's Chapter 11 Case commenced in April 2012 and throughout its Chapter 11 Case Debtor's lease and occupancy rates have ranged between 83% and 97%, with the sole exception of July and August 2013 due to the termination of the Associates for Women's Health lease.[13] Despite Associates for Women's Health's request to renew its lease, after discussions with Debtor's broker regarding the ability to re-lease Suite 105 – Debtor's "sweetest suite"– Debtor made an informed business decision not to renew the lease and to seek a stronger tenant. See Ex. "1" to RJN, pp. 24:20-25:13.  The Court, in large part, found the Plan to be unconfirmable based on this informed business judgment because it resulted in a ***two month*** lease occupancy rate decline (notwithstanding the more than 83% lease occupancy rate during the other ***nineteen months*** of the Chapter 11 Case and the fact that Debtor's informed business judgment resulted in a larger, stronger, and more attractive tenant.

On December 19, 2013, the United Lease was executed by United, a leading national health care company, who not only has an indisputable ability to meet its lease obligations, but also elevates the quality and appeal of the Medical Center to existing and prospective tenants. See Abelson Decl. ¶ 4.  This lease, coupled with the Salon Lease, and the two leases entered into prior to the Confirmation Hearing, have resulted in Debtor having a lease and occupancy rate of 95% prior to the Court issuing its Orders.  It would be a gross miscarriage of justice by this Court, a court of equity, to preclude Debtor from submitting the improvement in its tenancy into evidence, particularly where the Court weighed so heavily the termination of Associates for Women's Health's lease in July 2013 and discounted Debtor's ability to re-lease Suite 105, despite Dr. Abelson's testimony regarding the significant interest garnered within weeks of listing Suite 105 for lease. See Ex. "1" of RJN, pp. 32:13-33:13.

---

[13] See April 2012, occupancy 97% [ECF No. 47]; May 2013, occupancy 97% [ECF No. 59]; June 2012, occupancy 97% [ECF No. 61]; July 2012, occupancy 97% [ECF No. 69]; September 2012, occupancy 89% [ECF No. 189]; October 2012, occupancy 88% [ECF No. 204]; November 2012, occupancy 89% [ECF No. 205]; December 2012, occupancy 89% [ECF No. 206]; January 2013, occupancy 89% [ECF No. 224]; February 2013, occupancy 89% [ECF No. 239]; March 2013, occupancy 89% [ECF No. 244]; April 2013, occupancy 89% [ECF No. 257]; May 2013, occupancy 89% [ECF No. 266]; June 2013, occupancy 89% [ECF No. 272]; July 2013, occupancy 77% [ECF No. 288]; August 2013, occupancy 77% [ECF No. 311]; September 2013, occupancy 86% [ECF No. 332].

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103876-001/2156945_3.doc

9

The Ninth Circuit has held that where there has been a change in the factual circumstances surrounding the case after judgment is issued, the proper relief is to seek to reopen the case to hear additional proof. See First Beverages, Inc. of Las Vegas, 612 F.2d 1164, (9th Cir. 1980). The Ninth Circuit has further held that while reopening is in the discretion of the trial court, the evidence requested should be both important as a matter of preventing injustice and reasonably be available. See Keith, 858 F.2d 467, 478 (9th Cir. 1987) (affirming the district court's decision to reopen the proceedings to allow additional evidence). Here, foremost, where Debtor's lowered occupancy just prior to the Confirmation Hearing was the result of one lease termination based on Debtor's own informed business decision not to renew the lease in favor of securing a larger and more stable tenant, which space was in fact re-leased to a larger and more stable tenant even before the Court issued its Orders relying heavily on the lowered tenancy, it would be manifestly unjust to not reopen the proceedings to consider the new Leases and Debtor's current occupancy of 95%. Granting the Motion is necessary to ensure that "justice be done in light of all the facts,"[14] particularly considering that the policy of Chapter 11 is to permit the successful rehabilitation of debtors.

**C. The Orders Must Be Vacated or Amended as They Are Premised on Manifest Factual Errors Regarding Debtor's Tenancy.**

Throughout the Memorandum, the Court states or refers to the mistaken fact that at the Confirmation Hearing, Debtor's "occupancy was 77%." See, e.g., Memorandum, pp. 4:13; 13:11-12; 14:1; 24:13-20. On page 13 of the Memorandum, the Court cites "Ex. 57, June 2013 Monthly Operating Report" (the "MOR") as the source of the "77%" leasing rate. However, Debtor's June 2013 MOR refers to a lease and occupancy rate of 89%, not 77%. See ECF No. 272, p. 6 of 11. While Debtor's July 2013 MOR[15] does provide for a lease and occupancy rate of 77% due to the termination of the Associates for Women's Health lease (for Suite 105, 3,278 sq. ft.), as a result of the new leases to R2H Engineering (for Suite 205, 2,300 sq. ft.) and XIM Technologies, Inc. (for Suite 201-H, 178 sq. ft.), executed in July and September of 2013, and

---

[14] Walker, 332 B.R. at 832 (colleting cases).

[15] See ECF No. 288, p. 6 of 9.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103876-001/2156945_3.doc

10

thus before the Confirmation Hearing, as of the Confirmation Hearing, Debtor's tenancy was actually 83%. See Abelson Decl. ¶ 7; see also September MOR, ECF No. 332, at p. 6 of 9. The Court's reliance on the June or July 2013 MORs, which predate the Confirmation Hearing by two and three months, and in light of clear testimony from Dr. Abelson evidencing the increased occupancy rate at the time of the Confirmation Hearing, was clear and manifest error, which necessitates a vacation or amendment of the Orders to correct the lease and occupancy rate and the Court's analysis and determinations under Section 1129(a)(2), (a)(3), (a)(11), and (b) premised on its incorrect understanding of Debtor's lease and occupancy rate.

The Memorandum also repeatedly states and relies on its conclusion that there is only "seven percent guaranteed occupancy beyond 2015." See, e.g. Memorandum, pp. 13:15-17; 24:13-18. However, again, this calculation fails to account for the R2H Engineering lease entered into prior to the Confirmation Hearing, which increases the percentage of leases extending into and past 2017 to 16%.[16] With the additional Leases entered into in the fourth quarter of 2013 and prior to entry of the Orders, the percentage of leases in existence today that extend into and past 2017 is increased to 32%. See id. ¶ 7 (The R2H Engineering lease is for 2,300 sq. ft. and extends through 9/30/18, the Anthem Periodontics lease is for 2,003 sq. ft. and extends through 4/30/17, the United Lease is for 3,278 sq. ft. and extends through 12/31/18, and the Salon Lease is for 1,295 sq. ft. and extends through 1/31/19. $2,300 + 2,003 + 3,278 + 1,295 = 8,876$ / total rentable sq. ft. of $27,560 = 32\%$). The Court's failure to include the R2H Engineering lease in its calculation was clear and manifest error, which necessitates a vacation or amendment of the Orders to correct the Court's analysis and determinations under Section 1129(a)(2), (a)(3), (a)(11), and (b) premised on its incorrect understanding of Debtor's tenancy.

**D.  The Court's Finding Regarding the Extent of Administrative Claims Was Made in Error Necessitating a Vacature or Amendment of the Orders.**

The Memorandum also incorrectly states that Dr. Abelson testified that the administrative claims are about $350,000. See Memorandum, p. 4, ll. 16-17. However, Dr. Abelson actually

---

[16] See Abelson Decl. ¶ 7 (The R2H Engineering lease is for 2,300 sq. ft. and extends through 9/30/18 and the Anthem Periodontics lease is for 2,003 sq. ft. and extends through 4/30/17. $2,300 + 2,003 = 4,303$ / total rentable sq. ft. of $27,560 = 16\%$).

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103876-001/2156945_3.doc

11

testified that the unpaid administrative claims were around "$150,000 to $175,000." See Ex. "1" to RJN, p. 20:16-17.  This is consistent with the parties' Statement of Uncontested Facts, which states that "Debtor has incurred professional fees and expenses for its counsel and expert witnesses of over $165,000 since October 1, 2012." Joint Pre-Trial Statement, ECF No. 280 ¶ 25.  The finding that Dr. Abelson testified that the administrative claims are about $350,000 was in error and the Orders must be vacated or amended to correct this factual error, as well as the legal analysis regarding the materially incorrect disclosures in Debtor's Disclosure Statement premised upon this factual error.

**E.     The Court's Analysis of Section 1129(a)(7) and 1129(b) Was Manifestly Erroneous as a Result of the Court's Misunderstanding of Section 1.1.73 of Debtor's Plan.**

While Debtor proposed and advocated for an interest rate of 5%, Debtor's Plan expressly provided that the interest rate for the Class 1A Claim (the secured portion of the secured lender's claim) and the Class 1B Claim (the unsecured portion of the secured lender's claim) would be "[t]he rate of 5.00% per annum, or such other interest rate as determined by the Bankruptcy Court in conjunction with the Confirmation Hearing in the event the Bankruptcy Court must determine a fair and equitable interest rate pursuant to Section 1129(b) of the Bankruptcy Code." Debtor's Plan, ECF No. 284 § 1.1.73.  However, as evident from the Memorandum, the Court did not take into account the second clause of Section 1.1.73 of Debtor's Plan, providing that the applicable interest rate, if not 5%, would be the rate determined by the Court in accordance with Section 1129(b).

While the Court determined that the "appropriate interest rate would be six to six and one quarter percent (6.0% - 6.25%),"[17] the Court failed to apply this range of interest rates in its analysis of Section 1129(a)(7) and (b).  Rather, with regard to Section 1129(a)(7), the Court held as follows:

> Class 1A, BofA's secured claim, will not be paid in full under the Plan, as the Debtor's proposed 5% interest rate does not provide BofA with the present value of the amount of its claim.  Class 1A, BofA's secured claim, will not receive as much under the Plan as it would on liquidation.

---
[17] Memorandum, p. 29:14-16.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103876-001/2156945_3.doc

12

> Class 1B, BofA's unsecured claim, will not be paid in full under the Plan, as the Debtor's proposed 5% interest rate does not provide BofA with the present value of the amount of its claim. In a liquidation, BofA's unsecured claim would receive nothing. Class 1B will realize more under the Plan than it would on liquidation.
>
> Since the Second Amended Plan does not provide BofA with the present value of its Class 1A claim, the Plan fails to comply with Section 1129(a)(7).

Memorandum, pp. 18:21-19:3. The foregoing analysis would be correct if Debtor's Plan solely provided for an interest rate of 5%; however, since Debtor's Plan provided for an interest rate of 5%, or, the rate determined by the Court to provide the secured lender with the present value of its claim under Section 1129(b), the Court's analysis and conclusion are wrong. The Orders must be amended to correct the Court's incorrect interpretation or application of Section 1.1.73 of Debtor's Plan. Upon correction, Debtor's Plan satisfies the requirements of Section 1129(a)(7).

Similarly, in its analysis of Section 1129(b)(2)(A), the Court concludes that "Debtor's proposed five percent (5%) interest rate does not provide BofA with deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property." Memorandum, pp. 27:19-28:1. The Court then determines that the appropriate interest rate would be 6% - 6.25%. However, instead of applying 6% or 6.25% as contemplated by the second clause of Section 1.1.73 of Debtor's Plan (providing that the interest rate for the Class 1A Claim would be either 5% *or* the rate determined by the Court in accordance with Section 1129(b)(2)(A)), the Court instead finds that Debtor's Plan does not meet the requirements of Section 1129(b)(2)(A) because it provides for an interest rate of 5%. See id., p. 28. This was a clear error or misunderstanding of Debtor's Plan that must be corrected in the Orders.

The Court made precisely the same error with regard to its analysis of Section 1129(b)(2)(B). See id., p. 29. Having determined that the appropriate interest rate under Section 1129(b)(2)(B) was 6% - 6.25%, the Court then concluded that "[t]he 5% interest rate proposed for the Class 1B Note is too low to make the present value of the proposed payments under the Class 1B Note equal to the allowed amount of the Lender's Unsecured Claim." Id., p. 28:11-14.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103876-001/2156945_3.doc

13

However, as stated above, Debtor's Plan provided for an interest rate of 5%, *or*, the rate determined by the Court in accordance with Section 1129(b)(2)(B).  See Debtor's Plan §§ 1.1.73 and 4.2.  Thus, the Court erred in not applying an interest rate of 6% - 6.25% to the Class 1B Claim.[18]

The foregoing manifest errors resulting from the misapplication of Section 1.1.73 of Debtor's Plan must be corrected through a vacature or amendment of the Orders, resulting in Debtor's Plan meeting the requirements of Section 1129(b)(2)(A) and (b)(2)(B).[19]

**F.    A Sale at the End of a Plan Term Does Not Render a Plan Not Feasible.**

While the Court found that "[i]t is likely that Reorganized Debtor would be able to obtain the capital it needs to operate the property during the seven-year Plan period," the Court also concluded that due to a 90% loan-to-value ratio at the Plan's term (a point Debtor adamantly disputes), Debtor will be unable to refinance the Class 1A and Class 1B Notes.  See Memorandum, pp. 23-25.  While acknowledging that Debtor will have a 10% equity cushion, the Court erroneous determined that a sale at the end of the Plan term that repays all of the debt and produces a return for equity is nonetheless not feasible under Section 1129(a)(11) as it will be a liquidation of assets.[20]  See id.

Bankruptcy courts have historically confirmed plans that provide for balloon payments without requiring the debtor to explain with certainty how the balloon payment will be made.

---

[18] As more fully discussed in *Debtor's Post-Trial Brief*, Debtor has been tendering adequate protection payments at the rate of 6.18% throughout the course of the Chapter 11 Case.  See ECF No. 308, pp. 8-11.

[19] The Court prepares an extensive "new value" analysis; however, such analysis is unnecessary once the 6% or 6.25% interest rate is applied in accordance with Section 1.1.73 of Debtor's Plan, thereby resulting in the full payment of all claims and permitting the Class 5 Equity Securities to retain their interests without violating the "absolute priority rule."  See Debtor's Plan §§ 4.1 – 4.5; see also Memorandum, pp. 29-31.

[20] The Court also incorrectly states that "Paragraphs 4.1.1(h) and 4.2.1(h) of the Plan both provide that the filing of a voluntary or involuntary petitions in bankruptcy by or against Debtor are not events of default under the notes given to Lender on account of its Class 1A and 1B claims."  Memorandum, p. 26:1-4.  This is, however, an incorrect understanding of Paragraphs 4.1.1(h) and 4.2.1(h), which both provide as follows: "***Debtor's pre-Effective Date*** insolvency, inability to pay its debts as they mature, the making of an assignment for the benefit of creditors by ***Debtor***, the appointment of a receiver of the property of ***Debtor***, or the filing of a voluntary or involuntary petition under Title 11 or similar proceeding under law against ***Debtor*** shall not constitute an event of default under the Loan Documents."  Sections 4.1.1(h) and 4.2.1(h) solely refer to "***pre-Effective Date***" insolvency and bankruptcy filings.  This is further evidenced by the reference to "Debtor," not "Reorganized Debtor," the entity existing after the Effective Date.  Section 4.1.1(h) and 4.2.1(h) absolutely do not apply to any post-Effective Date bankruptcy relief.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103876-001/2156945_3.doc

14

1  See In re Boulders on the River, Inc., 164 B.R. 99 (B.A.P. 9th Cir. 1994); In re Briscoe Enterps.,
2  Ltd., II, 994 F.2d 1160 (5th Cir. 1993); In re Guilford Telecasters, Inc., 128 B.R. 622 (Bankr.
3  N.C. 1991); In re LMR, LLC, 496 B.R. 410 (Bankr. W.D. Tex. 2013).[21]  In determining whether
4  a balloon payment plan is feasible, "the court should consider whether the debtor will have
5  sufficient equity to attract a refinancer or, if not, whether *the debtor can sell the property and*
6  *fully pay-off the secured creditor*."  In re Geijsel, 480 B.R. 238, 260-61 (Bankr. N.D. Tex. 2012)
7  (citing In re T-H New Orleans Ltd. P'ship, 116 F.3d 790, 802 (5th Cir. 1997); see also In re
8  Trenton Ridge Investors, LLC, 461 B.R. 440, 494 (Bankr. S.D. Ohio 2011); F.H. Partners, L.P.
9  v. Inv. Co. of the Sw., Inc. (In re Inv. Co. of the Sw., Inc.), 341 B.R. 298, 316 (B.A.P. 10th Cir.
10  2006).  The only relevant evidence at confirmation is that the debtor must be able to make the
11  balloon payment to satisfy the creditor's claim pursuant to the plan; how a debtor satisfies the
12  claim, whether it pays cash, sells the property, or obtains refinancing, is irrelevant to a feasibility
13  determination.

14  In In re Briscoe Enterps., Ltd., II, 994 F.2d 1160 (5th Cir. 1993), the Fifth Circuit
15  affirmed the bankruptcy court's order confirming the debtor's plan of reorganization, which, for
16  the secured claim, provided monthly installments of principal and interest at 10.25%, amortized
17  over thirty years, to be paid in full upon the *sale of the property* or the expiration of 15 years,
18  whichever occurred first.  See id. at 1163.  The secured creditor suggested that the plan's
19  "balloon payment [was] unacceptable as there [was] no immediate indication from where the
20  funds [would] come to pay off the balloon."  Id. at 1169.  The Fifth Circuit stated: "[a]s a general
21  matter, many courts have held balloon payments to satisfy 1129(b)."  Id.

---

[21] In In re LMR, LLC, the debtor, the owner and operator of a hotel in Texas, proposed to pay off creditors with interest over five years through revenue generated from the hotel and two restaurant leases on the hotel's property. Accordingly, with respect to the secured creditor's claim, the debtor proposed a plan of reorganization that provided that the debtor would pay the secured creditor monthly installment payments of principal and interest at 6% amortized over 25 years, with a balloon payment at the end of the fifth year.  To the extent the debtor was oversecured, the plan proposed to pay the secured creditor's deficiency claim in full in monthly installments in five years.  The court determined that the value of the debtor's hotel was $3.2 million, and thus, pursuant to Section 506(a), bifurcated the secured creditor's claim into a secured claim in the amount of $3.2 million and an unsecured deficiency claim in the amount of $520,355.  The secured creditor objected to confirmation, "express[ing] concern with respect to the debtor's ability to pay or refinance the balloon payment [of $2.8 Million] due on [the] secured claim by the end of the 5-year Plan term."  Notwithstanding this concern, the bankruptcy court found that the debtor's plan was feasible under Section 1129(a)(11).  See id.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103876-001/2156945_3.doc

15

Moreover, the courts in this District, as well as other courts in this Circuit have *recently* confirmed plans providing for balloon payments where the balloon payment may be satisfied by either a ***refinancing or a subsequent sale*** at the end of the plan term. See In re Boulders on the River, Inc., 164 B.R. 99 (B.A.P. 9th Cir. 1994); In re VDG Chicken, LLC, 09-32607-bam (Bankr. D. Nev. May 18, 2010), 2011 WL 3299089 (B.A.P. 9th Cir. Apr. 11, 2011) (unpublished); In re Windmill Durango Office, LLC, 473 B.R. 762 (9th Cir. 2012); In re Seasons Partners, LLC, 439 B.R. 505 (Bankr. D. Ariz. 2010); In re Red Mt. Mech. Co., 448 B.R. 1 (Bankr. D. Ariz 2011); In re Dhillon Properties, LLC, 09-54640-gwz (Bankr. D. Nev. Sept. 6, 2012); In re Bains Motels, Inc., 11-53427-btb (Bankr. D. Nev. Feb. 26, 2013).

Finally, the Court's reliance on In re Made in Detroit, Inc., 299 B.R. 170 (Bankr. E.D. Mich. 2003), and In re Walker, 165 B.R. 994 (E.D. Va. 1994) to find that Debtor's Plan is not feasible because the balloon payment may be satisfied through a sale of the Medical Center at the end of the Plan's seven-year term is misplaced. The facts on which the courts found the plans were not feasible in these cases are completely inapposite to the facts of this case. In Made in Detroit, the court found: "In summary, the Debtor failed to show at confirmation that it had exit financing to fund its plan. The proposed financing had so many contingencies that Debtor's Plan was conditional at best. Thus, the Debtor's Plan is not feasible under 1129(a)(11), and the Court must deny confirmation of Debtor's Plan." In re Made in Detroit, Inc., 299 B.R. at 180. Debtor's Plan here does not contemplate exit financing; it simply provides for the current loan to remain in place, subject to the terms of the Plan, including its seven year maturity.

In Walker, the debtors, a husband and wife, proposed a plan that provided for an amorphous sale of their property that did not obligate payments to the secured creditors for a period of four years, did not provide a schedule for the liquidation of assets, and gave the debtors unfettered discretion in deciding how to market the assets. See In re Walker, 165 B.R. at 1002. Given all of the conditions and uncertainties, the court found that the Walker's plan "provides no basis upon which to conclude that it is feasible within the meaning of 11 U.S.C. § 1129(a)(11)." Debtor's Plan, to the contrary, provides that Debtor will pay the remaining balance of secured lender's claims as a balloon payment at the end of the Plan's seven-year term, either by way of

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

16

103876-001/2156945_3.doc

cash, refinance, or a sale of the Medical Center. All other creditor claims will be paid in full during the term of the Plan. Accordingly, <u>Made in Detroit</u> and <u>Walker</u> are inapplicable to the Court's feasibility analysis with respect to Debtor's Plan.

Thus, even using the Court's extraordinarily conservative determination that Reorganized Debtor's loan-to-value ratio will be 90% at the end of the Plan term,[22] the Court's erroneous conclusion that Debtor's Plan did not satisfy Section 1129(a)(11) because Debtor's Plan provided that its balloon payment may be satisfied through a sale is manifestly erroneous. This error must be corrected resulting in the determination that Debtor's Plan has satisfied Section 1129(a)(11).

### III. CONCLUSION

Debtor respectfully requests that the Court grant: (i) this Motion, thereby reopening evidence to consider the Leases and vacating or amending its Orders as necessary to correct the factual and legal errors as more fully set forth herein; and (ii) such other and further relief as is just and proper.

DATED this 3rd day of January, 2014.

GORDON SILVER

By: /s/ Talitha Gray Kozlowski
GERALD M. GORDON, ESQ.
TALITHA GRAY KOZLOWSKI, ESQ.
TERESA M. PILATOWICZ, ESQ.
3960 Howard Hughes Pkwy., 9th Floor
Las Vegas, Nevada 89169
Attorneys for Debtor

---

[22] As noted in *Debtor's Post-Confirmation Brief* [ECF No. 308], if the Medical Center appreciated at a conservative rate of 1%, the value of the Medical Center at Plan end would be $4.7 million, with a loan-to-value ratio of 84.2%. If the property appreciated at rate of 2.85% (which Debtor still believes is conservative), the value of the Medical Center at Plan end would be $5.3 million, with a loan-to-value ratio of 74.9%. With such appreciation, it is likely that Debtor could refinance the balloon payment.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103876-001/2156945_3.doc

17