DANIELLE STEFFEN - 1/17/2014

Page 1

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF NEVADA


In re:                        )
                              )
HORIZON RIDGE MEDICAL &       )
CORPORATE CENTER, L.L.C.      )    CASE NO: BK-S-12-13906-LBR
                              )
     Debtor.                  )    CHAPTER 11
_____)



DEPOSITION OF DANIELLE STEFFEN
LAS VEGAS, NEVADA
FRIDAY, JANUARY 17, 2014




REPORTED BY:  VANESSA LOPEZ, CCR NO. 902
JOB NO.:  200034

Page 2

1  DEPOSITION OF DANIELLE STEFFEN held at Gordon
2  Silver, located at 3773 Howard Hughes Parkway, Third Floor,
3  Las Vegas, Nevada, on Friday, JANUARY 17, 2014, at 1:58
4  p.m., before Vanessa Lopez, Certified Court Reporter, in and
5  for the State of Nevada.
6
7
8  APPEARANCES:
9  For Debtor:
10      GORDON SILVER
        BY:  TALITHA GRAY KOZLOWSKI, ESQ.
11      3773 Howard Hughes Parkway, Third Floor
        Las Vegas, Nevada 89169
12      (702)796-5555
        tkozlowski@gordonsilver.com
13
14
15  For Danielle Steffen:

        DUANE MORRIS, LLP
16      BY:  ROSANNE CIAMBRONE, ESQ.
        190 South LaSalle Street, Suite 3700
17      Chicago, Illinois 60603
        (312)499-0127
18      rciambrone@duanemorris.com
19
20
21
22
23
24
25

Page 3

1           I N D E X
2  WITNESS:  DANIELLE STEFFEN
3  EXAMINATION                    PAGE
4    BY:  Ms. Kozlowski            4
5
6
7           E X H I B I T S
8           (NONE MARKED)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1       LAS VEGAS, NEVADA; FRIDAY, JANUARY 17, 2014
2              1:58 P.M.
3              -oOo-
4  Whereupon,
5     (In an off-the-record discussion held prior
6     to the commencement of the proceedings,
7     counsel agreed to waive the court reporter's
8     requirements under Rule 30(b)(4) of the
9     Nevada Rules of Civil Procedure.)
10          DANIELLE STEFFEN,
11  having been first duly sworn by the court reporter to
12  testify to the truth, the whole truth, and nothing but the
13  truth, was examined and testified under oath as follows:
14
15          EXAMINATION
16  BY MS. KOZLOWSKI:
17     Q.  My name is Talitha Gray Kozlowski, and we're here
18  for a deposition in connection with Horizon Ridge Medical
19  Center in its Chapter 11 case.
20         Throughout the deposition to try to minimize
21  confusion, I'd like to refer to the company as the debtor
22  and the property as Horizon Ridge Medical Center.  Will that
23  make sense to you if we go with that?
24     A.  Yeah.
25     Q.  Can you please state and spell your name for the

Page 5

1  record.
2     A.  Danielle Steffen, D-A-N-I-E-L-L-E, S-T-E-F-F-E-N.
3     Q.  Can you please state your business address?
4     A.  3773 Howard Hughes Parkway, Suite 100, Las Vegas,
5  Nevada 89169.
6     Q.  Thank you.  Have you ever provided testimony in a
7  bankruptcy context before?
8     A.  No.
9     Q.  Have you ever been deposed before?
10    A.  Yes.
11    Q.  How many times?
12    A.  Once.
13    Q.  In what context?
14    A.  I was a factual witness for a real estate
15  transaction I had done.
16    Q.  How long ago was that?
17    A.  Approximately two years I would say.
18    Q.  Was that in state court here in Nevada?
19    A.  No -- yes, I was deposed by the lawyer for the
20  other side in the case.  It was in the state court.
21    Q.  Did you provide any trial testimony?
22    A.  No, I did not.
23    Q.  The deposition is being stenographically recorded.
24  So it's important that we don't have any head shakes or
25  gestures, everything be audible.  And also, so that the

Page 6

1  record is clean, if you can let me finish my question, I'll
2  try to make sure I give you sufficient time to answer so
3  we're not talking over each other.
4      A.  Okay.
5      Q.  If at any point you want a break, as long as I
6  don't have a question pending, certainly happy to take a
7  break.  So just let me know.  And to the extent that I ask
8  any questions that just don't make sense to you, certainly
9  do not hesitate to ask me to clarify --
10     A.  Okay.
11     Q.  -- so you understand.  Is there any reason you
12 can't go forward with your best testimony today?
13     A.  No.
14     Q.  What did you do to prepare for today's deposition?
15     A.  I read the sale motion and reviewed my listing
16 agreement and declaration.
17     Q.  Anything else?
18     A.  I'm not sure exactly what you would be referring
19 to, I suppose.
20     Q.  Did you review any other documents or is that the
21 full extent of documents you reviewed?
22     A.  I reviewed all the rent rolls, October's operating
23 expense report, and I briefly looked at your motion for
24 reconsideration regarding the two leases that were done.
25     Q.  What month was the rent roll for?

Page 7

1      A.  I have, I believe, November's rent roll and
2  December's rent roll.
3      Q.  Did you have any discussions with anyone in
4  preparation for today's deposition?
5      A.  With counsel, John Weiss and Rosanne.
6      Q.  When did those conversations take place?
7      A.  The beginning of the week.
8      Q.  Were there multiple conversations or just one
9  conversation?
10     A.  One conversation with John Weiss and two
11 conversations with Rosanne.
12     Q.  What did you generally discuss?
13     A.  We discussed the -- discussed the form of the
14 deposition and what topics might be discussed.
15     Q.  What topics did you generally discuss?
16     A.  We discussed the sale motion, the documents I
17 basically reviewed.
18     Q.  Did you discuss your responses to any anticipated
19 questions?
20     A.  Not specifically.
21     Q.  Did you speak with anyone else at Cushman?
22     A.  No.
23     Q.  How long have you lived in Nevada?
24     A.  Since 2001.
25     Q.  Do you have a degree?

Page 8

1      A.  Yes.
2      Q.  From where?
3      A.  University of Phoenix.
4      Q.  I'm sorry?
5      A.  University of Phoenix.
6      Q.  What degree did you receive?
7      A.  Information technology, bachelor's of science.
8      Q.  When was that?
9      A.  2003, I believe.
10     Q.  Do you hold any licenses?
11     A.  A broker salesman license.
12     Q.  When did you obtain that license?
13     A.  2003.
14     Q.  Since 2003, has your only source of employment
15 been as a broker?
16     A.  Yes.
17     Q.  Where were you first employed?
18     A.  Starting -- can you --
19     Q.  I'm sorry.  As a broker.
20     A.  Oh, as a broker.  Thank you.  I was employed for
21 Insight Development.
22     Q.  What is that?
23     A.  They were a local development company in town that
24 developed office and industry.
25     Q.  Are they still operating?

Page 9

1      A.  As a developer, no.  I think they moved from the
2  market.
3      Q.  Do you know when that occurred?
4      A.  2006.
5      Q.  Are they still operating in other markets?
6      A.  Not as a developer.
7      Q.  Are they providing any services in Nevada?
8      A.  They are an investor currently.
9      Q.  Have you done any -- brokered any deals with them
10 as an investor?
11     A.  No.
12        (Interruption in proceedings.)
13        THE WITNESS:  Oh, sorry.
14     Q.  (By Ms. Kozlowski)  How long were you with Insight
15 Development?
16     A.  Approximately 18 months.
17     Q.  Where did you go after that?
18     A.  Mark Fine's office.
19     Q.  Is he an attorney?
20     A.  He is -- no, he's not an attorney.  He is a
21 developer.  He developed a lot of Green Valley.
22     Q.  What did you do at Mark Fine's office?
23     A.  Broker.
24     Q.  How long were you with Mark Fine?
25     A.  Approximately six months.

Page 10

1  Q. Where did you go after that?
2  A. IPG Commercial Real Estate Services.
3  Q. And what is IPG?
4  A. IPG stands for the Industrial Property Group. It
5  is a commercial real estate brokerage company.
6  Q. How long were you with them?
7  A. The company was sold in 2007 to Prudential. I
8  stayed with Prudential until 2010 when Prudential was sold
9  to Cushman & Wakefield Commerce.
10  Q. When you were with IPG, what was your title?
11  A. Vice president.
12  Q. What did that entail?
13  A. To earn titles in real estate companies, you
14  generally have to have a production requirement, income
15  requirement, and years of experience. Specifically what
16  their requirements were, since it was a while ago, I don't
17  know, but those are the general rules.
18  Q. Did IPG specialize in any specific areas of real
19  estate?
20  A. Office and industrial.
21  Q. Did you specialize in either office or industrial
22  or did you do both?
23  A. Both.
24  Q. What is your current job title with Cushman?
25  A. Director.

Page 11

1  Q. What does that mean at Cushman?
2  A. Along the same lines. It's -- we have senior
3  directors, directors, associates. It's along the same
4  lines. You have to have income requirements . . . To earn
5  the titles.
6  Q. Are there additional responsibilities that go
7  along with the different titles or is it more of a sort of
8  differentiation based on your historical performance?
9  A. There's no additional responsibilities that come
10  with titles or independent contractors.
11  Q. What areas do you specialize in?
12  A. Industrial and office investments.
13  Q. I think your biography said you closed over
14  83 million in transactions since 2011. Is that accurate?
15  A. Yes.
16  Q. Why is 2011 the benchmark?
17  A. We updated our bios as the time goes on. Well,
18  since it's a new year, we're going to be adding to that.
19  Every year we just kind of update them. And we started 201
20  because the market had gone down in 2007 through 2010.
21  Transaction volume started increasing and my partner and I
22  joined a team, so we -- we used the 2011 as a benchmark,
23  because that was the start of our team, so . . .
24  Q. Who is your partner?
25  A. Amy Ogden.

Page 12

1  Q. O-G-D-E-N?
2  A. Mm-hmm, yes.
3  Q. Do you have a recollection of about how many
4  transactions you closed in 2011?
5  A. I have a recollection of the volume. The
6  transaction number, I don't know off the top of my head.
7  I'd have to look that up.
8  Q. What was the volume?
9  A. Just over 40 million.
10  Q. Were there a couple sizeable deals that comprised
11  the majority of that 40 million or was it a number of
12  smaller deals?
13  A. A number, a variety of transactions, different
14  sizes.
15  Q. Were most of those industrial or office?
16  A. A combination of both.
17  Q. Do you represent more sellers or buyers or is it
18  sort of an even mix?
19  A. It's an even mix. I -- even mix.
20  Q. Do you have a recollection of how many estimated
21  transactions you closed in 2012?
22  A. I would have to look for the number. I would have
23  to look. I'm sorry. I don't know, off the top of my head,
24  the -- the number.
25  Q. Where would you look to determine that?

Page 13

1  A. I have a spreadsheet.
2  Q. What all is on that spreadsheet?
3  A. It has our transactions, the volume, and our
4  income.
5  Q. Being the percentage -- when you say your income,
6  your take home or the percentage broker fee associated with
7  the transaction?
8  A. The take home that comes from my office.
9  Q. Does the spreadsheet itemize each of the
10  transactions?
11  A. Yes.
12  Q. Do you have a recollection of how many of those
13  transactions were industrial versus office?
14  A. No, I generally do 50 percent industrial,
15  50 percent office. It's probably a mix again. It was 2012.
16  Q. Fair enough.
17  A. I don't know.
18  Q. Okay. Let's go to last year. About how many
19  transactions did you close in 2013?
20  A. Again, I don't know that number off the top of my
21  head. I would have to look.
22  Q. Can you estimate?
23  A. I would estimate it somewhere in the neighborhood
24  of 20 to 25.
25  Q. Were those all sales?

Page 14

1    A.  A combination of sales and leasing.
2    Q.  How many would you estimate were sales?
3    A.  Eighty percent.
4    Q.  On the leasing, is it -- are you generally doing
5  leasing for industrial or leasing for commercial?
6    A.  On a leasing basis, I do more industrial leasing.
7    Q.  Do you have a recollection of how many of the
8  sales involved transactions over $3 1/2 million?
9    A.  Probably 10 percent; 10, 20.
10    Q.  I'm certainly not trying to trick you or lock you
11  in.  Trying to get a general understanding.  Did you close
12  more transactions or have greater volume in 2013 than 2012?
13    A.  Yes.
14    Q.  Do you have an idea by what the approximate
15  increase was?
16    A.  30 percent.
17    Q.  What do you attribute that to?
18    A.  The return of buyers to the market.
19    Q.  Who are the buyers?  Are we talking local or are
20  you seeing a lot of out of state investments?
21    A.  It's a combination.
22    Q.  Are you continuing to see an increase or do you
23  anticipate continued increase into 2014.
24    A.  Of buyers in the marketplace?
25    Q.  Or increase in volume of transactions?

Page 15

1    A.  Yes.
2    Q.  Can you recall a couple of the transactions from
3  last year that were over 3.5 million?
4        MS. CIAMBRONE:  Objection to the extent you're
5  asking for non-public information.  If it's publically
6  available . . .
7        MS. KOZLOWSKI:  Fair enough.
8        THE WITNESS:  I'm trying to think.  Sorry.
9    Q.  (By Ms. Kozlowski)  It's all right.  Take your
10  time.
11    A.  We sold two investment properties that were an
12  office building and an industrial building from one owner
13  that was over 3.5 million.  We had a couple lease
14  transactions that were over 3.5 million and another
15  investment sale.
16    Q.  Was that sale office or industrial?
17    A.  That one was industrial.
18    Q.  And did you represent the seller or the buyer?
19    A.  In one scenario we represented the -- both the
20  buyer and the seller and the other time seller.
21    Q.  With regard to the sale involving both the
22  industrial building and the office building, what was the
23  marketing period prior to the sale?
24    A.  We probably produced a buyer for the properties
25  within 40 days, relatively fast transaction.

Page 16

1    Q.  When you say produced a buyer, what do you mean?
2    A.  Brought a qualified buyer to buy the property.
3    Q.  Then was there a due diligence period after that?
4    A.  Yes.
5    Q.  Do you have a recollection of how long the due
6  diligence period was?
7    A.  Thirty days.
8    Q.  Then approximately how long did it take to close
9  after the due diligence period?
10    A.  Fifteen days.
11    Q.  Were there any for sale conditions?
12    A.  I'm sorry.  I don't understand what you're asking.
13    Q.  Was there a pending foreclosure sale?  Was it an
14  REO property?
15    A.  No.
16    Q.  Did the buyer have cash or financing available at
17  the time --
18        MS. CIAMBRONE:  I'm going to object to this as to
19  relevance.  You can go ahead and answer if you can, but I'd
20  like an objection on the record as to relevance.
21        THE WITNESS:  They were both cash deals.
22    Q.  (By Ms. Kozlowski)  Was the lease transaction for
23  office or industrial?
24    A.  Office.
25    Q.  And then I believe we talked about another sale

Page 17

1  for industrial property.
2    A.  Mm-hmm.
3    Q.  With that one, did you represent the buyer or
4  seller or both?
5    A.  The seller.
6    Q.  Were there any for sale conditions with that sale?
7    A.  No.
8    Q.  And how long was the property approximately
9  marketed before there was a qualified buyer?
10        MS. CIAMBRONE:  Again, objection as to relevance.
11  You can go ahead and answer.
12        THE WITNESS:  Sixty days.
13    Q.  (By Ms. Kozlowski)  And how long was the due
14  diligence period?
15    A.  Thirty days.
16    Q.  Do you have a recollection of how long it took to
17  close after that?
18    A.  Another 30.
19    Q.  Are those the sales you can recall that were over
20  3.5 million last year?
21    A.  Yes.
22    Q.  Is the 30 day due diligence period fairly common
23  in your experience?
24    A.  Yes.
25    Q.  Certainly transactions vary, and I appreciate

Page 18

1  that, but as far as moving from a due diligence period to
2  closing, is 15 days to 30 days something you see pretty
3  common in the market or --
4      A.  Yes.
5          MS. CIAMBRONE:  I'm going to object.  For
6  clarification, are we talking -- we're talking about a for
7  sale transaction or if we're talking about a sale outside of
8  any type of auction or bankruptcy context?  They are two
9  completely different things that should be clarified.
10     Q.  (By Ms. Kozlowski)  Fair enough.  For a sale
11 outside of an auction or bankruptcy context, is a 15 day to
12 30 day closing period fairly typical?
13     A.  Yes.
14     Q.  With regard to the two sales we talked about,
15 there was a 30 to 60 day marketing period to obtain a
16 qualified buyer.  Is that fairly typical outside of the for
17 sale context?
18     A.  Depending on the property, yes.
19     Q.  For commercial real estate, commercial buildings,
20 is that fairly typical?
21     A.  It depends.  Again, like I said, it depends upon
22 the property.  If it is an investment property, yes.  If it
23 is an owner user property, the timing is a little different.
24 Be a little longer time period, likely, to procure a buyer.
25 It's -- it's a -- it just depends.  It's not a -- investment

Page 19

1  properties, yes, that is typical for normal sales outside of
2  bankruptcy or auction situations.
3      Q.  And the owner operator, you indicated, was a
4  little longer.  Can you give me sort of an estimated
5  additional time frame?
6      A.  Four months.
7      Q.  You indicated at the outset that prior to 2011
8  there wasn't a lot of leasing or sales activity in Nevada.
9  Since 2011, what trends have you seen in office leasing?
10     A.  Well, we've seen the vacancy rates have gone down.
11 lease rates have gone up across the board in real estate.
12     Q.  Has that been year over year since 2011?
13         MS. CIAMBRONE:  I'm going to object as to
14 relevance just because we've hired her as a broker or to
15 sell the property, obviously, subject to court approval.  So
16 she's not being offered as an expert witness in any way.  So
17 the question as to leasing and the market are irrelevant.
18     Q.  (By Ms. Kozlowski)  Answer the question.
19     A.  Can you please repeat it, I'm sorry.
20     Q.  Certainly.  Have the improvements and -- decreases
21 in vacancy rates and the improvement of lease rates, since
22 2011, been sort of year over year improvement?
23     A.  Since 2011 we have seen some increase, yes.  We
24 are starting to stabilize.
25     Q.  Who are the out of state buyers that you're seeing

Page 20

1  come into the market that you referenced earlier?
2      A.  I'm sorry.  Are you asking me the type of buyers
3  or --
4      Q.  Yeah, not specific names.
5      A.  Investors.
6      Q.  Has there been any increase in companies opening
7  offices or --
8      A.  We have seen some increases of businesses come to
9  the Las Vegas market.
10     Q.  The investor groups, are they generally hedge
11 funds or sort of private property owners?  Combination?
12 What do the investment groups look like?
13     A.  It's a combination of everything.  Groups, private
14 investors.
15     Q.  Has that increase -- when did that increase begin?
16 Was it in 2011 and has it continued or when did you start to
17 see a meaningful increase in the numbers of buyers in the
18 market?
19     A.  End of 2011.
20     Q.  Based on your knowledge and experience, do you
21 anticipate that the number of investors is going to continue
22 to grow in 2014?
23         MS. CIAMBRONE:  I'm going to object again as to
24 relevance.  She's being proffered here as a potential broker
25 for this particular property.  She's not being proffered as

Page 21

1  an expert as to the underlying sale or who's going to come
2  in.  I'm just not sure where we're going with this line of
3  questioning with respect to what she's here for.
4          MS. KOZLOWSKI:  The motion --
5          Let's go off the record.
6          (Pause in proceedings.)
7          MS. CIAMBRONE:  I have an ongoing relevance
8  objection to the entire line of questioning, to the extent
9  that you're questioning her with respect to the market and
10 the appropriateness of the underlying sales.  It's not what
11 she's being offered for.
12         MS. KOZLOWSKI:  Can you read back my question.
13         (Question on page 20, line 20 was read back.)
14         THE WITNESS:  We will likely see some entry of new
15 investors into the marketplace.
16     Q.  (By Ms. Kozlowski)  What is your experience with
17 medical office space in Las Vegas?
18     A.  I do mainly office investment sales.  So I have
19 experience with medical office tenants, them being occupied
20 in an investment property.
21     Q.  Have you handled any owner occupied sales medical
22 office space?
23     A.  No -- I'm sorry.  By owner occupied you mean
24 vacant?
25     Q.  Somebody purchasing it to --

Page 22

1     A.  To occupy it?
2     Q.  -- utilize some portion of it.
3     A.  No.
4     Q.  If you are retained, how do you intend to market
5  the property?
6     A.  We will put it on all of our commercial listing
7  services that we use.  There are several, approximately five
8  or so.  We will put it on a service called Real Capital
9  Market.  They have a database of -- across the nation of
10 investors that typically buy this type of asset.  We will
11 put it on our company website.  We will send it out globally
12 to everybody in our company, all of our contacts.  We will
13 send it out to our list of investors that we have
14 internally.  We will send it to property owners of similar
15 product type in the Las Vegas Valley.  We will place signage
16 on the property.  We will follow up with phone calls.  We
17 will do a mailer.  I believe -- yes, that's generally what
18 we do.
19    Q.  Is that the type of marketing that you generally
20 do with any sort of commercial property?
21    A.  Yes.
22    Q.  Have you begun any marketing?
23    A.  I haven't been retained, employed.
24    Q.  Fair enough.  Have you been to Horizon Ridge
25 Medical Center?

Page 23

1     A.  Yes.
2     Q.  Have you been inside?
3     A.  Yes.
4     Q.  About how long were you there?
5     A.  Ten minutes.
6     Q.  What was your general opinion of the building?
7     A.  I think it's a class B office building.
8     Q.  No other thoughts?
9     A.  It's your standard class B office -- office
10 building.  It's . . .
11    Q.  Okay.  What documents have you been provided
12 regarding the medical center?
13    A.  I have the rent rolls and an operating statement
14 for October.
15    Q.  Is that the full extent of documents?
16    A.  Regarding the medical center, I've looked at an
17 old appraisal.
18    Q.  Who prepared that appraisal?
19    A.  I don't recall who prepared it.
20    Q.  Do you remember what the date was approximately?
21    A.  2012.
22    Q.  Do you remember the value of that appraisal?
23    A.  3.2 million.
24    Q.  Have you asked for any documents you haven't
25 received yet?

Page 24

1     A.  Yes.
2     Q.  What additional documents would you like to
3  receive?
4     A.  The leases that were done recently.
5     Q.  Any other documents?
6     A.  Operating statements for year end.  And as we go
7  forward, there will be additional documents I need once I'm
8  employed.
9     Q.  What would those include?
10    A.  Leases, any due diligence items that you might
11 have.
12    Q.  Do you require potential purchasers to sign a
13 confidentiality agreement for providing documents?
14    A.  Yes.
15    Q.  Is it a Cushman Wakefield form or --
16    A.  We have a form.
17    Q.  So it would be a standard form that you have
18 that --
19    A.  We have a standard form.
20    Q.  You've indicated at the outset that you had
21 reviewed the declaration that was filed in the Chapter 11
22 case.  Who provided the information that's contained within
23 that declaration?
24    A.  Specifically which information?
25    Q.  If you can review it, let me know if there's any

Page 25

1  information in there that was not provided by you.
2     A.  Okay.  I provided it, yes.
3     Q.  Do you recognize this document?
4     A.  Yes.
5     Q.  What is it?
6     A.  The sale motion.
7     Q.  If I can have you turn to Exhibit A, it's 367-1 at
8  the top, pages 2 and 4.  Have you previously reviewed the
9  sales procedures in any detail?
10    A.  Yes.
11    Q.  Did you provide any comment on the sale procedures
12 before they were filed?
13    A.  No.
14    Q.  Have you provided any comments since they've been
15 filed?
16    A.  Specifically, no.
17    Q.  You sort of hesitated.  Can you -- what's the
18 clarification?
19    A.  We've had discussions regarding the procedures.
20 I've agreed to do the marketing program that's outlined in
21 them.
22    Q.  So --
23    A.  I'm not sure --
24    Q.  -- you haven't suggested any modifications?
25    A.  No, I -- no.

Page 26

1  Q. Can I have you turn towards the back. It's the
2  sales agreement. It's 360 -- I'm sorry the employment
3  agreement, 364-4, page 14 of 20. Who drafted this
4  agreement?
5  A. I received it from John Weiss.
6  Q. Do you have a standard sales agreement that you
7  usually use?
8  A. Yes.
9  Q. Why wasn't that used in this instance?
10 A. This is a bankruptcy sale and there's language in
11 this agreement that we don't generally have in our standard
12 agreements that are outside of those.
13 Q. Who negotiated this agreement on behalf of Bank of
14 America?
15 A. I don't know.
16 Q. In determining what the terms of your engagement
17 would be, who handled it on your end? Was it you or someone
18 else?
19 A. I handled it with CW.
20 Q. Who were you dealing with at CW?
21 A. Ben Miller.
22 Q. The two of you negotiated the terms of the
23 agreement?
24 A. Yes.
25 Q. I apologize. I should have been more clear. Have

Page 27

1  you ever had an agreement structure like this before where
2  you have one fee based on a sale of the property and one on
3  a credit bid?
4  A. No.
5  Q. How were those terms arrived at?
6  A. We arrived at the terms based on the marketing of
7  the property and the employment and we came to a conclusion
8  of a fee for the event of the credit bid and there's
9  definitely motivation there to find another buyer based on
10 the fee. The fee is obviously less with the credit bid.
11 Q. Is the commission -- a 5 percent commission, if
12 you obtain a sale, your standard commission?
13 A. Between 5 and 6 percent is standard, yes.
14 Q. Besides yourself, who will be handling all of the
15 marketing tasks that you indicated?
16 A. My assistant and my partner.
17 Q. About how many hours do you think are required to
18 complete all of the mailings and the postings that you
19 described?
20 A. Approximately a week.
21 Q. How did you arrive at the 75,000 as the payment
22 made under the credit bid?
23 A. It is a percentage of the credit bid. A lower
24 percentage than our standard fee, just ...
25 Q. Do you believe there's a prospect to obtain a

Page 28

1  buyer at $4 million or greater?
2  A. It's possible. I haven't gotten to that point
3  with the property yet because I cannot evaluate it and I
4  don't have all of the data. So I don't have a -- I can't
5  answer that.
6  Q. Would a period of great -- longer than 30 days
7  increase the likelihood of obtaining a buyer at $4 million
8  or greater?
9  A. How long of a period are you referring to?
10 Q. If you had 120 days, would that increase the
11 likelihood of being able to locate a buyer and complete due
12 diligence and close a transaction for $4 million versus 30
13 days?
14 A. Are we talking about an auction scenario?
15 Q. Let's do it in both. So in an auction scenario,
16 120 days out, do you think that increases the likelihood of
17 obtaining a buyer?
18 A. In an auction scenario, I don't believe so.
19 Q. Outside an auction scenario?
20 A. It's possible.
21 Q. Why does the auction scenario alter that answer?
22 A. Because there is a time frame on an auction. It's
23 best to keep things fresh in a buyer's mind. When you have
24 a longer time frame, you see decreased activity. If it is a
25 standard transaction with no auction or end date, it is

Page 29

1  possible that somebody could come in in 120 days and pay
2  more, but in a format where there's a specific time frame,
3  it is better to keep it on the shorter side, rather than the
4  longer side. Everybody will receive the data.
5  Q. Does 30 days provide sufficient time to market and
6  complete due diligence, in your opinion?
7  A. In my opinion, 30 days is a little bit short.
8  Q. I suggested 120. If we were talking 90 days, do
9  you think that would put you in any better position to
10 market and maximize the value in an auction scenario?
11 A. Ninety days is better than 120.
12 Q. Is there an optimal period in-between?
13 A. In my opinion, 60. Six weeks to 60 days is an
14 optimal time to maximize the value in an auction process.
15 Q. Can you explain -- I think you're going to
16 reiterate a little bit, but can you explain why 60 days or
17 six weeks lead to be optimal?
18 A. There have been properties that have been traded
19 via auction. As you know, auction.com is a really big part
20 of the market right now. They generally market six weeks in
21 auction scenarios. It's very effective. It's -- the time
22 frame is right. Everybody can get the due diligence. The
23 property is out there from the time it goes live. Activity
24 generally picks up at auctions 30 days prior to the sale, as
25 a general rule. And I believe six weeks to 60 days is

Page 30

1  plenty of time for somebody to evaluate an asset.
2     Q.  Does that analysis assume we're talking about an
3  investment purchaser versus an owner occupier?
4     A.  Oh, yes.
5     Q.  Owner occupier is unlikely to move that quick.  Is
6  that correct?
7     A.  An owner occupier would move that fast in a sale
8  transaction.  I've sold buildings to owner occupiers in two
9  weeks.  It -- it depends, but in an investment scenario, you
10 have a property, you have all of the data, you're an
11 interested buyer, six weeks is plenty of time for you to
12 make your analysis, considering the fact that in an auction
13 your due diligence is done beforehand as . . .
14    Q.  Do you anticipate appearing at the hearing on the
15 sale motion?
16    A.  Yes.
17    Q.  Have you discussed providing any testimony at the
18 hearing?
19    A.  No.
20    Q.  Have you had any conversations with anyone else at
21 CW Capital, other than Ben Miller?
22    A.  No.
23    Q.  Have you had any conversations with Ben Miller,
24 other than the ones we discussed regarding the negotiation
25 of your engagement?

Page 31

1     A.  I'm sorry.  I don't understand what you're asking
2  me.
3     Q.  Have you had any conversations with Ben Miller,
4  other than the conversations relating to your engagement
5  that we already discussed?
6     A.  Are you asking me if I know Ben Miller previously?
7     Q.  In --
8     A.  Other matters?  Sorry.
9     Q.  No, no, with regard to this property, have you had
10 conversations with Ben Miller that are other than the
11 negotiation of your agreement?  Have you had discussions
12 about the sale, how it proceeds, anything like that?
13    A.  He contacted me and asked me if I would work on
14 this property for him and I agreed and we briefly discussed
15 what it was and that's about it.
16    Q.  Have you been engaged by CW Capital in the past?
17    A.  No.
18    Q.  Do you know if Ben Miller -- from -- do you have a
19 prior relationship with Ben Miller?
20    A.  We've worked on some transactions.  They're a
21 receiver in this market.  So, yes, we build relationships
22 with receivers.
23        MS. KOZLOWSKI:  Going to go off the record for a
24 minute.
25        (Pause in proceedings.)

Page 32

1         MS. KOZLOWSKI:  That's all my questions.  Thank
2  you for your time today.  Appreciate it.
3         THE WITNESS:  Thank you.
4         (The proceedings concluded at 2:56 p.m.)
5                    -oOo-

Page 33

CERTIFICATE OF DEPONENT

PAGE    LINE    CHANGE          REASON
_____
_____
_____
_____
_____
_____
_____

                * * * * *

     I, Danielle Steffen, Deponent
herein, do hereby certify and declare under
penalty of perjury the within and foregoing
transcription to be my deposition in said action;
that I have read, corrected, and do hereby affix my
signature to said deposition, under penalty of perjury.


        _____
             Danielle Steffen, Deponent

Page 34

STATE OF NEVADA  )
                 ) SS:
COUNTY OF CLARK  )
            CERTIFICATE OF REPORTER
        I, Vanessa Lopez, a duly commissioned and licensed court reporter, Clark County, State of Nevada, do hereby certify:  That I reported the taking of the deposition of Danielle Steffen, commencing on Friday, JANUARY 17, 2014, at the hour of 1:58 p.m.;
        That the witness was, by me, duly sworn to testify to the truth and that I thereafter transcribed my said shorthand notes into typewriting, and that the typewritten transcript of said deposition is a complete, true, and accurate transcription of said shorthand notes;
        I further certify that I am not a relative or employee of any of the parties involved in said action, nor a relative or employee of an attorney involved in said action, nor a person financially interested in said action;
        That the reading and signing of the transcript was not requested.
        IN WITNESS WHEREOF, I have hereunto set my hand in my office in the County of Clark, State of Nevada, this 23rd day of JANUARY, 2014.


                    _____
                    VANESSA LOPEZ, CCR NO. 902

**A**
able 28:11
accurate 11:14
 34:13
action 33:16
 34:15,17,17
activity 19:8
 28:24 29:23
adding 11:18
additional 11:6
 11:9 19:5 24:2
 24:7
address 5:3
affix 33:17
ago 5:16 10:16
agreed 4:7
 25:20 31:14
agreement 6:16
 24:13 26:2,3,4
 26:6,11,13,23
 27:1 31:11
agreements
 26:12
ahead 16:19
 17:11
alter 28:21
america 26:14
amy 11:25
analysis 30:2,12
answer 6:2
 16:19 17:11
 19:18 28:5,21
anticipate 14:23
 20:21 30:14
anticipated 7:18
apologize 26:25
appearances 2:8
appearing 30:14
appraisal 23:17
 23:18,22
appreciate
 17:25 32:2
appropriaten...
 21:10
approval 19:15

approximate
 14:14
approximately
 5:17 9:16,25
 16:8 17:8 22:7
 23:20 27:20
areas 10:18
 11:11
arrive 27:21
arrived 27:5,6
asked 23:24
 31:13
asking 15:5
 16:12 20:2
 31:1,6
asset 22:10 30:1
assistant 27:16
associated 13:6
associates 11:3
assume 30:2
attorney 9:19,20
 34:16
attribute 14:17
auction 18:8,11
 19:2 28:14,15
 28:18,19,21,22
 28:25 29:10,14
 29:19,19,21
 30:12
auctions 29:24
audible 5:25
available 15:6
 16:16

**B**
bachelors 8:7
back 21:12,13
 26:1
bank 26:13
bankruptcy 1:1
 5:7 18:8,11
 19:2 26:10
based 11:8
 20:20 27:2,6,9
basically 7:17
basis 14:6

beginning 7:7
begun 22:22
behalf 26:13
believe 7:1 8:9
 16:25 22:17
 27:25 28:18
 29:25
ben 26:21 30:21
 30:23 31:3,6
 31:10,18,19
benchmark
 11:16,22
best 6:12 28:23
better 29:3,9,11
bid 27:3,8,10,22
 27:23
big 29:19
biography
 11:13
bios 11:17
bit 29:7,16
bks1213906lbr
 1:5
board 19:11
break 6:5,7
briefly 6:23
 31:14
broker 8:11,15
 8:19,20 9:23
 13:6 19:14
 20:24
brokerage 10:5
brokered 9:9
brought 16:2
build 31:21
building 15:12
 15:12,22,22
 23:6,7,10
buildings 18:19
 30:8
business 5:3
businesses 20:8
buy 16:2 22:10
buyer 15:18,20
 15:24 16:1,2
 16:16 17:3,9

 18:16,24 27:9
 28:1,7,11,17
 30:11
buyers 12:17
 14:18,19,24
 19:25 20:2,17
 28:23

**C**
called 22:8
calls 22:16
cant 6:12 28:4
capital 22:8
 30:21 31:16
case 1:5 4:19
 5:20 24:22
cash 16:16,21
ccr 1:24 34:24
center 1:5 4:19
 4:22 22:25
 23:12,16
certainly 6:6,8
 14:10 17:25
 19:20
certificate 33:1
 34:3
certified 2:4
certify 33:15
 34:6,14
change 33:3
chapter 1:6 4:19
 24:21
chicago 2:17
ciambrone 2:16
 15:4 16:18
 17:10 18:5
 19:13 20:23
 21:7
civil 4:9
clarification
 18:6 25:18
clarified 18:9
clarify 6:9
clark 34:2,5,21
class 23:7,9
clean 6:1

clear 26:25
close 13:19
 14:11 16:8
 17:17 28:12
closed 11:13
 12:4,21
closing 18:2,12
com 2:12,18
 29:19
combination
 12:16 14:1,21
 20:11,13
come 11:9 20:1
 20:8 21:1 29:1
comes 13:8
commencement
 4:6
commencing
 34:7
comment 25:11
comments 25:14
commerce 10:9
commercial
 10:2,5 14:5
 18:19,19 22:6
 22:20
commission
 27:11,11,12
commissioned
 34:4
common 17:22
 18:3
companies
 10:13 20:6
company 4:21
 8:23 10:5,7
 22:11,12
complete 27:18
 28:11 29:6
 34:12
completely 18:9
comprised
 12:10
concluded 32:4
conclusion 27:7
conditions

16:11 17:6
**confidentiality**
 24:13
**confusion** 4:21
**connection** 4:18
**considering**
 30:12
**contacted** 31:13
**contacts** 22:12
**contained** 24:22
**context** 5:7,13
 18:8,11,17
**continue** 20:21
**continued** 14:23
 20:16
**continuing**
 14:22
**contractors**
 11:10
**conversation**
 7:9,10
**conversations**
 7:6,8,11 30:20
 30:23 31:3,4
 31:10
**corporate** 1:5
**correct** 30:6
**corrected** 33:17
**counsel** 4:7 7:5
**county** 34:2,5
 34:21
**couple** 12:10
 15:2,13
**court** 1:1 2:4 4:7
 4:11 5:18,20
 19:15 34:5
**credit** 27:3,8,10
 27:22,23
**current** 10:24
**currently** 9:8
**cushman** 7:21
 10:9,24 11:1
 24:15
**cw** 26:19,20
 30:21 31:16

 D
**danielle** 1:12
 2:1,14 3:2
 4:10 5:2,2
 33:15,19 34:7
**data** 28:4 29:4
 30:10
**database** 22:9
**date** 23:20 28:25
**day** 17:22 18:11
 18:12,15 34:22
**days** 15:25 16:7
 16:10 17:12,15
 18:2,2 28:6,10
 28:13,16 29:1
 29:5,7,8,11,13
 29:16,24,25
**dealing** 26:20
**deals** 9:9 12:10
 12:12 16:21
**debtor** 1:6 2:9
 4:21
**decembers** 7:2
**declaration** 6:16
 24:21,23
**declare** 33:15
**decreased** 28:24
**decreases** 19:20
**definitely** 27:9
**degree** 7:25 8:6
**depending**
 18:18
**depends** 18:21
 18:21,25 30:9
**deponent** 33:1
 33:15,19
**deposed** 5:9,19
**deposition** 1:12
 2:1 4:18,20
 5:23 6:14 7:4
 7:14 33:16,17
 34:6,12
**described** 27:19
**detail** 25:9
**determine** 12:25

**determining**
 26:16
**developed** 8:24
 9:21
**developer** 9:1,6
 9:21
**development**
 8:21,23 9:15
**different** 11:7
 12:13 18:9,23
**differentiation**
 11:8
**diligence** 16:3,6
 16:9 17:14,22
 18:1 24:10
 28:12 29:6,22
 30:13
**director** 10:25
**directors** 11:3,3
**discuss** 7:12,15
 7:18
**discussed** 7:13
 7:13,14,16
 30:17,24 31:5
 31:14
**discussion** 4:5
**discussions** 7:3
 25:19 31:11
**district** 1:2
**document** 25:3
**documents** 6:20
 6:21 7:16
 23:11,15,24
 24:2,5,7,13
**doing** 14:4
**dont** 5:24 6:6,8
 10:16 12:6,23
 13:17,20 16:12
 23:19 26:11,15
 28:4,4,18 31:1
**drafted** 26:3
**duane** 2:15
**duanemorris**
 2:18
**due** 16:3,5,9
 17:13,22 18:1

 24:10 28:11
 29:6,22 30:13
**duly** 4:11 34:4,9

 E
**earlier** 20:1
**earn** 10:13 11:4
**effective** 29:21
**eighty** 14:3
**either** 10:21
**employed** 8:17
 8:20 22:23
 24:8
**employee** 34:15
 34:16
**employment**
 8:14 26:2 27:7
**engaged** 31:16
**engagement**
 26:16 30:25
 31:4
**entail** 10:12
**entire** 21:8
**entry** 21:14
**esq** 2:10,16
**estate** 5:14 10:2
 10:5,13,19
 18:19 19:11
**estimate** 13:22
 13:23 14:2
**estimated** 12:20
 19:4
**evaluate** 28:3
 30:1
**event** 27:8
**everybody**
 22:12 29:4,22
**exactly** 6:18
**examination** 3:3
 4:15
**examined** 4:13
**exhibit** 25:7
**expense** 6:23
**experience**
 10:15 17:23
 20:20 21:16,19

**expert** 19:16
 21:1
**explain** 29:15,16
**extent** 6:7,21
 15:4 21:8
 23:15

 F
**fact** 30:12
**factual** 5:14
**fair** 13:16 15:7
 18:10 22:24
**fairly** 17:22
 18:12,16,20
**far** 18:1
**fast** 15:25 30:7
**fee** 13:6 27:2,8
 27:10,10,24
**fifteen** 16:10
**filed** 24:21
 25:12,15
**financially**
 34:17
**financing** 16:16
**find** 27:9
**fine** 9:24
**fines** 9:18,22
**finish** 6:1
**first** 4:11 8:17
**five** 22:7
**floor** 2:2,11
**follow** 22:16
**follows** 4:13
**foreclosure**
 16:13
**foregoing** 33:16
**form** 7:13 24:15
 24:16,17,19
**format** 29:2
**forward** 6:12
 24:7
**four** 19:6
**frame** 19:5
 28:22,24 29:2
 29:22
**fresh** 28:23

**full** 6:21 23:15
**funds** 20:11
**further** 34:14

---
**G**

**general** 10:17
  14:11 23:6
  29:25
**generally** 7:12
  7:15 10:14
  13:14 14:4
  20:10 22:17,19
  26:11 29:20,24
**gestures** 5:25
**give** 6:2 19:4
**globally** 22:11
**go** 4:23 6:12
  9:17 10:1 11:6
  13:18 16:19
  17:11 21:5
  24:6 31:23
**goes** 11:17 29:23
**going** 11:18
  16:18 18:5
  19:13 20:21,23
  21:1,2 29:15
  31:23
**gordon** 2:1,10
**gordonsilver**
  2:12
**gotten** 28:2
**gray** 2:10 4:17
**great** 28:6
**greater** 14:12
  28:1,8
**green** 9:21
**group** 10:4
**groups** 20:10,12
  20:13
**grow** 20:22

---
**H**

**hand** 34:20
**handled** 21:21
  26:17,19
**handling** 27:14

**happy** 6:6
**havent** 22:23
  23:24 25:24
  28:2
**head** 5:24 12:6
  12:23 13:21
**hearing** 30:14
  30:18
**hedge** 20:10
**held** 2:1 4:5
**hereunto** 34:20
**hes** 9:20
**hesitate** 6:9
**hesitated** 25:17
**hired** 19:14
**historical** 11:8
**hold** 8:10
**home** 13:6,8
**horizon** 1:5 4:18
  4:22 22:24
**hour** 34:8
**hours** 27:17
**howard** 2:2,11
  5:4
**hughes** 2:2,11
  5:4

---
**I**

**id** 4:21 12:7
  16:19
**idea** 14:14
**ill** 6:1
**illinois** 2:17
**im** 6:18 8:4,19
  12:23 14:10
  15:8 16:12,18
  18:5 19:13,19
  20:2,23 21:2
  21:23 24:7
  25:23 26:2
  31:1
**important** 5:24
**improvement**
  19:21,22
**improvements**
  19:20

**inbetween** 29:12
**include** 24:9
**income** 10:14
  11:4 13:4,5
**increase** 14:15
  14:22,23,25
  19:23 20:6,15
  20:15,17 28:7
  28:10
**increases** 20:8
  28:16
**increasing**
  11:21
**independent**
  11:10
**indicated** 19:3,7
  24:20 27:15
**industrial** 10:4
  10:20,21 11:12
  12:15 13:13,14
  14:5,6 15:12
  15:16,17,22
  16:23 17:1
**industry** 8:24
**information** 8:7
  15:5 24:22,24
  25:1
**inside** 23:2
**insight** 8:21
  9:14
**instance** 26:9
**intend** 22:4
**interested** 30:11
  34:17
**internally** 22:14
**interruption**
  9:12
**investment**
  15:11,15 18:22
  18:25 20:12
  21:18,20 30:3
  30:9
**investments**
  11:12 14:20
**investor** 9:8,10
  20:10

**investors** 20:5
  20:14,21 21:15
  22:10,13
**involved** 14:8
  34:15,16
**involving** 15:21
**ipg** 10:2,3,4,10
  10:18
**irrelevant** 19:17
**itemize** 13:9
**items** 24:10
**ive** 23:16 25:20
  30:8

---
**J**

**january** 1:13
  2:3 4:1 34:7
  34:22
**job** 1:24 10:24
**john** 7:5,10 26:5
**joined** 11:22

---
**K**

**keep** 28:23 29:3
**kind** 11:19
**know** 6:7 9:3
  10:17 12:6,23
  13:17,20 24:25
  26:15 29:19
  31:6,18
**knowledge**
  20:20
**kozlowski** 2:10
  3:4 4:16,17
  9:14 15:7,9
  16:22 17:13
  18:10 19:18
  21:4,12,16
  31:23 32:1

---
**L**

**language** 26:10
**las** 1:13 2:3,11
  4:1 5:4 20:9
  21:17 22:15
**lasalle** 2:16

**lawyer** 5:19
**lead** 29:17
**lease** 15:13
  16:22 19:11,21
**leases** 6:24 24:4
  24:10
**leasing** 14:1,4,5
  14:5,6,6 19:8,9
  19:17
**license** 8:11,12
**licensed** 34:4
**licenses** 8:10
**likelihood** 28:7
  28:11,16
**line** 21:2,8,13
  33:3
**lines** 11:2,4
**list** 22:13
**listing** 6:15 22:6
**little** 18:23,24
  19:4 29:7,16
**live** 29:23
**lived** 7:23
**llp** 2:15
**local** 8:23 14:19
**locate** 28:11
**located** 2:2
**lock** 14:10
**long** 5:16 6:5
  7:23 9:14,24
  10:6 16:5,8
  17:8,13,16
  23:4 28:9
**longer** 18:24
  19:4 28:6,24
  29:4
**look** 12:7,22,23
  12:25 13:21
  20:12
**looked** 6:23
  23:16
**lopez** 1:24 2:4
  34:4,24
**lot** 9:21 14:20
  19:8
**lower** 27:23

**M**
mailer 22:17
mailings 27:18
majority 12:11
mark 9:18,22,24
marked 3:8
market 9:2
   11:20 14:18
   18:3 19:17
   20:1,9,18 21:9
   22:4,9 29:5,10
   29:20,20 31:21
marketed 17:9
marketing
   15:23 18:15
   22:19,22 25:20
   27:6,15
marketplace
   14:24 21:15
markets 9:5
matters 31:8
maximize 29:10
   29:14
mean 11:1 16:1
   21:23
meaningful
   20:17
medical 1:5
   4:18,22 21:17
   21:19,21 22:25
   23:12,16
miller 26:21
   30:21,23 31:3
   31:6,10,18,19
million 11:14
   12:9,11 14:8
   15:3,13,14
   17:20 23:23
   28:1,7,12
mind 28:23
minimize 4:20
minute 31:24
minutes 23:5
mix 12:18,19,19
   13:15

mmhmm 12:2
   17:2
modifications
   25:24
month 6:25
months 9:16,25
   19:6
morris 2:15
motion 6:15,23
   7:16 21:4 25:6
   30:15
motivation 27:9
move 30:5,7
moved 9:1
moving 18:1
multiple 7:8

**N**
name 4:17,25
names 20:4
nation 22:9
need 24:7
negotiated
   26:13,22
negotiation
   30:24 31:11
neighborhood
   13:23
nevada 1:2,13
   2:3,5,11 4:1,9
   5:5,18 7:23
   9:7 19:8 34:1
   34:5,21
new 11:18 21:14
ninety 29:11
nonpublic 15:5
normal 19:1
notes 34:11,13
novembers 7:1
number 12:6,11
   12:13,22,24
   13:20 20:21
numbers 20:17

**O**
oath 4:13

object 16:18
   18:5 19:13
   20:23
objection 15:4
   16:20 17:10
   21:8
obtain 8:12
   18:15 27:12,25
obtaining 28:7
   28:17
obviously 19:15
   27:10
occupied 21:19
   21:21,23
occupier 30:3,5
   30:7
occupiers 30:8
occupy 22:1
occurred 9:3
october 23:14
octobers 6:22
offered 19:16
   21:11
office 8:24 9:18
   9:22 10:20,21
   11:12 12:15
   13:8,13,15
   15:12,16,22
   16:23,24 19:9
   21:17,18,19,22
   23:7,9,9 34:21
offices 20:7
offtherecord 4:5
ogden 11:25
   12:1
oh 8:20 9:13
   30:4
okay 6:4,10
   13:18 23:11
   25:2
old 23:17
once 5:12 24:7
ones 30:24
ongoing 21:7
ooo 4:3 32:5
opening 20:6

operating 6:22
   8:25 9:5 23:13
   24:6
operator 19:3
opinion 23:6
   29:6,7,13
optimal 29:12
   29:14,17
outlined 25:20
outset 19:7
   24:20
outside 18:7,11
   18:16 19:1
   26:12 28:19
owner 15:12
   18:23 19:3
   21:21,23 30:3
   30:5,7,8
owners 20:11
   22:14

**P**
page 3:3 21:13
   26:3 33:3
pages 25:8
parkway 2:2,11
   5:4
part 29:19
particular 20:25
parties 34:15
partner 11:21
   11:24 27:16
pause 21:6
   31:25
pay 29:1
payment 27:21
penalty 33:16
   33:17
pending 6:6
   16:13
percent 13:14
   13:15 14:3,9
   14:16 27:11,13
percentage 13:5
   13:6 27:23,24
performance

   11:8
period 15:23
   16:3,6,9 17:14
   17:22 18:1,12
   18:15,24 28:6
   28:9 29:12
perjury 33:16
   33:17
person 34:17
phoenix 8:3,5
phone 22:16
picks 29:24
place 7:6 22:15
please 4:25 5:3
   19:19
plenty 30:1,11
point 6:5 28:2
portion 22:2
position 29:9
possible 28:2,20
   29:1
postings 27:18
potential 20:24
   24:12
preparation 7:4
prepare 6:14
prepared 23:18
   23:19
president 10:11
pretty 18:2
previously 25:8
   31:6
prior 4:5 15:23
   19:7 29:24
   31:19
private 20:11,13
probably 13:15
   14:9 15:24
procedure 4:9
procedures 25:9
   25:11,19
proceedings 4:6
   9:12 21:6
   31:25 32:4
proceeds 31:12
process 29:14

procure 18:24
produced 15:24
  16:1
product 22:15
production
  10:14
proffered 20:24
  20:25
program 25:20
properties
  15:11,24 19:1
  29:18
property 4:22
  10:4 16:2,14
  17:1,8 18:18
  18:22,22,23
  19:15 20:11,25
  21:20 22:5,14
  22:16,20 27:2
  27:7 28:3
  29:23 30:10
  31:9,14
prospect 27:25
provide 5:21
  25:11 29:5
provided 5:6
  23:11 24:22
  25:1,2,14
providing 9:7
  24:13 30:17
prudential 10:7
  10:8,8
publically 15:5
purchaser 30:3
purchasers
  24:12
purchasing
  21:25
put 22:6,8,11
  29:9

           Q
qualified 16:2
  17:9 18:16
question 6:1,6
  19:17,18 21:12
  21:13
questioning
  21:3,8,9
questions 6:8
  7:19 32:1
quick 30:5

           R
rates 19:10,11
  19:21,21
rciambrone
  2:18
read 6:15 21:12
  21:13 33:17
reading 34:18
real 5:14 10:2,5
  10:13,18 18:19
  19:11 22:8
really 29:19
reason 6:11 33:3
recall 15:2
  17:19 23:19
receive 8:6 24:3
  29:4
received 23:25
  26:5
receiver 31:21
receivers 31:22
recognize 25:3
recollection
  12:3,5,20
  13:12 14:7
  16:5 17:16
reconsideration
  6:24
record 5:1 6:1
  16:20 21:5
  31:23
recorded 5:23
refer 4:21
referenced 20:1
referring 6:18
  28:9
regard 15:21
  18:14 31:9
regarding 6:24

23:12,16 25:19
  30:24
reiterate 29:16
relating 31:4
relationship
  31:19
relationships
  31:21
relative 34:14
  34:16
relatively 15:25
relevance 16:19
  16:20 17:10
  19:14 20:24
  21:7
remember
  23:20,22
rent 6:22,25 7:1
  7:2 23:13
reo 16:14
repeat 19:19
report 6:23
reported 1:24
  34:6
reporter 2:4
  4:11 34:3,5
reporters 4:7
represent 12:17
  15:18 17:3
represented
  15:19
requested 34:19
require 24:12
required 27:17
requirement
  10:14,15
requirements
  4:8 10:16 11:4
respect 21:3,9
responses 7:18
responsibilities
  11:6,9
retained 22:4,23
return 14:18
review 6:20
  24:25

reviewed 6:15
  6:21,22 7:17
  24:21 25:8
ridge 1:5 4:18
  4:22 22:24
right 15:9 29:20
  29:22
roll 6:25 7:1,2
rolls 6:22 23:13
rosanne 2:16
  7:5,11
rule 4:8 29:25
rules 4:9 10:17

           S
sale 6:15 7:16
  15:15,16,21,23
  16:11,13,25
  17:6,6 18:7,7
  18:10,17 21:1
  25:6,11 26:10
  27:2,12 29:24
  30:7,15 31:12
sales 13:25 14:1
  14:2,8 17:19
  18:14 19:1,8
  21:10,18,21
  25:9 26:2,6
salesman 8:11
scenario 15:19
  28:14,15,18,19
  28:21 29:10
  30:9
scenarios 29:21
science 8:7
see 14:22 18:2
  20:17 21:14
  28:24
seeing 14:20
  19:25
seen 19:9,10,23
  20:8
sell 19:15
seller 15:18,20
  15:20 17:4,5
sellers 12:17

send 22:11,13
  22:14
senior 11:2
sense 4:23 6:8
service 22:8
services 9:7
  10:2 22:7
set 34:20
shakes 5:24
shes 19:16 20:24
  20:25 21:3,11
short 29:7
shorter 29:3
shorthand
  34:11,13
side 5:20 29:3,4
sign 24:12
signage 22:15
signature 33:17
signing 34:18
silver 2:2,10
similar 22:14
situations 19:2
six 9:25 29:13
  29:17,20,25
  30:11
sixty 17:12
sizeable 12:10
sizes 12:14
smaller 12:12
sold 10:7,8
  15:11 30:8
somebody 21:25
  29:1 30:1
sorry 8:4,19
  9:13 12:23
  15:8 16:12
  19:19 20:2
  21:23 26:2
  31:1,8
sort 11:7 12:18
  19:4,22 20:11
  22:20 25:17
source 8:14
south 2:16
space 21:17,22

speak 7:21
specialize 10:18
  10:21 11:11
specific 10:18
  20:4 29:2
specifically 7:20
  10:15 24:24
  25:16
spell 4:25
spreadsheet
  13:1,2,9
ss 34:1
stabilize 19:24
standard 23:9
  24:17,19 26:6
  26:11 27:12,13
  27:24 28:25
stands 10:4
start 11:23
  20:16
started 11:19,21
starting 8:18
  19:24
state 2:5 4:25
  5:3,18,20
  14:20 19:25
  34:1,5,21
statement 23:13
statements 24:6
states 1:1
stayed 10:8
steffen 1:12 2:1
  2:14 3:2 4:10
  5:2,2 33:15,19
  34:7
stenographica...
  5:23
street 2:16
structure 27:1
subject 19:15
sufficient 6:2
  29:5
suggested 25:24
  29:8
suite 2:16 5:4
suppose 6:19

sure 6:2,18 21:2
  25:23
sworn 4:11 34:9

———— T ————
take 6:6 7:6
  13:6,8 15:9
  16:8
talitha 2:10 4:17
talked 16:25
  18:14
talking 6:3
  14:19 18:6,6,7
  28:14 29:8
  30:2
tasks 27:15
team 11:22,23
technology 8:7
ten 23:5
tenants 21:19
terms 26:16,22
  27:5,6
testified 4:13
testify 4:12 34:9
testimony 5:6
  5:21 6:12
  30:17
thank 5:6 8:20
  32:1,3
thats 22:17
  24:22 25:20
  31:15 32:1
theres 11:9
  24:25 26:10
  27:8,25 29:2
theyre 31:20
theyve 25:14
things 18:9
  28:23
think 9:1 11:13
  15:8 23:7
  27:17 28:16
  29:9,15
third 2:2,11
thirty 16:7
  17:15

thoughts 23:8
time 6:2 11:17
  15:10,20 16:17
  18:24 19:5
  28:22,24 29:2
  29:5,14,21,23
  30:1,11 32:2
times 5:11
timing 18:23
title 10:10,24
titles 10:13 11:5
  11:7,10
tkozlowski 2:12
today 6:12 32:2
todays 6:14 7:4
top 12:6,23
  13:20 25:8
topics 7:14,15
town 8:23
traded 29:18
transaction 5:15
  11:21 12:6
  13:7 15:25
  16:22 18:7
  28:12,25 30:8
transactions
  11:14 12:4,13
  12:21 13:3,10
  13:13,19 14:8
  14:12,25 15:2
  15:14 17:25
  31:20
transcribed
  34:10
transcript 34:12
  34:18
transcription
  33:16 34:13
trends 19:9
trial 5:21
trick 14:10
true 34:12
truth 4:12,12,13
  34:10
try 4:20 6:2
trying 14:10,11

  15:8
turn 25:7 26:1
two 5:17 6:24
  7:10 15:11
  18:8,14 26:22
  30:8
type 18:8 20:2
  22:10,15,19
typewriting
  34:11
typewritten
  34:11
typical 18:12,16
  18:20 19:1
typically 22:10

———— U ————
underlying 21:1
  21:10
understand
  6:11 16:12
  31:1
understanding
  14:11
united 1:1
university 8:3,5
update 11:19
updated 11:17
use 22:7 26:7
user 18:23
usually 26:7
utilize 22:2

———— V ————
vacancy 19:10
  19:21
vacant 21:24
valley 9:21
  22:15
value 23:22
  29:10,14
vanessa 1:24 2:4
  34:4,24
variety 12:13
vary 17:25
vegas 1:13 2:3

  15:8
turn 25:7 26:1
two 5:17 6:24
  7:10 15:11
  18:8,14 26:22
  30:8
type 18:8 20:2
  22:10,15,19
typewriting
  34:11
typewritten
  34:11
typical 18:12,16
  18:20 19:1
typically 22:10

———— U ————
underlying 21:1
  21:10
understand
  6:11 16:12
  31:1
understanding
  14:11
united 1:1
university 8:3,5
update 11:19
updated 11:17
use 22:7 26:7
user 18:23
usually 26:7
utilize 22:2

———— V ————
vacancy 19:10
  19:21
vacant 21:24
valley 9:21
  22:15
value 23:22
  29:10,14
vanessa 1:24 2:4
  34:4,24
variety 12:13
vary 17:25
vegas 1:13 2:3

  2:11 4:1 5:4
  20:9 21:17
  22:15
versus 13:13
  28:12 30:3
vice 10:11
volume 11:21
  12:5,8 13:3
  14:12,25

———— W ————
waive 4:7
wakefield 10:9
  24:15
want 6:5
wasnt 19:8 26:9
way 19:16
website 22:11
week 7:7 27:20
weeks 29:13,17
  29:20,25 30:9
  30:11
weiss 7:5,10
  26:5
weve 19:10,14
  25:19 31:20
whats 25:17
whereof 34:20
whos 21:1
witness 3:2 5:14
  9:13 15:8
  16:21 17:12
  19:16 21:14
  32:3 34:9,20
work 31:13
worked 31:20

———— X ————

———— Y ————
yeah 4:24 20:4
year 11:18,19
  13:18 15:3
  17:20 19:12,12
  19:22,22 24:6
years 5:17 10:15

| | | |
|---|---|---|
| **youre** 15:4 16:12 19:25 21:9 29:15 30:10 31:1<br>**youve** 24:20<br>**Z**<br>**0**<br>**000** 27:21<br>**1**<br>**1** 2:3 4:2 14:8 34:8<br>**10** 14:9,9<br>**100** 5:4<br>**11** 1:6 4:19 24:21<br>**120** 28:10,16 29:1,8,11<br>**14** 26:3<br>**15** 18:2,11<br>**17** 1:13 2:3 4:1 34:7<br>**18** 9:16<br>**190** 2:16<br>**2**<br>**2** 14:8 23:23 25:8 32:4<br>**20** 13:24 14:9 21:13,13 26:3<br>**200034** 1:24<br>**2001** 7:24<br>**2003** 8:9,13,14<br>**2006** 9:4<br>**2007** 10:7 11:20<br>**2010** 10:8 11:20<br>**2011** 11:14,16 11:19,22 12:4 19:7,9,12,22 19:23 20:16,19<br>**2012** 12:21 13:15 14:12 23:21<br>**2013** 13:19 | 14:12<br>**2014** 1:13 2:3 4:1 14:23 20:22 34:7,22<br>**23rd** 34:21<br>**25** 13:24<br>**3**<br>**3** 14:8 15:3,13 15:14 17:20 23:23<br>**30** 4:8 14:16 17:18,22 18:2 18:12,15 28:6 28:12 29:5,7 29:24<br>**312** 2:17<br>**360** 26:2<br>**3644** 26:3<br>**3671** 25:7<br>**3700** 2:16<br>**3773** 2:2,11 5:4<br>**4**<br>**4** 3:4 4:8 25:8 28:1,7,12<br>**40** 12:9,11 15:25<br>**4990127** 2:17<br>**5**<br>**5** 15:3,13,14 17:20 27:11,13<br>**50** 13:14,15<br>**56** 32:4<br>**58** 2:3 4:2 34:8<br>**6**<br>**6** 27:13<br>**60** 18:15 29:13 29:13,16,25<br>**60603** 2:17<br>**7**<br>**702** 2:12<br>**75** 27:21<br>**7965555** 2:12 | **8**<br>**83** 11:14<br>**89169** 2:11 5:5<br>**9**<br>**90** 29:8<br>**902** 1:24 34:24 |