GORDON SILVER
GERALD M. GORDON, ESQ., NV Bar No. 229
E-mail: ggordon@gordonsilver.com
TALITHA GRAY KOZLOWSKI, ESQ., NV Bar No. 9040
E-mail: tgray@gordonsilver.com
TERESA M. PILATOWICZ, ESQ., NV Bar No. 9065
E-mail: tpilatowicz@gordonsilver.com
3960 Howard Hughes Pkwy., 9th Floor
Las Vegas, Nevada 89169
Telephone (702) 796-5555; Facsimile (702) 369-2666
*Attorneys for Debtor*

**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>HORIZON RIDGE MEDICAL & CORPORATE CENTER, L.L.C.,<br><br>    Debtor. | Case No.: BK-S-12-13906-BTB<br>Chapter 11<br><br><br><br>Date:   February 6, 2014<br>Time:   11:00 a.m. |

**REPLY TO BANK OF AMERICA, N.A., AS TRUSTEE'S RESPONSE TO MOTION TO AMEND OR VACATE ORDERS AND TO REOPEN EVIDENCE PURSUANT TO FED. R. BANKR. P. 9023 AND 9024**

Debtor,[1] by and through its attorneys, the law firm of Gordon Silver, hereby submits its reply (the "Reply") to *Bank of America, N.A. as Trustee's Response to Debtor's Motion to Amend or Vacate Orders and to Reopen Evidence Pursuant to Fed. R. Bankr. P. 9023 and 9024* [ECF No. 392] (the "Response") filed by Lender.

**I.
INTRODUCTORY STATEMENT**

As Lender acknowledges, FRCP 59 is premised upon the court's need "to preserve the delicate balance between the sanctity of final judgments and the incessant command of a court's consciousness *that justice be done in light of all of the facts*." See Walker, 332 B.R. 820, 832 (D. Nev. 2005) (collecting cases) (emphasis added). The facts before this Court indisputably establish that Debtor's occupancy is at 95% as a result of the United Lease and Salon Lease, both

---

[1] Unless otherwise indicated, all capitalized terms herein shall have the meaning set forth in *Debtor's Motion to Amend or Vacate Orders and to Reopen Evidence Pursuant to Fed. R. Bankr. P. 9023 and 9024* [ECF No. 360] (the "Motion").

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103876-001/2182982_3.doc

entered into in December 2013, and that Debtor has since entered into two Lease Extensions (defined below) with Dr. Srinivas Vuthoori and Upper V. Capital Inc.[2] As discussed in conjunction with Debtor's opposition to Lender's sale motion,[3] due to the improvement in real estate values and the increased tenancy, the Medical Center has increased in value **by at least $100,000** since the Court entered its Valuation Order in February 2013. See ECF Nos. 223, 399, and 401.

This Court, a court of equity, cannot ignore the context in which this Motion is brought. This Court previously took evidence on two competing plans. The Debtor's Plan that provides for Debtor to repay all of its debts ***in full*** over seven years and to retain the Medical Center that its principals invested more than fifteen years of their lives designing, constructing, and operating, as well as invested more than $710,000 of their own funds.[4] The Lender's Plan conversely provides for a forced sale of the Medical Center under procedures that ensure that a sales price of 25% - 50% less than the fair market value is obtained.[5] In this context, it would be manifestly unjust to not consider the two new Leases, the two new Lease Extensions, and the corresponding impact on the value of the Medical Center and the confirmability of Debtor's Plan, particularly where such Leases were entered into in December 2013 and where the Motion was brought within 14 days of entry of the Court's Orders.

Importantly, in confirming Lender's Plan, this Court stated that "[i]t would be appropriate to offer conditional confirmation of Debtor's plan, were that possible. However, Debtor lacks

---

[2] Specifically, on January 28, 2014, The MYR Corporation (Dr. Srinivas Vuthoori) executed an addendum to its current lease for Suite 200 extending its lease for a 3-year term through July 31, 2017 (the "Suite 200 Extension"). See Second Abelson Decl. ¶ 3 and Ex. "1," ECF No. 406. Additionally, in his initial declaration [ECF No. 361], Dr. Abelson stated that "Debtor and tenant [in Suite 203] are in negotiations regarding the 3-year extension of the current lease. These negotiations will be finalized prior to the expiration of the current lease," which lease concludes on February 28, 2014. See id.; see also ECF No. 361. Consistent therewith, on January 28, 2014, Debtor and Upper V. Capital, Inc. executed an addendum to its current lease for Suite 203 extending its lease for a 5-year term through February 28, 2019 (the "Suite 203 Extension," and together with the Suite 200 Extension, the "Lease Extensions"). See Second Abelson Decl. ¶ 5 and Ex. "2."

[3] In the interest of brevity, Debtor incorporates herein by this reference the valuation analysis set forth in Debtor's opposition to Lender's sale motion and the supporting declaration of Keith Harper (the "Harper Decl."), ECF Nos. 399 and 401.

[4] See ECF No. 308, at pp. 8-9.

[5] See Harper Decl. ¶¶ 25-28, ECF No. 401.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103876-001/2182982_3.doc

2

the resources to propose a feasible plan." ECF No. 356, p. 23. Debtor submits that the additional Leases and Lease Extensions and corresponding increase in value render Debtor's Plan feasible. Where a new trial will make the difference between liquidation and reorganization and that trial can be completed within 60 days, not only does the policy of Chapter 11 favoring reorganizations support a new trial to consider the Leases and their impact on Debtor's Plan,[6] but the interests of justice likewise mandate a new trial.

## II.
## PERTINENT FACTS

The following chart sets forth Debtor's tenants as of the Confirmation Hearing, the approximate length of their tenancy as of the Confirmation Hearing, the current lease expirations, and Debtor's tenants as of the filing of this Reply:

| *Suite No.* | *Sq. Ft.* | *Tenants as of the Conf. Hearing* | *Approximate Length of Tenancy as of the Confirmation Hearing* | *Tenants as of the Filing of the Reply* |
|---|---|---|---|---|
| 100 | 2,815 | VIP Medical Clinic & Wellness (Dr. Lee) | 12 years (Current lease expiration is 4/30/15) | VIP Medical Clinic & Wellness (Dr. Lee) |
| 101 | 2,448 | VIP Medical Clinic & Wellness (Dr. Lee) | 12 years (Current lease expiration is 4/30/15) | VIP Medical Clinic & Wellness (Dr. Lee) |
| 102 | 1,295 | Salon Triage | 7 years | Salon Fontana **(5-year lease through 1/31/19 with 1 3-year option to extend)** |
| 103 | 2,964 | Madame et Monsieur | 6 years (Current lease expiration is 10/31/15) | Madame et Monsieur |
| 104 | 1,294 | Jaget, Ltd. (Chiropractic Group) | 2 years (3-year lease with 1 3-year extension, current lease expiration is 12/31/14) | Jaget, Ltd. (Chiropractic Group) |
| 105 | 3,278 | Vacant | | United HealthCare Services **(5-year lease through 12/31/18 with 2 3-year options to extend)** |
| 200 | 2,500 | The MYR Corporation (Dr. Srinivas Vuthoori) | 12 years | Dr. Srinivas Vuthoori **(Lease has been extended to 7/31/17)** |
| 201 | 522 | Common Lobby | | Common Lobby for Suites |
| 201A | 161 | Dr. Nancy Sylvanie, Inc. | Month-to-month since 2013;[7] tenant for 7 years | Dr. Nancy Sylvanie, Inc. |

---

[6] The "policy of Chapter 11 is to permit successful rehabilitation of debtors," thereby enabling a troubled enterprise to operate successfully in the future. See National Labor Relations Board v. Bildisco and Bildisco, 465 U.S. 513, 527 (1984); Whiting Pools, Inc., 462 U.S. 198, 204 (1983). "By permitting reorganizations, Congress anticipated that the business would continue to provide jobs, to satisfy creditors' claims, and to produce a return for its owners," as well as to maximize the value of the bankruptcy estate for such creditors and owners. See Whiting Pools, Inc., 462 U.S. at 204; Toibb, 501 U.S. 157, 163 (1991).

[7] The tenant is currently month-to-month due to the pending Chapter 11 proceedings. The tenant will renew her lease if Debtor maintains ownership of the Medical Center.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103876-001/2182982_3.doc

3

| | | | | |
|---|---|---|---|---|
| 201B | 158 | Conference Room | N/A | Conference Room |
| 201C, D, & E | 752 | Nathco Services, Inc. (Medical Equipment Provider) | Month-to-month since 2007; tenant for 11 years | Nathco Services, Inc. (Medical Equipment Provider) |
| 201F | 265 | Key Search International | Month-to-month since 2004; tenant for 10 years | Key Search International |
| 201G | 253 | Leasing and Management Office | N/A | Leasing and Management Office |
| 201H | 178 | XIM Technologies, Inc. (Related to Nathco Services, Inc.) | Executed 7/13 - 1-year term (Current lease expiration is 7/31/14) | XIM Technologies, Inc. (Related to Nathco Services, Inc.) |
| 202 | 2,003 | Anthem Periodontics | 11 years (Current lease expiration is 4/30/17) | Anthem Periodontics |
| 203 | 2,415 | Upper V. Capital Inc. (Liposuction Group) | 2 years | Upper V. Capital Inc. (Liposuction Group) **(Lease has been extended to 2/28/19)** |
| 204 | 665 | Deblanc Music | 2 years (Current lease expiration is 1/31/14)[8] | Deblanc Music |
| 205 | 2,300 | R2H Engineering | Executed 9/13 - 5-year term (1 3-year option to extend, current lease expiration is 9/30/18) | R2H Engineering |
| 206 | 1,294 | Vacant | | Vacant[9] |
| **% Tenancy** | | **83% (incl. conference room and common areas as leased space)** **81% (excl. conference rooms and common areas as leased space)** | | **95% (incl. conference room and common areas as leased space)** **93% (excl. conference rooms and common areas as leased space)** |

See Second Abelson Decl. ¶ 6.

Thus, contrary to Lender's assertions, the Medical Center's occupancy is 95% and 13,791 of the 26,627 sq. ft. of space leased to tenants (or 52%) is for leases extending through 2017 to 2019,[10] with 6,458 sq. ft. of the remaining 10,513 sq. ft. being leased by tenants that have been at the Medical Center for over 10 years.[11] Therefore, over 76% of the tenants have either been

---

[8] Debtor does not intend to renew this lease due to noise complaints by other tenants. The tenant is currently month-to-month. Several doctors have already expressed interest in leasing Suite 204 and it is anticipated that it will be re-leased within 45 days.

[9] In December 2013, two medical groups expressed interest in leasing Suite 206 and discussions remain on-going with these potential tenants.

[10] Tenants with leases extending into and beyond 2017 include: (i) Salon Fontana, 1,295 sq. ft., leased through 1/31/19; (ii) United HealthCare Services, 3,278 sq. ft., leased through 12/31/18; (iii) Dr. Srinivas Vuthoori, 2,500 sq. ft., leased through 7/31/17; (iv) Anthem Periodontics, 2,003 sq. ft., leased through 4/30/17; (v) Upper V. Capital Inc., 2,415 sq. ft., leased through 2/28/19; and (vi) R2H Engineering, 2,300 sq. ft., leased through 9/30/18.

[11] The additional tenants *not* identified in footnote 10 above that have been tenants for in-excess-of 10 years include: (i) VIP Medical Clinic & Wellness, tenant for over 12 years, total of 5,263 sq. ft.; (ii) Nathco Services, Inc., tenant for over 10 years, total of 930 sq. ft.; and (iii) Key Search International, tenant for over 10 years, total of 265 sq. ft.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103876-001/2182982_3.doc

4

tenants of the Medical Center for over 10 years or are subject to leases continuing through between 2017 and 2019.

Of the remaining tenants, only one, Jaget, Ltd., has a lease that terminates in 2014 and only 1,843 sq. ft. (or 6.9%) of the 26,627 sq. ft. being leased by tenants are on a month-to-month basis. Notably, of this 1,843 sq. ft., 1,178 sq. ft. is leased to tenants having been at the Medical Center for 7 to 11 years and Dr. Sylvanie, leasing Suite 201A, has advised that she will sign a new lease upon receiving comfort that Debtor will retain ownership of the Medical Center. See Second Abelson Decl. ¶ 6, ECF No. 406. Thus, Debtor's occupancy has stabilized.

### III.
### ARGUMENT

A. **FRCP 59 v. FRCP 60: The Court Has Significantly Broader Discretion to Amend the Orders Under FRCP 59.**

While Lender acknowledges that FRCP 50 applies to the facts before this Court, Lender instead attempts to apply the case law interpreting FRCP 60 to Debtor's Motion as the standards for relief under FRCP 60 are significant more stringent than those under FRCP 59. See Response, at p. 6:18-7:26. "When a proceeding has been tried to the court as opposed to a jury, the court has broad discretion in deciding whether to grant or deny such motions." Kendall v. Turner (In re Turner), 345 B.R. 674, 676 (Bankr. N.D. Cal. 2006); see also Lavespere v Niagara Machine & Tool Works, Inc., 910 F.2d 167, 174 (5th Cir. 1990) (courts have "considerable discretion" to grant relief requested under FRCP 59); Texas A&M Research Foundation v. Magna Transportation, Inc., 338 F.3d 394, 401 (5th Cir. 2003).

In fact, Lender spent significant time discussing FRCP 60(b)(2), and the limitations on the admission of newly discovered evidence under FRCP 60(b)(2); however, the limitations on newly discovered set forth in FRCP 60(b)(2) are simply not found in FRCP 59, which expressly allows the Court to take additional testimony. "[O]ne of the grounds that may warrant a new trial is a significant change or development in the facts *after* the submission of the issues to the court, i.e., if there is a change in circumstances and the continued enforcement of the judgment would constitute an injustice." White v. White (In re White), 241 B.R. 429, 430 (Bankr. E.D. Ark. 1999) (granted the debtor's motion for a new trial under FRCP 59(a) (emphasis added))

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103876-001/2182982_3.doc

5

1  (citing Gregg v. American Quasar Petroleum Co., 840 F. Supp. 1394 (D. Colo. 1991); McClendon v. B&H Freight Services, Inc., 910 F. Supp. 364 (E.D. Tenn. 1995); Nyberg v. City of Virginia, 667 F.2d 754 (8th Cir. 1982)).

Lender similarly contends that Debtor cannot "rehash the same arguments" under FRCP 60; however, once again, Lender ignores the clear language of FRCP 59 providing that "[a]fter a nonjury trial, the court may, on motion for a new trial, open the judgment if one has been entered, to *take additional testimony,* **amend findings of fact and conclusions of law or make new ones,** *and direct the entry of a new judgment."* Fed. R. Civ. P. 59(a)(2) (emphasis added). Thus, FRCP 59 expressly contemplates the Court reconsidering the arguments previously presented and determined if there was clear error and, if appropriate, directing entry of a new judgment or amending its findings and conclusions.

**B.      Subject to the Court's Calendar, a New Trial Can Be Completed Within 60 Days.**

While Lender provides a very dramatic portrayal of the extent of evidence provided to this Court, the reality is that only 1.5 days of testimony was provided. A new trial to address the Leases, the Lease Extensions, and their impact on Debtor's Plan could be conducted with 1 additional day of trial testimony, which could be completed (subject to the Court's calendar) in 60 days. Debtor and Lender's experts have already prepared their reports. Thus, they would simply need to amend the existing reports to address the new and extended Leases. This is not significant work.

Additionally, there would be no need to provide an amended pre-trial statement, other than a new witness and exhibit list, or to file amended plan objections as the prior pleadings identify the disputed issues and the applicable law. Thus, Debtor submits that the following schedule provides ample time to prepare for a new trial that contemplates the new and extended Leases and their impact on Debtor's Plan.

. . .

. . .

. . .

. . .

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103876-001/2182982_3.doc

6

| *Description* | *Deadline* |
|---|---|
| Service of Debtor's Revised Disclosure Statement | 5 days of entry of the Order granting the Motion (the "Approval Order") |
| Written Discovery (if any) | 10 days after entry of the Approval Order |
| Responses to Written Discovery | 10 days after service |
| Exchange of Amended Expert Reports | 20 days after entry of the Approval Order |
| Depositions (fact and expert – if any) | 21 – 45 days after entry of the Approval Order |
| Ballots and Ballot Summary Due | 7 days before the Confirmation Hearing |
| Joint List of Trial Exhibits and Witness | 7 days before the Confirmation Hearing |
| Confirmation Hearing | 60 days after entry of the Approval Order |

Despite Lender's insinuations to the contrary, the Motion does not create extended delay; instead, the Motion provides the just outcome of allowing this Court to consider, *within 60 days,* Debtor's true occupancy and financial condition before determining that Debtor's assets should be liquidated under forced sale conditions, rather than reorganized as a going-concern for the benefit of all parties-in-interest.[12]

**C.    The Fact That Suite 205 Was Leased as of the Confirmation Hearing Was in Evidence and Thus, the Court's Ruling as to 77% Occupancy Was Erroneous.**

Lender's sole defense to the fact that the Court erred in its determination that Debtor was only 77% leased is its contention that there was no evidence that Suite 205 had been leased as of the Confirmation Hearing. See Response, p. 11 § 1. However, as the following excerpt from the September 17, 2013 transcript unequivocally sets forth, not only was the proposed lease for Suite 205 is evidence at Exhibit 19, but Mr. Weiss, on behalf of Lender, expressly stipulated on the record that the lease for Suite 205 had been signed as of the Confirmation Hearing.

> MS. KOZLOWSKI: Your Honor, in an effort to save any further testimony, the leases -- as Mr. Abelson testified this morning, the lease was being signed. It has, in fact, been signed.
>
> The parties will stipulate that it has been signed, so we don't have to waste any time bringing Mr. Abelson up to actually testify that the new lease has been signed if that's acceptable to the Court.
>
> THE COURT: Yes.
>
> MS. KOZLOWSKI: Okay.

---

[12] Similarly, Lender's contention that a new trial will need to be conducted upon every lease renewal is unavailing. First, as set forth above, only one lease terminates in 2014, and that lease is for a mere 1,294 sq. ft. and does not terminate until December 2014. Second, if the Court determines that Debtor's Plan satisfies Section 1129 as a result of the new and extended Leases and the corresponding increases in value, under Debtor's Plan, Lender retains its right to foreclose under its loan documents should Debtor ever default post-confirmation. Thus, even under a "dooms-day" hypothetical, Lender would still be in a better position than it is in now due to the increased value (as cited in the Harper appraisal) and Lender will have received debt service payments from Reorganized Debtor.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103876-001/2182982_3.doc

7

> MR. WEISS: Your Honor, that's fine with me. I've seen the document. I've seen the signatures on the document. I haven't had a chance to study it to see whether it matches the testimony that was earlier given, so we're not actually putting the document into evidence, but I --
>
> THE COURT: Right. You're --
>
> MR. WEISS: -- have seen --
>
> THE COURT: -- just stipulating that the new lease as to which Mr. Abelson testified has, in fact, been signed by the parties.
>
> MR. WEISS: Yes. But I have no idea whether it actually matches what he testified about, but there is a lease that's been signed. Yes. I can see that.

Request for Judicial Notice, at Ex. "1," filed concurrently herewith. Thus, there can be no dispute that the Court erred in determining that the Center was only 77% leased as of the Confirmation Hearing.

### D. The Leases Improve Debtor's Economic Condition.

Surprisingly, Lender contends that the new Leases do not actually improve Debtor's economic condition. See Response, pp. 9-10. This argument is nonsensical. It is beyond dispute that increasing Debtor's occupancy to 95% improved Debtor's economic condition. This is further substantiated by Mr. Harper's independent valuation, which provides that Debtor's value has increased by ***at least $100,000.*** See Harper Decl., ECF. 401.

While Lender tries to discount the United Lease, Lender conveniently ignores the quality of United Health Care as a tenant. United HealthCare is one of the largest healthcare companies in the United States and thus, is not a credit risk, alleviating the need for a security deposit. Additionally, having United HealthCare and its doctors as a tenant significantly increases the appeal of the Medical Center to other doctors, thereby providing certainty that the Center will remain fully leased, which is bolstered by United HealthCare's right to first refusal to lease the remaining space as it seeks to grow its practice in Nevada as well. See Abelson Decl. ¶¶ 3 and 4, ECF No. 361.

Furthermore, Lender completely ignores the fact that Debtor has been able to obtain 95% occupancy despite being a debtor in a Chapter 11 proceeding. This Court is certainly cognizant of the negative impact being a debtor has on the ability to lease property. The fact that Debtor

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103876-001/2182982_3.doc

8

has achieved such high occupancy with exceptional tenants at reasonable lease rates is a testament to the quality and skill of Debtor's management and is nothing short of an impressive feat. This Court should dismiss Lender's very strained efforts to minimize Debtor's exceptional occupancy and the quality of these new Leases and the improvement in Debtor's economic condition.

E.     **Asking the Court to Apply Section 1.1.73 of the Plan Is Not a "New Legal Theory."**

Unable to dispute that the Court failed to properly apply the interest rate set forth in Section 1.1.73 of Debtor's Plan,[13] Lender instead contends that Debtor is somehow raising a "new legal theory" in contending that the Court was required to determine the appropriate interest rate under Section 1129(b). Such argument is nonsensical. Requiring this Court to determine the appropriate interest rate is not only consistent with Section 1129(b) itself, but also the clear language of Debtor's Plan and the ordinary course of conduct in the numerous cases that have been before this Court.[14] While Debtor advocated that a 5% interest rate satisfies Section 1129(b)'s requirements, as the Court did not agree, the Court was required, under both Section 1.1.73 of Debtor's Plan and Section 1129(b), to determine the appropriate interest rate. This is not "a new legal theory;" rather, it is simply a requirement that the Court act in

---

[13] Section 1.1.73 provides as follows: "**Secured Interest Rate.** The rate of 5.00% per annum, or such other interest rate as determined by the Bankruptcy Court in conjunction with the Confirmation Hearing in the event the Bankruptcy Court must determine a fair and equitable interest rate pursuant to Section 1129(b) of the Bankruptcy Code."

[14] See In re Sarvpreet Singh Bains, Case No. 11-53427-gwz (jointly administered with In re Bains Motels, Inc., Case No. 11-53423-gwz) (Bankr. D. Nev. Feb. 26, 2013) (plan at ECF No. 136 provided, in relevant part: "The Pacifica Secured Claim shall bear interest at the rate of 3.75% per annum from and after the Effective Date, or, in the event of objection by the Class 1 creditor, such other rate as the Court shall determine is appropriate after considering the evidence at the Confirmation Hearing," and the pursuant to such term, the confirmation order at ECF No. 206 amended the plan to provide a different interest rate, as follows, "The Pacifica Secured Claim shall bear interest at the rate of 5.13% per annum, amortized over thirty (30) years, from and after the Effective Date."). Courts have also revised a plan's interest rate in its confirmation order without this express clause authorizing the court to do so. See In re Windmill Durango Office, LLC, 481 B.R. 51, 59 (9th Cir. B.A.P. 2012) (affirming the bankruptcy court's confirmation of the debtor's plan with an interest rate of 4.52% rather than the plan's proposed interest rate of 2.75%); In re Woodridge Villas, Inc., Case No. 12-11795-led (Bankr. D. Nev. Apr. 8, 2013) (plan at ECF No. 81 providing, in relevant part, "The Lender will be paid its claim in full, including principal, accrued interest and costs and reasonable attorneys' fees. This amount shall be paid with interest at the rate of 3.83% per annum from the Effective Date," but the court confirmed the plan in its confirmation order with a different interest rate, as follows, "the Plan is confirmed, with an appropriate interest rate of 4.25% under Till. . . ."); In re Mendoza, 2010 WL 1610120, 2010 Bankr. Lexis 1308 (Bankr. N.D. Cal. 2010) (despite the plan providing for a 3.75% interest rate for secured creditor U.S. Bank, the Court entered a memorandum regarding confirmation providing that if the debtor amended his plan to provide an interest rate of 4.4%, it would confirm the plan).

103876-001/2182982_3.doc

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

accordance with Debtor's Plan and Section 1129(b). The Orders must be corrected to address the Court's misapplication of Section 1.1.73 of Debtor's Plan, resulting in Debtor's Plan meeting the requirements of Section 1129(a)(7), 1129(b)(2)(A), and (b)(2)(B).

### F. The Leases and a New Trial Should Resolve the Court's Good Faith Concerns.

Lender contends that a new trial will not resolve the Court's good faith findings. This arguments is incorrect for at least two reasons. Foremost, the two new Leases and two new Lease Extensions and their combined effect on the present and future values of the Medical Center are absolutely pertinent to a determination of whether the risk has been shifted to Lender. The evidence of an increase in value by over $100,000 and an occupancy of 95% certainly counter against any contention that Debtor's Plan shifts the risk to Lender and must be considered by this Court at a new trial.

Second, the Court found that Debtor's Plan was not filed in good faith where it was filed *in advance of* the Confirmation Hearing and was addressed in two days of trial testimony. See Memorandum, at p. 15:10-19. However, the Court confirmed Lender's Plan, where Lender orally modified its treatment of the General Unsecured Claims *during* the Confirmation Hearing and where the Court required numerous modifications *after* the Confirmation Hearing to Lender's Plan to which Debtor was not provided an opportunity to comment or object. See ECF Nos. 356 and 357. Such rulings are entirely incompatible and must be addressed at a new trial.

### G. The Court's Determination that Debtor's Disclosure Statement was Inadequate Pursuant to Sections 1125(b) and 1129(a)(2) Was Erroneous.

Lender contends that a new trial would not resolve the Court's determinations regarding the accuracy of Debtor's Disclosure Statement. Lender is wrong. Foremost, the increased occupancy (95%) and the increased value (over $100,000) are all relevant to whether the Disclosure Statement contacted adequate information.

Additionally, certain of the Court's findings were erroneous and the Court's Orders should be amended accordingly. The following table sets forth the Court's specific findings that the Disclosure Statement was inadequate, and provides the evidence or other support in the record that either refutes such finding or supports the adequacy of the Disclosure Statement:

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103876-001/2182982_3.doc

10

| *Finding in Memorandum* | *Evidence or other Support that Refutes Such Finding or Supports Adequate of Disclosure Statement* |
|---|---|
| "Debtor's Disclosure Statement fails to provide accurate information regarding the number, scope, and type of claims and classes of claims under the Second Amended Plan" because (i) "[Lender's] unsecured deficiency claim should have been separately classified from [Lender's] secured claim under Debtor's Original Reorganization Plan," (ii) "Debtor did not send [Lender] a ballot to vote its unsecured deficiency claim." See Memorandum, at p. 12:17-13:3. | The treatment of Lender's deficiency claim did not change between Debtor's initial plan and its amended plan, other than the decrease from 3 years of interest-only payments to 2 years of interest-only payments. Rather, Debtor always contemplated that the entirety of Lender's claim would be paid over seven years. The only difference was the separate classification of any deficiency claim into Class 1B in the amended plan. At the time of the plans, it remained uncertain whether Lender would even have an unsecured claim, which determination was not made until half-way through the first day of the Confirmation Hearing. Additionally, as the Court noted, the separate classification was proper under Ninth Circuit law. See Memorandum, at p. 12:11-16.<br>Moreover, the creation of Class 1B would not have affected any creditor votes as Lender's Class 1 rejection vote under the initial plan was attributed to both Class 1A and Class1B. See In re Bergh, 141 B.R. 409, 421 (Bankr. D. Minn. 1992). Hence, adequate disclosure was made. |
| "Debtor's Disclosure Statement stated that the Administrative Claims were approximately $29,000. At the Confirmation Hearing the Administrative Claims were disclosed to be approximately $350,000.00. Thus, Debtor's Disclosure Statement failed to provide accurate information regarding the scope of Debtor's Administrative Claims." Memorandum, at p. 13:4-8. | While Debtor did include an "estimate of unpaid administrative expenses of $29,000," Debtor expressly stated in the Disclosure Statement that they were an "estimate." See ECF No. 116, at p. 15. The Disclosure Statement also expressly stated that the longer the Chapter 11 Case goes on, Debtor will be required to incur substantial costs for professional fees and other expenses associated with the proceedings. See id. at p. 34. Thus, the Disclosure Statement expressly contemplated the possibility for increased administrative costs, and warned creditors of such risk. Hence, adequate disclosure was made. |
| Because the occupancy rate at the time of the Confirmation Hearing was different than at the time the Disclosure Statement was filed, "Debtor's Disclosure Statement failed to provide accurate information regarding the Property's tenant occupancy rate." Memorandum, at p. 13:9-14. Also, "Debtor's Disclosure Statement fails to provide accurate information regarding the Property's long-term occupancy rate and the risk that such a low occupancy rate poses to creditors under Debtor's Second Amended Plan. | Foremost, the Disclosure Statement expressly states that one of the risk factors of a prolonged Chapter 11 Case could be the "loss of valuable tenants." See id., at p. 34. The Disclosure Statement thus warned creditors that tenant occupancy can fluctuate during the pendency of the Chapter 11 Case. Moreover, Debtor is currently 95% leased and more than 76% of the tenants have either been tenants of the Center for over 10 years or are subject to leases continuing through between2017 and 2019. |

Contrary to Lender's generalized and vague assertions regarding the Court's disclosure statement findings [Response 11:17-26], the foregoing errors identified in the first column were the specific bases for the Court's finding that Debtor failed to satisfy Section 1129(a)(2). As established in the second column of the table, however, the Disclosure Statement was adequate for the purposes of Section 1125(b) and 1129(a)(2), and the Orders should be amended

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103876-001/2182982_3.doc

11

accordingly, particularly where Debtor' tenancy is currently 95%.

**H.    Presenting Legal Authority to Advise the Court of an Erroneous Legal Conclusion Regarding Feasibility is Appropriate.**

As pointed out in the Motion, the Court erred in determining that a sale of the Medical Center with a 90% loan-to-value ratio at the end of the Plan term that would repay all claims in full, including the Class 1A and Class 1B Notes, while also providing a return to equity, was not feasible under Section 1129(a)(11). Debtor did not need to prove at confirmation how it would make the balloon payments to repay its secured creditor, or who would buy the Medical Center or refinance the secured claim at maturity of the Plan.[15] Rather, Debtor was only required to prove that it would have the ability to attract refinancing or could sell the Medical Center and pay off Lender's claims in full. See In re Geijsel, 480 B.R. at 260-61. Debtor satisfied this requirement.

Whether the Court uses an overly conservative 90% loan-to-value ratio at the end of the Plan term as it did in its Memorandum, or more appropriately adopts a loan-to-value ratio consistent with the Medical Center's increase in value resulting from both market appreciation and the new Leases and the new Lease Extensions,[16] Debtor has established its ability at the end of the Plan term to make the balloon payments—either by refinancing the Class 1A and Class 1B Notes or selling the Medical Center and paying such notes in their entirety. Thus, contrary to the Court's conclusion, Debtor has satisfied the feasibility requirement of Section 1129(a)(11).

. . .

---

[15] See Motion, at pp. 14:17-15:10 (citing In re Geijsel, 480 B.R. 238, 260-61 (Bankr. N.D. Tex. 2012); In re Boulders on the River, Inc., 164 B.R. 99 (B.A.P. 9th Cir. 1994); In re Briscoe Enterps., Ltd., II, 994 F.2d 1160 (5th Cir. 1993); In re Guilford Telecasters, Inc., 128 B.R. 622 (Bankr. N.C. 1991); In re LMR, LLC, 496 B.R. 410 (Bankr. W.D. Tex. 2013); In re T-H New Orleans Ltd. P'ship, 116 F.3d 790, 802 (5th Cir. 1997); In re Trenton Ridge Investors, LLC, 461 B.R. 440, 494 (Bankr. S.D. Ohio 2011); F.H. Partners, L.P. v. Inv. Co. of the Sw., Inc. (In re Inv. Co. of the Sw., Inc.), 341 B.R. 298, 316 (B.A.P. 10th Cir. 2006)).

[16] As set forth in the Harper Decl. and briefly above, the value of the property based on comparable sales (sales comparison approach) and the property's increased net operating income taking into account the two new Leases (the income capitalization approach) has already increased $100,000 to $4,350,000. See also *Debtor's Post-Confirmation Brief* [ECF No. 308 (if the Medical Center appreciated at a conservative rate of 1%, the value of the Medical Center at Plan end would be $4.7 million, with a loan-to-value ratio of 84.2%. If the property appreciated at rate of 2.85% (which Debtor still believes is conservative), the value of the Medical Center at Plan end would be $5.3 million, with a loan-to-value ratio of 74.9%. With such appreciation, it is likely that Debtor could refinance the balloon payment.).

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103876-001/2182982_3.doc

12

Furthermore, it is a red herring that Lender does not even attempt to argue that the Court's feasibility determination was an erroneous legal conclusion. Lender simply cannot rebut the foregoing authority and evidence that supports a finding that Debtor's Plan is feasible. Instead, in an effort to get the Court to not correct an erroneous legal conclusion, Lender accuses Debtor of citing In re LMR, LLC, 496 B.R. 410 (Bankr. W.D. Tex. 2013), among other cases, in the Motion to re-litigate old matters. This accusation lacks merit.

Debtor appropriately referenced these cases to advise the Court of its erroneous legal conclusion regarding feasibility, not to raise new legal arguments or to rehash the same arguments made at the Confirmation Hearing. This is precisely what a motion for reconsideration under FRCP 59 is designed to do. See In re Walker, 332 B.R. at 831-32 (reconsideration of a judgment under FRCP 59(e) is appropriate to correct manifest errors of law or fact upon which a judgment is based). As such, where the Motion seeks reconsideration of erroneous legal conclusions and factual findings, the Motion is appropriate, and should be granted.

## IV.
## CONCLUSION

Debtor respectfully requests that the Court grant this Motion, thereby: (i) reopening evidence through a new trial to consider the Leases and Addenda and their corresponding impact on the Medical Center's valuation and Debtor's Plan; (ii) vacating or amending its Orders as necessary to correct the factual and legal errors as more fully set forth in the Motion and this Reply; and (ii) granting such other and further relief as is just and proper.

DATED this 31st day of January, 2014.

                GORDON SILVER

                By:   /s/ Talitha Gray Kozlowski
                     GERALD M. GORDON, ESQ.
                     TALITHA GRAY KOZLOWSKI, ESQ.
                     TERESA M. PILATOWICZ, ESQ.
                     *Attorneys for Debtor*

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103876-001/2182982_3.doc

13