GORDON SILVER
GERALD M. GORDON, ESQ.
Nevada Bar No. 229
E-mail:  ggordon@gordonsilver.com
TALITHA GRAY KOZLOWSKI, ESQ.
Nevada Bar No. 9040
E-mail:  tgray@gordonsilver.com
TERESA M. PILATOWICZ, ESQ.
Nevada Bar No. 9065
E-mail:  tpilatowicz@gordonsilver.com
3960 Howard Hughes Pkwy., 9th Floor
Las Vegas, Nevada 89169
Telephone (702) 796-5555
Facsimile (702) 369-2666
Attorneys for Debtor

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No.:    BK-S-12-13906-BTB |
| HORIZON RIDGE MEDICAL & CORPORATE CENTER, L.L.C., | Chapter 11 |
| Debtor. | |

## NOTICE OF APPEAL

Horizon Ridge Medical & Corporate Center, L.L.C. ("Debtor") appeals under 28 U.S.C. § 158(a) and Rule 8001 of the Federal Rules of Bankruptcy Procedure from the *Order Denying Approval of Debtor's Disclosure Statement* [ECF No. 351] and the *Memorandum Decision Concerning Denial of Confirmation of Debtor's Second Amended Plan of Reorganization* [ECF No. 349] entered in this bankruptcy proceeding on the 20th day of December, 2013 and the *Order Denying Approval of Debtor's Disclosure Statement* [ECF No. 431] and the *Memorandum Decision Granting in Part Debtor's Motion to Amend or Vacate Orders and to Reopen Evidence Pursuant to Fed. R. Bankr. P. 9023 and 9024 by Denying Confirmation of Debtor's Second Amended Plan of Reorganization* [ECF No. 429] entered in this bankruptcy proceeding on the 5th day of March, 2014, copies of which are attached hereto as **Exhibits "1" - "4."**

The names of all parties to the order appealed from and the names, addresses, and

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103876-001/2220225

telephone numbers of their respective attorneys are as follows:

APPELLANT:

> *Horizon Ridge Medical & Corporate Center, L.L.C.*
> GERALD M. GORDON, ESQ.
> TALITHA GRAY KOZLOWSKI, ESQ.
> TERESA M. PILATOWICZ, ESQ.
> **Gordon Silver**
> 3960 Howard Hughes Parkway, 9th Floor
> Las Vegas, Nevada 89169
> Telephone: 702.796.5555
> Facsimile: 702.369.2666
> E-Mail: ggordon@gordonsilver.com
> tgray@gordonsilver.com
> tpilatowicz@gordonsilver.com

APPELLEE:

> *BANK OF AMERICA, N.A., successor by merger*
> *to LaSalle Bank National Association, as trustee*
> *for the registered holders of GMAC Commercial*
> *Mortgage Securities, Inc., Commercial Mortgage*
> *Pass-Through Certificates, Series 2003-C1, acting*
> *by and through CWCapital Asset Management, LLC,*
> *as Special Servicer*
> DOMINICA C. ANDERSON, ESQ. (SBN 2988)
> **Duane Morris LLP**
> 100 North City Parkway, Suite 1560
> Las Vegas, NV 89106
> Telephone: 702.868.2600
> Facsimile: 702.385.6862
> E-Mail: dcanderson@duanemorris.com
>
> JOHN ROBERT WEISS (IL Bar No. 6190335)
> *Admitted Pro Hac*
> **Duane Morris LLP**
> 190 South LaSalle Street, Suite 3700
> Chicago, IL 60603
> Telephone: 312.499.6700
> Facsimile: 312.499.6701
> Email: jrweiss@duanemorris.com

. . .

. . .

. . .

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

103876-001/2220225

2

1

2

DATED this 13th day of March, 2014.

GORDON SILVER

3

4

By: */s/ Teresa Pilatowicz*

GERALD M. GORDON, ESQ.

5

TALITHA GRAY KOZLOWSKI, ESQ.

TERESA M. PILATOWICZ, ESQ.

6

3960 Howard Hughes Pkwy., 9th Floor

Las Vegas, Nevada 89169

7

Attorneys for Debtor

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

3

103876-001/2220225

# EXHIBIT "1"




Honorable Lloyd King
United States Bankruptcy Judge

**Entered on Docket**
**December 20, 2013**

1

2

3

4

5

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

\* \* \* \* \* \*

6

7

8

9  In re:

10

11

12

13

|  |  |  |
|---|---|---|
| In re: | ) | Case No.: BK-S-12-13906 |
|  | ) |  |
| HORIZON RIDGE MEDICAL & | ) | Chapter 11 |
| CORPORATE CENTER, L.L.C., | ) |  |
|  | ) | Date: September 16 & 17, 2013 |
| Debtor. | ) |  |
|  | ) |  |

14

15

### ORDER DENYING APPROVAL
### OF DEBTOR'S DISCLOSURE STATEMENT

16    For the reasons set forth in the Memorandum Decision Concerning Denial

17  Of Confirmation Of Debtor's Second Amended Plan Of Reorganization entered

18  concurrently herewith, final approval of the Disclosure Statement to Accompany

19  Debtor's Amended Plan of Reorganization [ECF No. 116] is **DENIED**.

20

21  **IT IS SO ORDERED**

22

23    Copies noticed through ECF to:

24    DOROTHY G. BUNCE on behalf of Interested Party Rick Abelson
          1bankruptcy@cox.net

25

26

1

TALITHA GRAY KOZLOWSKI on behalf of Debtor HORIZON RIDGE
    MEDICAL & CORPORATE CENTER, LLC
    bankruptcynotices@gordonsilver.com; bknotices@gordonsilver.com

KIRK D. HOMEYER on behalf of Debtor HORIZON RIDGE MEDICAL &
    CORPORATE CENTER, LLC

BANKRUPTCYNOTICES@GORDONSILVER.COM,

BKNOTICES@GORDONSILVER.COM

TERESA M. PILATOWICZ on behalf of Debtor HORIZON RIDGE MEDICAL
    & CORPORATE CENTER, LLC Bankruptcynotices@gordonsilver.com,
    bknotices@gordonsilver.com

U.S. TRUSTEE - LV - 11, 11

USTPRegion17.lv.ecf@usdoj.gov

JOHN ROBERT WEISS on behalf of Interested Party BANK OF AMERICA,
    N.A. AS SUCCESSOR BY MERGER TO LASALLE BANK NATIONAL
    ASSOCIATION, AS TRUSTEE jrweiss@duanemorris.com,
    maolins@duanemorris.com; jjohnson3@duanemorris.com

MATTHEW C. ZIRZOW on behalf of Debtor HORIZON RIDGE MEDICAL &
    CORPORATE CENTER, LLC mzirzow@lzlawnv.com,
    susan@lzlawnv.com; tiffany@lzlawnv.com; carey@lzlawnv.com;
    mary@lzlawnv.com

and sent to BNC to:

    All parties on BNC mailing list

# # #

2

# EXHIBIT "2"



*Lloyd King*

Honorable Lloyd King
United States Bankruptcy Judge

**Entered on Docket**
**December 20, 2013**

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

\* \* \* \* \* \*

In re:                                           )    Case No.: BK-S-12-13906
                                                 )
HORIZON RIDGE MEDICAL &                          )    Chapter 11
CORPORATE CENTER, L.L.C.,                        )
                                                 )    Date: September 16 & 17, 2013
             Debtor.             )
                                                 )
_____ )

## MEMORANDUM DECISION CONCERNING DENIAL OF CONFIRMATION OF DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION[1]

## INTRODUCTION

A plan confirmation hearing ("Confirmation Hearing") concerning two competing reorganization plans in the above-referenced case was conducted on

---

[1] In this Order, all references to "Section" shall be to provisions of the Bankruptcy Code, 11 U.S.C. section 101 et seq., unless otherwise indicated. All references to "Code" shall be to the United States Bankruptcy Code, 11 U.S.C. § 101, et. seq. All references to "FRCP" shall be to the Federal Rules of Civil Procedure. All references to "FRBP" or "Rule" shall be to the Federal Rules of Bankruptcy Procedure.

1

1   September 16 and 17, 2013.[2]  Talitha Gray Kozlowski, Esq., and Teresa M.

2   Pilatowicz, Esq., of Gordon Silver, appeared for Debtor.  John Robert Weiss, Esq.,

3   and Dominica C. Anderson, Esq., of Duane Morris, appeared for Bank of America,

4   N.A.[3] ("BofA" or "Lender")

5         After the filing of post-hearing memoranda, final arguments were heard on

6   October 22, 2013.  On that date, the Court advised counsel that confirmation of

7   Debtor's Second Amended Plan of Reorganization would be denied, and that

8   Lender's Liquidation Plan would be confirmed.  Counsel for Lender was told to

9   file proposed findings of fact and conclusions of law.

10        This opinion concerns only the denial of Debtor's Second Amended Plan of

11  Reorganization.  A separate opinion will address confirmation of Lender's

12  Liquidation Plan.

13

14  **FACTS**

15        Debtor owns and operates the Horizon Ridge Medical & Corporate Center,

16  an office building located at 2610 W. Horizon Ridge Parkway, Henderson, NV (the

17  "Property").[4]

18  _____

19        [2] Three disputed matters were considered at the Confirmation Hearing:
    (i) Final approval of the Debtor's Disclosure Statement (Dkt. #116) that was conditionally

20        approved on November 14, 2012 (Dkt. #159);
    (ii) Confirmation of Debtor's Second Amended Plan of Reorganization (Dkt. #284), Ex. 2; and

21    (iii) Confirmation of Bank of America, N.A. as Trustee's Liquidation Plan for the Property
        (Dkt. #126), Ex. 7.

22

23        [3] Bank of America, N.A. is the successor by merger to LaSalle Bank National
    Association, as trustee for the registered holders of GMAC Commercial Mortgage Securities,

24  Inc., Commercial Mortgage Pass-Through Certificates, Series 2003-C1.

25        [4] Debtor is a single-asset real estate entity: its sole asset is the Property and improvements
    comprising the Medical Center building.  The Property is managed by Dr. Rick Abelson.

26  (Second Amended Plan, ¶ 5.7; Dkt#284, p. 22).

1    Debtor filed a voluntary Chapter 11 petition on April 2, 2012. (Dkt. #1).

2    The Court has determined the value of Debtor's Property to be $3,975,000.

3    (Order Determining Value of Debtor's Real Property for Purposes of

4    Confirmation, Dkt. #223).

5    The Court has also determined that Lender holds a secured claim in the

6    amount of $3,975,000 and an unsecured claim in the amount of $369,314.

7    (Findings of Fact and Conclusions of Law and Order Regarding Debtor's

8    Objection to Proof of Claim, etc., Dkt. #313).

9    Chandrakant Patel ("Patel") and Dr. Rick Abelson ("Abelson") own the

10    equity interests in Debtor.  Abelson manages the Property.

11

12    **DEBTOR'S PLANS AND DISCLOSURE STATEMENT**

13    On October 12, 2012, Debtor filed an Amended Plan of Reorganization, Dkt.

14    #115, and a Disclosure Statement. (Dkt. #116).

15    On November 14, 2012, pursuant to Local Rule 3017, the court entered an

16    Order conditionally approving the Debtor's Disclosure Statement.[5]  The court

17    found that Debtor's Disclosure Statement contained "adequate information" within

18    the meaning of Section 1125 of the Code and established procedures for the

19    Debtors' solicitation of votes on Debtor's then-existing reorganization plan

20    _____

21    The "Property is approximately 2.2 acres of land, and the Center consists of a two-story
office building situated on the Real Property with approximately 29,142 sq. ft., containing six

22    first-floor suites, and seven second-floor suits, one of which has been subdivided into nine suites,
for a total of twenty-one suites. Debtor maintains its management office in one of the eight

23    subdivided suites, as well as a community conference room, thereby leaving nineteen leasable

24    suites." (Disclosure Statement, Dkt. #116, at p. 15).

25    [5] The Disclosure Statement provides that BofA's claim is secured. (Disclosure
Statement, Dkt. #116, at p. 11). Debtor disputed the scope of BofA's secured claim, and

26    reserved the right to object to the claim amount. (Id.).

3

1  ("Original Reorganization Plan").[6] (Disclosure Statement Order, Dkt. #159). A

2  confirmation hearing was, eventually, set for September 16, 2013.

3      On September 13, 2013, one business day before the confirmation hearing,

4  Debtor filed its Second Amended Plan of Reorganization ("Second Amended

5  Plan"). (Dkt.#284) That is the Plan which is the subject of this opinion. The

6  Second Amended Plan was not accompanied by a disclosure statement. When

7  Debtor's Second Amended Plan was filed, discovery had already closed, and the

8  parties had filed trial memoranda concerning confirmation of the Original

9  Reorganization Plan, filed by Debtor in October, 2012.

10     By the time of the September, 2013, confirmation hearing, the November,

11  2012 Disclosure Statement was inaccurate in several respects. Tenant occupancy

12  was overstated. The Disclosure Statement reported 97% occupancy. At the time

13  of the confirmation hearing, occupancy was 77%. Unsecured claims were stated to

14  be approximately $9,000, which fails to take account Lender's unsecured claim in

15  excess of $300,000. The Disclosure Statement alleges that administrative claims

16  are $29,000. At the confirmation hearing, Abelson testified that such claims are

17  about $350,000.

18     The Second Amended Plan differs from the Original Reorganization Plan in

19  two significant respects. The Second Amended Plan subdivides Lender's Class 1

20  into two separate classes: Class 1A and Class 1B. Class 1A includes only BofA's

21  secured claim. Class 1B includes only BofA's unsecured deficiency claim.

22  (Second Amended Plan, Dkt. #284, at pp. 11-12). Debtor's Second Amended Plan

23  proposes to pay Lender's Class 1A secured note and Class 1B unsecured note on

24  the same seven year schedule. That payment schedule call for interest-only

25

26      [6] Debtor's Amended Plan of Reorganization. (Dkt. #115).

4

1   payments for the first two years, with principal and interest payments thereafter on

2   a thirty-year amortization schedule for the next five years, with a final balloon

3   payment at the end of year seven.  Approximately 8% of Lender's claim will be

4   paid down over the seven year plan period, leaving 92%, or approximately

5   $4,000,000 of the claim to be paid at the end of the seven-year note period.

6       The Second Amended Plan also includes a new, contingent[7] guaranty

7   ("Guaranty") by Patel and Abelson regarding the payment of monthly debt service

8   payments on the Class 1A and Class 1B promissory notes (the "Notes") and the

9   payment of the Reorganized Debtor's Property operating expenses during the

10  seven-year term of the Plan.  (Second Amended Plan, Sections 1.1.40, and 3.2.2,

11  Dkt. #284).  The obligation to make the debt service payments and/or pay the

12  operating expenses payments is triggered by a written payment request from the

13  Reorganized Debtor.  The Guaranty does not guarantee payment of the unpaid

14  principal balance or balloon amount of the Notes on the Maturity Date.

15      Pursuant to its Second Amended Plan, Debtor intends to retain the Property.

16  Debtor proposes to finance the first seven years of the  reorganization process with

17  monthly income from the rent revenues obtained from the tenants of the Property.

18  (Second Amended Plan, Dkt. #284, Section 7.2 at p. 3).  At the end of the seven

19  year period, when the large balloon payment to Lender comes due, Debtor hopes to

20  refinance that debt or to sell the property in order to repay Lender.

21      In exchange for the contingent agreement to pay the Reorganized Debtor's

22  operating expenses and monthly debt service obligations under the Plan, Patel and

23  Abelson will retain their equity interest in the Reorganized Debtor.  (Second

24

25

26

---

[7] If the Reorganized Debtor does not make a request for payment, Patel and Abelson have
no obligation to contribute any funds to the Reorganized Debtor.

1   Amended Plan, Dkt. #284, Section 4.6).

2        The Second Amended Plan gives Patel and Abelson the exclusive right to

3   acquire the equity. The Plan does not establish a market value for the equity being

4   retained by Patel and Abelson, nor does it otherwise propose to test the "market" to

5   see if there is any interest by third parties in acquiring the equity.

6        The Debtor intends to sell or to refinance the Property prior to the Maturity

7   Date. (Second Amended Plan, Dkt. #284, Sections 4.1.1.(g), and 4.2.1(g), at pp.

8   13-14).

9        Mr. Nelson, Debtor's Interest Rate Expert, noted in his Report that:

10       Although there is substantial lender activity in connection with
         multi-family commercial properties, including ones of this nature,
11       those loans usually consist of private party loans and commercial
         loans limited to qualified borrowers, with good credit, appropriate
12       loan to value ratios (typically around 70-75% or lower), with
         substantial down payments. (Timothy W. Nelson Report, Ex. 11, at p.
13       5).

14       On the Maturity Date Debtor's Property will have a loan-to-value ratio of

15   roughly ninety percent (90%) of the court-established value of the Property. (Post

16   Hearing Brief, Dkt. #308, at p. 6; Response, Dkt. #312, at pp. 3-4).

17       Abelson's optimistic testimony about future rents and operation expenses

18   was unsupported. No tenant on a month-to-month lease testified or gave a

19   declaration that they would stay in the Property for an extended period of time. No

20   tenant with a lease expiring in the next two years testified or gave a declaration that

21   it intended to renew its lease when it expired.

22       Debtor's cash flow projections (Ex. 4) for the Property are unreasonable.

23   Debtor projects an increase in rental income by 6.66% in 2014 and by 4.63% in

24   2015, while operating expenses only increase 1.23% and 1.24% during those same

25   years. (Timothy W. Nelson Report, Ex. 11 at p. 11). The projections also assume

26

1    that property taxes would remain the same during the seven-year Plan period.  The

2    projections were not altered after the loss of the Property's largest tenant.

3    Debtor proposes an interest rate of five percent (5%) for the Plan, comprised

4    of the Prime Rate (3.25%) and a risk premium of 1.75%. (Timothy W. Nelson

5    Report, Ex. 11 at pp. 7-10).

6    Debtor sought out commercial lenders concerning loans on the Property to

7    pay BofA in full and exit the bankruptcy case.  No lender was willing to lend the

8    Debtor the funds to pay off the BofA Note.  One of those lenders stated that:

9        With over 50% of your building's leases expiring in 2014 and

10       over 70% expiring in 2015, there is no way I could even get a
         short-term loan approved.  Especially given the uncertainty of

11       where market rates may be over the next few years upon lease
         renewal. (Ex. 17).

12   Commercial lenders are charging nearly five percent (5%) interest on loans to

13   clients with good credit ratings, sizable down payments and a 70% to 75% loan-to-

14   value ratio.  (Timothy W. Nelson Report, Ex. 11, at p. 7).  The Reorganized Debtor

15   is not a qualified borrower, does not have good credit, nor does it have a sizable

16   down payment.

17   Distressed property lenders are charging ten percent (10%) to eleven percent

18   (11%) on loans with a 65% loan-to-value ratio.  (Ex. #18)

19   BofA's projections for the Property are more realistic than Debtor's, and

20   reflect lower rent rate increases as well as higher increases in operating expenses

21   and taxes than are proposed by Debtor.  (Keith Bierman Report, Ex. #12).

22   BofA proposed an interest rate of 6.75% for the Plan, based upon the Prime

23   Rate (3.25%) plus a risk premium of 3.50 (composed of default risk, interest rate

24   and loan duration risk, and security risk).  (Keith Bierman Report, Ex. #12, p. 10).

25   Debtor's proposed interest rate of five percent (5%) is not adequate to

26

compensate Lender for all of the risks incumbent in the Debtor's 100+% financed reorganization Plan. BofA's suggested interest rate of six and three quarters percent (6.75%) is unreasonably high. An appropriate interest rate in this case is between six percent (6%) and six and one quarter percent (6.25%)

## DISCUSSION

Confirmation of a plan of reorganization is governed by Section 1129 of the Bankruptcy Code. 11 U.S.C. § 1129. Under section 1129, the court has an affirmative duty to ensure that the plan satisfies all of the requirements for confirmation. Liberty Nat'l Enters. v. Ambanc La Mesa Limited Partnership (In re Ambanc La Mesa), 115 F.3d 650, 653 (9th Cir.1997), cert denied, 522 U.S. 1110 (1998).

In determining whether the standard has been met, the court may take into account all previous proceedings and matters on record in the case. See In re Acequia, Inc., 787 F.2d 1352, 1358 (9th Cir.1986).

Generally, a plan of reorganization can be confirmed in one of two ways. Initially, if all sixteen subsections of Section 1129(a) are satisfied by the plan proponent, a plan can be confirmed consensually under Section 1129(a). RadLAX Gateway Hotel, LLC v. Amalgamated Bank ("RadLAX"), 132 S.Ct. 2065, 2069, 182 L.Ed.2d 967 (2012). See also United States ex rel. Farmers Home Admin. v. Arnold & Baker Farms (In re Arnold & Baker Farms), 177 B.R. 648, 654 (B.A.P. 9th Cir.1994).

In the instant case, BofA voted against confirmation in Class 1A.[8] (Ballot

---

[8] Class 1B, BofA's unsecured deficiency claim, appears for the first time in Debtor's Second Amended Plan. As such, Class 1B did not exist at the time Debtor's ballots were distributed to creditors. BofA voted against confirmation for Class 1A, and its reasonable to presume that BofA would have voted similarly if had been able to separately vote Class 1B.

8

1  Summary, Dkt. #192).  Accordingly, Debtor's Second Amended Plan cannot be

2  confirmed consensually under Section 1129(a).

3      If a plan proponent satisfies all paragraphs of Section 1129(a) except the

4  unanimous voting requirement of Section 1129(a)(8), then the court may still

5  confirm the plan as long as the plan "does not discriminate unfairly" against and "is

6  fair and equitable" towards each impaired class that has not accepted the plan.  11

7  U.S.C. § 1129(b)(1).  RadLAX, supra, 132 S.Ct. at 2069; Bank of America Nat'l

8  Trust Ass'n v. 203 North LaSalle St. P'ship ("203 North LaSalle"), 526 U.S. 434,

9  441 (1999); In re Ambanc La Mesa, supra, 115 F.3d at 653.  This second,

10  nonconsensual, method of confirmation is commonly referred to as "cramdown."[9]

11  RadLAX, supra, 132 S.Ct. at 2069; 203 North LaSalle, 526 U.S. at 441.

12      Given that Lender's Class 1A[10] rejected the Debtor's Second Amended Plan,

13  the only method of confirmation available to the Debtor is nonconsensual

14  cramdown under 11 U.S.C. § 1129(b).

15      Although BofA does not attack the Debtor's Second Amended Plan regarding

16  each element of Section 1129(a), the court has a duty to consider each element of

17  Section 1129 when considering a plan for confirmation.  In re Ambanc La Mesa,

18

---

19      [9] "Courts use "cramdown" and "cram down" and "cram-down" interchangeably to refer to

20  nonconsensual confirmation.  Indeed, Justice Douglas once combined different forms in the
   same paragraph.  Blanchette v. Connecticut Gen. Ins. Corps., 419 U.S. 102, 167, 95 S.Ct. 335, 42

21  L.Ed.2d 320 (1974) (Douglas, J., dissenting).  The hyphenated version appears to have been the
   first locution used by a court.  New England Coal & Coke Co. v. Rutland R.R. Co., 143 F.2d 179,

22  189 n. 36 (2d Cir.1944).  The earliest print references to the term use either the two-word or the
   hyphenated form.  Compare Robert T. Swaine, Present Status of Railroad Reorganizations And

23  Legislation Affecting Them, AM. BAR ASS'N, PROCEEDINGS OF THE SECTION ON COMM. LAW
   15, 15 (1940) (two-word form) and Warner Fuller, The Background and Techniques of Equity

24  and Bankruptcy Railroad Reorganizations-A Survey, 7 Law & Contemp. Probs. 377, 389, 390

25  (1940) (hyphenated form)."  In re Shat, 424 B.R. 854, 585 fn. 7 (Bankr. D. Nev.2012).

26      [10] As noted earlier in fn. 8, BofA never had a chance to vote its Class1B claim.

9

1   supra, 115 F.3d at 653.

2       Under Section 1129(a), the court shall confirm a plan only if each of the

3   sixteen subsections are met.  11 U.S.C. § 1129(a).  Sections 1129(a)(1) and (a)(2)

4   require the court to consider whether the Debtor's Second Amended Plan and the

5   Debtor have complied with the Code.  11 U.S.C. §§ 1129(a)(1) & (2).

**Section 1129(a)(1) - Plan compliance with applicable provisions of the Bankruptcy Code.**

8       Pursuant to Section 1129(a)(1) the court may not confirm a plan unless "[t]he

9   plan complies with the applicable provisions of this title."  11 U.S.C. § 1129(a)(1).

10  Stated differently, if the court finds any of BofA's Plan objections meritorious, the

11  Plan would also have violated Section 1129(a)(1) and cannot be confirmed.

**Section 1129(a)(2) - Plan proponent's (Debtor's) compliance with applicable provisions of the Bankruptcy Code.**

14      Pursuant to Section 1129(a)(2) the court may not confirm a plan unless "[t]he

15  proponent of the plan complies with the applicable provisions of this title."  11

16  U.S.C. § 1129(a)(2).  "The legislative history of the Section indicates that Congress

17  was concerned "that the proponent of the plan must comply with the applicable

18  provisions of title 11, such as ... disclosure and solicitation requirements of sections

19  1125 and 1126." 7 Collier on Bankruptcy ¶ 1129.02[2], at p. 1129-19 (Alan N.

20  Resnick & Henry J. Sommer eds., 16th ed. rev.2009); see also, In re Idearc, Inc.,

21  423 B.R. 138, 163 (Bankr. N.D. Tex. 2009).

22      Section 1125 requires the disclosure statement to provide "adequate

23  information" to the creditors in order for them to make an "informed judgement

24  about the plan."  11 U.S.C. § 1125(a)(1).

25      "While including false information is a more serious matter than a mere lack

26  of information, 'the determination of what is adequate information is subjective and

1    made on a case by case basis.  This determination is largely within the discretion of

2    the bankruptcy court.' "  Computer Task Group, Inc v. Brotby (In re Brotby), 303

3    B.R. 177, 193 (B.A.P. 9th Cir.2003) (quoting, In re Texas Extrusion Corp., 844

4    F.2d 1142, 1157 (5th Cir.1988)).

5        The adequacy of the disclosure statement information has been evaluated

6    using numerous factors, including the present condition of the debtor while in

7    Chapter 11, the classes and claims within the reorganization plan, the estimated

8    administrative expenses (including attorneys' fees), financial information and

9    projections relevant to the decision to accept or reject the debtor's plan, information

10   relevant to the risks posed to creditors under the debtor's plan.  In re Reilly, 71 B.R.

11   132, 1334-35 (Bankr. D. Mont.1987).  7 Collier on Bankruptcy ¶ 1125.2[2], at p.

12   1125-10 to 1125-11 (Resnick & Henry J. Sommer eds., 16th ed. rev.2010).

13       Class 2, Other Secured Claims, and Class 5, Membership Interests in the

14   Debtor,[11] are unimpaired.  (Second Amended Plan, Section 3.1, at p. 11, Dkt. #284).

15   Pursuant to Section 1126(f), the members of Classes 2 and 5 are conclusively

16   presumed to have accepted the Plan.  11 U.S.C. § 1126(f).

17       Members of Class 1, BofA's Claim, and Class 4, General Unsecured Claims,

18   are impaired, receive distributions under the plan, and were solicited to vote on

19   Debtor's then-existing plan of reorganization.

20       Classification of claims is governed by Section 1122(a).[12]  11 U.S.C. §

21   1122(a).  The Code does not mandate that all similar claims be classified together,

22

23       [11] Abelson controls the Debtor.  As such, Abelson is an "insider" pursuant to Section

24   101(31)(B)(iii), and is not permitted to vote on Debtor's plan.  11 U.S.C. § 1129(a)(10).

25       [12] Section 1122(a) provides that "a plan may place a claim or an interest in a particular
     class only if such claim or interest is substantially similar to the other claims or interests of such

26   class."  11 U.S.C. § 1122(a).

1    provided that there is a reasonable basis for not doing so.[13]  However, Section

2    1122(a) requires that dissimilar claims cannot be placed into the same class.  The

3    bankruptcy court has broad discretion in classifying claims under Section 1122(a).

4    Wells Fargo Bank v. Loop 76, LLC (In re Loop 76), 465 B.R. 525, 536 (B.A.P. 9th

5    Cir.2012).  A bankruptcy court's finding that a claim is or is not substantially

6    similar to other claims constitutes a question of fact reviewable under the clearly

7    erroneous standard.  Id.

8        Debtor failed to properly divide BofA's claim into its secured and unsecured

9    components, lumping them together under the Original Reorganization Plan and for

10    voting purposes.  11 U.S.C. § 506(a)(1).

11        A third-party source of funding will render a lender's deficiency claim

12    dissimilar to the unsecured trade creditor claims.  In re Loop 76, supra, 465 B.R. at

13    536; Barakat v. Life Ins. Co. of Va. (In re Barakat), 99 F.3d 1520, 1526 (9th

14    Cir.1996).  Given the Guaranty, BofA's unsecured deficiency claim is not

15    substantially similar to the unsecured claims comprising Class 4, General

16    Unsecured Claims, so separately classifying the claims was not improper.

17        Notwithstanding the Guaranty, BofA's unsecured deficiency claim should

18    have been separately classified from BofA's secured claim under Debtor's Original

19    Reorganization Plan.[14]  Debtor did not send BofA a ballot to vote its unsecured

20    deficiency claim.  At the time of balloting, BofA's deficiency claim would have

21

22        [13] "The separate classification of otherwise substantially similar claims and interests is
23    acceptable as long as the plan proponent can articulate a 'reasonable' justification for separate
     classification." 7 Collier on Bankruptcy ¶ 1122.03[1][a], at p. 1122-7 (Resnick & Henry J.
24    Sommer eds., 16th ed. rev.2010).  In re Adelphia Comm. Corp., 368 B.R. 140, 246-247 (Bankr.
     S.D.N.Y. 2007) (separate classification of substantially similar claims is permissible if there is a
25    reasonable basis for doing so).

26        [14] Debtor's Amended Plan of Reorganization. (Dkt. #115).

been at least $200,000.00 dollars.[15]  Thus, Debtor's Disclosure Statement fails to provide accurate information regarding the number, scope, and type of claims and classes of claims under the Debtor's Second Amended Plan.

Debtor's Disclosure Statement stated that the Administrative Claims were approximately $29,000.  At the Confirmation Hearing the Administrative Claims were disclosed to be approximately $350,000.00.  Thus, Debtor's Disclosure Statement failed to provide accurate information regarding the scope of Debtor's Administrative Claims.

The Disclosure Statement stated that the Property had an occupancy rate of ninety-seven percent. (Disclosure Statement, Dkt. #116, at p. 15) At the Confirmation Hearing the Property had an occupancy rate of Seventy-Seven percent. (Ex. 57, June 2013, Monthly Operating Report).  Thus, Debtor's Disclosure Statement failed to provide accurate information regarding the Property's tenant occupancy rate.

Debtor's Disclosure Statement provides no information regarding the Property's long-term tenant occupancy rate or the risk to creditors that is posed by the seven percent guaranteed occupancy beyond 2015. (Ex. 57, June 2013, Monthly Operating Report).  Thus, Debtor's Disclosure Statement fails to provide accurate information regarding the Property's long-term occupancy rate and the risk that such a low occupancy rate poses to creditor under the Debtor's Second Amended Plan.

Because BofA never received a ballot to vote its unsecured deficiency claim, and because the Disclosure Statement did not accurately reflect the number, type

---

[15] Debtor's Amended Schedule D reflects that the unsecured portion of BofA's claim was $200,000.00 on the petition date. (Dkt. #13)

13

1   and size of the various claims against Debtor's estate, the Property's occupancy

2   rates, the amount of Debtor's administrative claims at the time of the Confirmation

3   Hearing, or the relevant risk incumbent with the lack of long-term tenants in the

4   Property, the court concludes that Debtor's Disclosure Statement does not contain

5   "adequate information" that would enable a hypothetical investor to make an

6   informed judgment about the Debtor's Second Amended Plan and that Debtor has

7   not complied with the applicable provisions of section 1125 of the Bankruptcy

8   Code.

9          Because Debtor has not complied with Section 1125 of the Code, and the

10  requirements for adequate disclosure, the Debtor's Second Amended Plan is not

11  confirmable under section 1129(a)(2).  Regardless, the court will review the

12  remaining aspects of Plan under Section 1129.

13
    **Section 1129(a)(3) - Plan proposed in good faith and not by any
14  means forbidden by law.**

15         Section 1129(a)(3) requires that "[t]he plan has been proposed in good faith

16  and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  Section

17  1129(a)(3) does not define good faith.[16]  Platinum Capital, Inc. v. Sylmar Plaza,

18  L.P. (In re Sylmar Plaza, L.P.), 314 F.3d 1070, 1074 (9th Cir.2002), cert. denied,

19  538 U.S. 1035 (2003). Beal Bank USA v. Windmill Durango Office, LLC (In re

20

21  _____

22         [16]A legal distinction exists "between the good faith that is a prerequisite to filing a
    Chapter 11 petition and the good faith that is required to confirm a plan of reorganization."
23  Pacific First Bank v. Boulders on the River, Inc.(In re Boulders on the River, Inc.), 164 B.R. 99,
    103 (B.A.P. 9th Cir.1994); In re Stolrow's Inc., 84 B.R. 167, 171 (B.A.P. 9th Cir.1988).  Under §
24  1112(b), a Chapter 11 petition may be dismissed for cause "if it appears that the petition was
    filed in bad faith."  In re Stolrow's Inc., supra, 84 B.R. at 170.  "Bad faith [in filing a Chapter 11
25  petition] exists if there is no realistic possibility of reorganization and the debtor seeks merely to
    delay or frustrate efforts of secured creditors."  In re Boulders on the River, supra, 164 B.R. at
26  103.

                                        14

1 <u>Windmill Durango Office, LLC)</u>, 481 B.R. 51, 68 (B.A.P. 9th Cir.2012).

2      A plan is proposed in good faith where it achieves a result consistent with the

3 objectives and purposes of the Code. <u>In re Sylmar Plaza, L.P.</u>, <u>supra</u>, 314 F.3d at

4 1074; <u>In re Windmill Durango Office, LLC</u>, <u>supra</u>, 481 B.R. at 68. "Good faith"

5 under Section 1129(a)(3) is determined on a case-by-case basis, taking into account

6 the totality of the circumstances of the case. <u>In re Sylmar Plaza, L.P.</u>, <u>supra</u>, 314

7 F.3d at 1074-75;[17] <u>In re Windmill Durango Office, LLC</u>, <u>supra</u>, 481 B.R. at 68;

8 <u>Stolrow v. Stolrow's, Inc. (In re Stolrow's, Inc.)</u>, 84 B.R. 167, 172 (B.A.P. 9th

9 Cir.1988).

10      The creation of an impaired class in "an attempt to gerrymander a voting

11 class of creditors is indicative of bad faith" for purposes of § 1129(a)(3). <u>In re</u>

12 <u>Windmill Durango Office, LLC</u>, 481 B.R. at 68 (citing <u>Conn. Gen. Life Ins. Co. v.</u>

13 <u>Hotel Assocs. of Tucson (In re Hotel Assocs. of Tucson)</u>, 165 B.R. 470, 475

14 (B.A.P. 9th Cir.1994)).

15      Prior to the creation of Class 1B in the Second Amended Plan, Debtor had no

16 impaired accepting class. BofA's unsecured deficiency claim would have

17 controlled the vote of the General Unsecured Creditor Class, Class 4. The sequence

18 of events related to the last minute timing of the creation of BofA's Class 1B

19 unsecured deficiency claim constitutes indicia of bad faith.

20      Debtor has shifted virtually all of the risk of failure of the Property's

21 reorganization to BofA. BofA's combined claims exceed the value of the Property.

22

23     [17] In <u>Sylmar Plaza</u>, the Ninth Circuit rejected the use of <u>per se</u> rules in determining

24 whether good faith exists, and upheld a finding of good faith where the debtor invoked a
provision of the Code preventing a creditor from receiving a higher default interest rate under a

25 loan agreement. <u>In re Sylmar Plaza, L.P.</u>, <u>supra</u>, 314 F.3d at 1074–76. The court in <u>Sylmar</u>
concluded that the debtor's filing for bankruptcy relief was consistent with the objectives and

26 purposes of the Code, even though the case dealt primarily with a single creditor. <u>Id</u>.

If the Debtor's reorganization efforts fail, BofA will shoulder all of the loss. If the reorganization succeeds, the Reorganized Debtor and its insiders will benefit. Shifting the risk of loss in such a manner is evidence of bad faith.

The combination of the timing of Debtor's docketing of its Second Amended Plan and the allocation of substantially all of the risk of failure of that Plan to BofA results in the conclusion that the Debtor did not file its Second Amended Plan in good faith.

### Section 1129(a)(4) - Payments to professionals and others.

Section 1129(a)(4) requires that fees for those working on a debtor's case be submitted to the court and be approved as reasonable. 11 U.S.C. § 1129(a)(4). Debtor's Plan includes these provisions, and all fees approved to date have been allowed as interim, not final. Future requests will likewise be submitted to the court for approval. This section of the Code was satisfied.

### Section 1129(a)(5) - Debtor's future officers and directors.

A Chapter 11 plan may not be confirmed if the continuation in management of the persons proposed to serve as officers or managers of debtor is not in the interests of creditors and public policy. 11 U.S.C. § 1129(a)(5)(A)(ii). See e.g., In re Beyond.com Corp., 289 B.R. 138, 145 (Bankr. N.D. Cal.2003). Continued service by prior management may be inconsistent with the interests of creditors and public policy if it "directly or indirectly perpetuates incompetence, lack of discretion, inexperience or affiliations with groups inimical to the best interests of the debtor." In re Linda Vista Cinemas, L.L.C., 442 B.R. 724, 735-36 (Bankr. D. Ariz.2010) (citing In re Beyond.com Corp., 289 B.R. 138, 145 (Bankr. N.D. Cal.2003)).

16

1       Section 1129(a)(5)[18] compels a number of disclosures relating to post

2  confirmation management of the reorganized debtor.  "Section 1129(a)(5)(A)(i)

3  requires the plan proponent to disclose two attributes of post confirmation

4  management: their identity; and their "affiliations." ... The required disclosure must

5  be of the 'director[s], officer[s], or voting trustee[s].'  This leaves out analogous

6  management for partnerships or limited liability companies."   7 Collier on

7  Bankruptcy ¶ 1129.02[5][b], p. 1129-31 (Alan N. Resnick & Henry J. Sommer eds.,

8  16th ed. rev.2009).

9       According to Debtor's Second Amended Plan, "Reorganized Debtor will

10  continue to be managed by Debtor's pre-petition manager, Dr. Rick Abelson, which

11  management may subsequently be modified to the extent provided by Reorganized

12  Debtor's articles of organization, by-laws, and operating agreement (as amended,

13  supplemented, or modified).  Dr. Rick Abelson may also retain a property

14  management company to assist in Reorganized Debtor's day-to-day operations."

15  (Second Amended Plan, Dkt. #284, at p. 17).

16       There has been no proof of mismanagement by Abelson.  The disclosure is

17  adequate.

18

19               **Section 1129(a)(6) - Regulatory bodies.**

       Section 1129(a)(6) does not apply to Debtor's Plan.

20

21

22      [18] 11 U.S.C.§ 1129(a)(5) provides that:
  "(A)(i) The proponent of the plan has disclosed the identity and affiliations of any individual

23  proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the
debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the

24  debtor under the plan; and
     (ii) the appointment to, or continuance in, such office of such individual, is consistent with the

25     interests of creditors and equity security holders and with public policy; and
  (B) the proponent of the plan has disclosed the identity of any insider that will be employed or

26  retained by the reorganized debtor, and the nature of any compensation for such insider."

**Section 1129(a)(7) - Best interests of creditors**.

Under Section 1129(a)(7), creditors with impaired claims must either accept the proposed Plan or receive as much from the Plan as they would under liquidation. 11 U.S.C. § 1129(a)(7)(A). The Debtor's Plan includes four impaired classes, classes 1A, 1B, 3, and 4. (Second Amended Plan, Dkt. #284, at p. 11). Only Class 4 accepted the proposed Plan. Classes 1B, 3, and 4 receive at least as much through the Plan as they would from liquidation. As more fully explained below, Class 1A does not retain under Debtor's Second Amended Plan on account of its claim property of a value as of the effective date of the Debtor's Revised Plan that is not less than the amount that the Lender would receive if the Debtor were liquidated under Chapter 7.

Class 4, General Unsecured Creditors, will be paid 100% of its allowed claims within six months the effective date of the Plan. Class 4 voted 100% to accept the Plan. In a liquidation, Class 4 would likely receive nothing. Members of Class 4 will receive more under the Plan than they would under liquidation.

Class 3, Priority Unsecured Creditors, will be paid in full within roughly ninety days (90) from the effective date of the Plan. (Second Amended Plan, Section 4.4 at p. 15). In a liquidation, Class 3 would likely receive nothing. Members of Class 3 will receive more under the Plan than they would under liquidation.

Class 1A, BofA's secured claim, will not be paid in full under the Plan, as the Debtor's proposed 5% interest rate does not provide BofA with the present value of the amount of its claim. Class 1A, BofA's secured claim, will not receive as much under the Plan as it would on liquidation.

Class 1B, BofA's unsecured claim, will not be paid in full under the Plan, as

the Debtor's proposed 5% interest rate does not provide BofA with the present value of the amount of its claim.  In a liquidation, BofA's unsecured claim would receive nothing.  Class 1B will realize more under the Plan than it would on liquidation.

Since the Second Amended Plan does not provide BofA with the present value of its Class 1A claim, the Plan fails to comply with Section 1129(a)(7).

### Section 1129(a)(8) - Impairment and Acceptance

Under Section 1129(a)(8), for a plan to be confirmed, each class of claims or interests must either be unimpaired by the proposed plan, or it must accept the treatment proposed by the plan.  BofA has voted its Class 1A claim against confirmation of Debtor's Plan.  (Ballot Summary).  Accordingly, Section 1129(a)(8) has not been met in this case.

A plan may be confirmed even where Section 1129(a)(8) is not met, if "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1).  Whether the Debtor's Plan is "fair and equitable" under Section 1129(b)(1) is discussed below.

### Section 1129(a)(9) - Administrative Claims

"Section 1129(a)(9)(A) requires that holders of administrative claims and gap claims be paid 'cash equal to the allowed amount of such claim' on the 'effective date of the plan[.]' " 7 Collier on Bankruptcy ¶ 1129.02[9][a], p. 1129-43 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.2010) (footnotes omitted).  The Plan pays all administrative claim arising under Section 507(a)(1) in full on the effective date of the Plan or as soon as practicable thereafter, unless the claimant elected some alternative treatment.  (Second Amended Plan, Section 2.2, at p. 10). Accordingly, Section 1129(a)(9) has been satisfied.

19

## Section 1129(a)(10) - Acceptance by at Least One Impaired Class

The General Unsecured Creditor class, Class 4, unanimously accepted the Debtor's Plan. Accordingly, Section 1129(a)(10) has been satisfied.

## Section 1129(a)(11) - Feasibility/Future Liquidation

Section 1129(a)(11) requires that confirmation of the plan is not likely to be followed by liquidation, or the need for further financial reorganization of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan. 11 U.S.C. § 1129(a)(11). Sherman v. Harbin (In re Harbin), 486 F.3d 510, 517 (9th Cir.2007). Section 1129(a)(11) essentially looks at the feasibility of the Debtor's Plan.

The feasibility requirement set forth in Section 1129(a)(11) requires that:

> "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor ... unless such liquidation or reorganization is proposed in the plan." In re Harbin, 486 F.3d 510, 517 (9th Cir.2007); In re Roberts Rocky Mountain Equip. Co., Inc., 76 B.R. 784, 790 (Bankr.D.Mont.1987). The Ninth Circuit BAP has defined feasibility as a factual determination, and "as whether the things which are to be done after confirmation can be done as a practical matter under the facts."

In re Jorgensen, 66 B.R. 104, 108 (B.A.P. 9th Cir.1986) (citing In re Clarkson, 767 F.2d 417 (8th Cir.1985)); see also In re Ambanc La Mesa Ltd. P'ship, 115 F.3d at 657.

Debtor bears the burden of establishing the feasibility of its Plan by a preponderance of the evidence. In re Indian Nat'l Finals Rodeo, 453 B.R. 387, 402 (Bankr. D. Mont.2011); Danny Thomas Prop. II Ltd. P'ship v. Bank (In re Danny Thomas Prop. II Ltd. P'ship), 241 F.3d 959, 963 (8th Cir.2001); see also In re Young Broadcasting Inc.,430 B.R. 99, 128 (Bankr. S.D.N.Y.2010).

1    The Court has a duty under Section 1129(a)(11) to protect creditors against

2 "visionary schemes." Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii,

3 Inc.), 761 F.2d 1374, 1382 (9th Cir.1985); In re Linda Vista Cinemas, L.L.C.,

4 supra, 442 B.R. at 737; In re Las Vegas Monorail, 462 B.R. 795, 801 (Bankr. D.

5 Nev.2011); In re Windmill Durango Office, LLC, supra, 481 B.R. at 67; In re Loop

6 76, LLC, supra, 465 B.R. at 544.

7    While a reorganization plan's success need not be guaranteed, the court

8 cannot confirm a plan unless it has at least a reasonable chance of success. In re

9 Danny Thomas Prop. II Ltd. P'ship, 241 F.3d at 963; In re Acequia, Inc., supra, 787

10 F.2d at 1364; In re Brotby, supra, 303 B.R. at 191-92.[19]  "Some possibility of

11 liquidation or further reorganization is acceptable and often unavoidable." In re

12 DBSD North America, Inc., supra, 634 F.3d at 106-7.

13    To establish the feasibility of a plan, the debtor must present proof through

14 reasonable projections that there will be sufficient cash flow to fund the plan.

15 However, such projections cannot be speculative, conjectural, or unrealistic. M & S

16 Assocs., supra, 138 B.R. at 849.  A plan proponent, however, need only

17 demonstrate that there exists a reasonable probability that the plan provisions can be

18 performed.  T-H New Orleans, supra, 116 F.3d at 801 (quoting Landing Assocs.,

19 supra, 157 B.R. at 820).

20    Just as speculative prospects of success cannot sustain feasibility, speculative

21 prospects of failure cannot defeat feasibility. Cajun Elec., supra, 230 B.R. at 745.

22 The mere prospect of financial uncertainty cannot defeat confirmation on feasibility

23

24    [19] See also In re DBSD North America, Inc., supra, 634 F.3d at 106-7, Fin. Security
25 Assurance, Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship), 116 F.3d
790, 801 (5th Cir.1997), United States v. Haas (In re Haas), 162 F.3d 1087, 1090 (11th
26 Cir.1998).

21

1  grounds since a guarantee of the future is not required. Cajun Elec., supra, 230 B.R.

2  at 745; In re U.S. Truck Co., Inc., 47 B.R. 932, 944 (E.D. Mich.1985), affd, 800

3  F.2d 581 (6th Cir.1986).

4  Reorganization plans:

5  need not completely amortize reorganization debt to be confirmed.
   But if refinancing is anticipated, the plan proponent has to produce
6  some credible evidence about the likelihood of that refinancing.
   "[S]ection 1129(a)(11) requires the plan proponent to show concrete
7  evidence of a sufficient cash flow to fund and maintain both its
   operations and obligations under the plan." S & P, Inc. v. Pfeifer, 189
8  B.R. 173, 183 (N.D. Ind. 1995) (quoting In re SM 104 Ltd., 160 B.R.
   202, 234 (Bankr. S.D. Fla.1993)). Against this background, courts
9  have refused to confirm plans whose feasibility turned on future sales
   of property, or future refinancings, absent an adequate showing that
10 such sales or refinancings would be likely to occur."
11

12 In re Las Vegas Monorail, supra, 462 B.R. at 800; In re Vanderveer Estates

13 Holding, LLC, 293 B.R. 560 (Bankr. E.D.N.Y.2003).[20]

14 The likelihood of a future sale can be demonstrated by other evidence in

15 certain circumstances. See In re Made in Detroit, Inc., 299 B.R. 170, 179–80

16 (Bankr. E.D. Mich.2003) (plan not confirmed when proponent made inadequate

17 showing of ability to obtain financing); In re Walker, 165 B.R. 994 (E.D.Va.1994)

18 (similar regarding future sale of property).

19 Bankruptcy courts consider several factors when evaluating whether a

20 particular plan is feasible, including: (1) the adequacy of the capital structure; (2)

21 the earning power of the business; (3) economic conditions; (4) the ability of

22

23 _____

   [20] Even so, there are decisions finding proposed plans feasible without evidence of
24 marketing efforts or a firm offer to purchase. See, e.g., In re T–H New Orleans Ltd. P'ship,
   supra, 116 F.3d at 801–02 (plan proposing to repay secured creditor out of revenues, with a sale
25 of collateral if in default, was feasible without evidence of a sale offer or marketing efforts); In
   re Barnes, 309 B.R. 888, 895 (Bankr. N.D. Tex.2004) (plan calling for future sale of assets was
26 feasible when those assets had been increasing in value).

                                        22

1  management; (5) the probability of the continuation of the same management; and
2  (6) any other related matters which determine the prospects of a sufficiently
3  successful operation to enable performance of the provisions of the plan.  In re
4  Linda Vista Cinemas, L.L.C., supra, 442 B.R. at 738; In re Las Vegas Monorail,
5  supra, 462 B.R. at 802; 7 Collier on Bankruptcy ¶ 1129.02[11], p. 1129-52 (Alan N.
6  Resnick & Henry J. Sommer eds., 16th ed. rev.2009).

7        It is likely that the Reorganized Debtor would be able to obtain the capital it
8  needs to operate the Property during the seven-year Plan period.  Although the
9  Reorganized Debtor does not have earnings power beyond its tenant rent revenues,
10  the Guaranty provides some level of assurance that the Reorganized Debtor can
11  obtain operating capital if it needs to do so during the seven-year Plan.

12        Although it is likely that the Reorganized Debtor will be able to obtain the
13  operating capital it needs during the course of the 7-year Plan, it is very unlikely
14  that the Debtor will be able to find a lender to refinance BofA's loan at the end of
15  the 7-year Plan period.  Absent an unforeseen significant real estate property value
16  recovery in the region, the Property will have a loan-to-value ratio of roughly 90%
17  when the balloon payment on the Notes come due in seven years.  Commercial
18  lenders are unwilling to refinance properties with such heavy debt burdens.  The
19  Debtor's capital structure is inadequate to successfully negotiate reorganization.

20        Debtor attributes the inability of the Property to generate a profit to the
21  economic downturn that overwhelmed the Las Vegas area.  The Debtor is confident
22  that existing management can manage the Property in such a manner that it will be
23  profitable going forward during the course of the 7-year Plan.  Although the court is
24  not as confident as the Debtor about the economic recovery, the court finds that the
25  problems leading up to Debtor's bankruptcy filing were not directly attributable to
26  poor management.

1    Debtor leaves open the possibility of bringing in an outside manager to

2  manage the Property. While this may be a good idea, especially when compared

3  with Abelson engaging in long-distance property management from California, the

4  cost of such a manager is not otherwise accounted for in Debtor's Plan. Thus,

5  hiring outside management would likely make the Debtor's Plan even more

6  financially untenable. Although the problems leading up to Debtor's bankruptcy

7  filing were not directly attributable to poor management, the court is not as

8  confident as the Debtor that Abelson can manage the Property remotely from

9  California.

10    The court finds the Reorganized Debtor's prospects of successful operations

11  unlikely. The Debtor has underestimated both the likely operating cost increases

12  that it faces and the interest expense reasonably necessary to compensate BofA for

13  the risk of financing the Property for another seven years. More importantly,

14  Debtor's current tenant occupancy situation is perilous. Debtor's largest tenant

15  recently moved out. Several other tenants are on month-to-month leases, and can

16  leave on short notice. When the leases that expire in 2014 and 2015 are included in

17  the analysis, the Property will have only seven percent guaranteed tenancy at the

18  end of 2015. Even if the existing tenants all decide to stay, Debtor has provided no

19  information regarding the likely rent revenues that the Property can be expected to

20  generate after 2015.[21] Thus, the court concludes that Debtor has not demonstrated

21  its ability to generate sufficient cash flow to meet the payments required during the

22  Plan period.

23    Even assuming Debtor's proposed cost structure and interest rate were

24

25    [21] The Guaranty's monthly payment backstop, alone, does not satisfy the court that the
Reorganized Debtor will generate sufficient rent revenues to stay in business during the 7-year
26  Plan period.

1    adopted as reasonable, which they were not, Debtor has no more than a slim chance

2    of finding a lender willing to refinance the BofA Notes that will come due at the

3    end of the seven-year Plan.  The court concludes that the Debtor has not

4    demonstrated its ability to make these two balloon payments.

5        The Guaranty provides some level of assurance that the Reorganized Debtor

6    can obtain operating capital if it needs to do so during the Plan period.  However, at

7    the end of that time frame, there will remain a loan-to-value ratio of roughly 90%.[22]

8    Given the testimony that commercial lenders are generally not willing to make such

9    loans, allowing the Debtor's Plan to go forward merely acts to delay the inevitable

10   sale of the Property in order to pay off the two BofA's Notes.

11       When the court is dealing with an intermediate time frame like the seven

12   years after which the balloon payment comes due in this case, the level of proof

13   required from the Debtor will be somewhat less than that necessary to show it can

14   operate the property during the next two years, but more than that when trying to

15   extrapolate to financing twenty-years into the future.  Here the court has evidence

16   concerning the value of the property, the loan-to-value ratio of the Property during

17   the Plan period, and the views of commercial lenders when considering the

18   refinancing of Property in seven years.  In this context, the court bases its feasibility

19   finding on sufficiently specific proof to conclude that Debtor would be unlikely to

20   avoid reorganization or liquidation after seven years.  see, e.g., In re DBSD North

21   America, Inc., supra, 634 F.3d at 106-108.

22       The Second Amended Plan shows that Debtor also recognizes that it may

23

_____

24   [22] The Plan proposes to make interest only payments for the first two years of the Plan
     period, which buys Debtor breathing room to shore up its position before it becomes necessary to

25   commence paying the principal and interest on the BofA Notes.  The delayed principal payments
     simultaneously contributes to the situation where the Reorganized Debtor is left with significant

26   debt and very little equity in the Property.

1   need a future bankruptcy case.  Paragraphs 4.1.1(h) and 4.2.1(h) of the Plan both

2   provide that the filing of voluntary or involuntary petitions in bankruptcy by or

3   against Debtor are not events of default under the notes given to Lender on account

4   of its Class1A and 1B claims.

5        Debtor's Second Amended Plan is not feasible.  There is a probability of

6   default on Debtor's secured and unsecured obligations to BofA, and any such

7   default would lead to the type of liquidation or financial reorganization that Section

8   1129(a)(11) seeks to avoid.

### Section 1129(a)(12) - Fees

All required court and U.S. Trustee's fees have been paid and are current.
Thus, Section 1129(a)(12) has been satisfied.

### Sections 1129(a)(13), (14), (15), and (16) - Retirement Benefits, Domestic Support Obligations, Individual Debtors, Transfers of Property.

These provisions do not apply in this case.

### Section 1129(b)(1) - 'Unfair Discrimination' and 'Fair and Equitable'

A plan is "fair and equitable" under Section 1129(b)(1) if:

> (A) With respect to a class of secured claims, the plan
> provides--
>
> (i)(I) that the holders of such claims retain the liens securing
> such claims, whether the property subject to such liens is
> retained by the debtor or transferred to another entity, to the
> extent of the allowed amount of such claims; and
>
> (II) that each holder of a claim of such class receive on
> account of such claim deferred cash payments totaling at
> least the allowed amount of such claim, of a value, as of the

> effective date of the plan, of at least the value of such
> holder's interest in the estate's interest in such property;
>
> (ii) for the sale, subject to section 363(k) of this title, of any
> property that is subject to the liens securing such claims, free
> and clear of such liens, with such liens to attach to the proceeds
> of such sale, and the treatment of such liens on proceeds under
> clause (i) or (iii) of this subparagraph; or
>
> (iii) for the realization by such holders of the indubitable
> equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A)(i) - (iii) (West 2010).  The Debtor did not attempt to

confirm the Second Amended Plan under Section 1129(b)(2)(A)(ii) or (iii).

Debtor's Plan purports to employ the first alternative means of fair and

equitable treatment, making deferred cash payments equal to the present value at the

effective date.[23]  11 U.S.C. § 1129(b)(2)(A)(i)(II).

BofA argues, and the court agrees, that Debtor's Plan is not fair and equitable

to BofA's secured claim because it does not provide BofA with the present value of

the amount of its secured claim and because it unfairly shifts the risk of failure of the

Plan to BofA while simultaneously preserving the benefits for success for the

Debtor's insiders.  Thus, Debtor's Plan does not meet the requirements of Section

1129(b)(2)(A)(i)(II).  11 U.S.C. § 1129(b)(2)(A)(i)(II).

Debtor's proposed five percent (5%) interest rate does not provide BofA with

deferred cash payments totaling at least the allowed amount of such claim, of a

value, as of the effective date of the plan, of at least the value of such holder's

---

[23] The proper date to value collateral for purposes of plan confirmation is the date of confirmation. See 11 U.S.C. § 506(a); Yaissle and Cornerstone Invest. v. Unsecured Creditors Comm. (In re Heritage Highgate, Inc.), 449 B.R. 451, 457-58 (D. N.J.2011), aff'd, 679 F.3d 132, 143 n. 9 (3d Cir.2012). See also 4 Collier on Bankruptcy 506.03[10], p. 506-92 to 506-94 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.2013).

1    interest in the estate's interest in such property.  11 U.S.C. § 1129(b)(2)(A)(i)(II).

2            Two experts testified regarding the appropriate interest rate.  The court finds

3    that BofA's expert, Mr. Bierman,[24] has considerably more experience and was more

4    persuasive than the Debtor's expert, Mr. Nelson.[25]  Mr. Nelson proposed an interest

5    rate of 5%, while Mr. Bierman proposed an interest rate of 6.75%.  The court

6    concludes that an appropriate interest rate would be six to six and one quarter

7    percent (6.0% - 6.25%).

8            The Plan's insider Guaranty provides some level of assurance that the

9    Reorganized Debtor can make the required debt service and operating expense

10   payments during the seven-year Plan period.  However, the debt load is significant at

11   the Maturity Date.  On the Maturity Date, the Property will have a loan-to-value

12   ratio no lower than roughly 90%.[26]  Given the testimony that commercial lenders are

13   generally not willing to make loans with such heavy loan-to-value ratios, the risk of

14   nonpayment on the Notes when they come due on the Maturity Date is shifted to

15   BofA.          No new lender can reasonably be expected to loan the Debtor enough to

16   refinance BofA's Notes on the Maturity Date.

17           Debtor's Plan is not fair and equitable to BofA's unsecured claim because it

18   fails to meet the requirements of Section 1129(b)(2)(B) and provide BofA with the

19   present value of the amount of its unsecured claim.  11 U.S.C. § 1129(b)(2)(B).

20           A plan is "fair and equitable" under Section 1129(b)(2)(B) if:

21                   (i)      the plan provides that each holder of a claim of such class
                             receive or retain on account of such claim property of a

22

23   _____

     [24] Keith Bierman Report, Ex. 12.

24
     [25]Timothy W. Nelson Report, Ex. 11.

25
     [26] The loan-to-value ratio becomes even heavier when the Debtor's projected cash flow is
26   analyzed in the context of 6% interest on both BofA's secured and unsecured Notes.

value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii)  the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.

11 U.S.C. § 1129(b)(2)(B).

The Debtor's Second Amended Plan does not provide that BofA will receive or retain on account of its unsecured claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim.  The 5% interest rate proposed for the Class 1B Note is too low to make the present value of the proposed payments under the Class 1B Note equal to the allowed amount of the Lender's Unsecured Claim.  As noted above, the court concludes that 6%-6.25% is a fair and reasonable interest rate.  Accordingly, the Plan fails to meet the requirements of Section 1129(b)(2)(B)(i).  11 U.S.C. § 1129(b)(2)(B)(i).

The Second Amended Plan does not meet the requirements of Section 1129(b)(2)(B)(ii).  11 U.S.C. § 1129(b)(2)(B).

Section 1129(b)(2)(B)(ii) requires that "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section." 11 U.S.C. § 1129(b)(2)(B)(ii)

"In plainer English the provision bars old equity from receiving any property via a reorganization plan 'on account of' its prior equitable ownership when all

29

1    senior claim classes are not paid in full." Bonner Mall P'ship v. U.S. Bancorp

2    Mortg. Co. (In re Bonner Mall P'ship), 2 F.3d 899, 908 (9th Cir.1993), mot. to

3    vacate denied and cert. dismissed, 513 U.S. 18 (1994) (citing, Snyder v. Farm Credit

4    Bank of St. Louis (In re Snyder), 967 F.2d 1126, 1130 (7th Cir.1992)).[27]

5         This provision is known as the "absolute priority rule," and it generally

6    requires that all unsecured creditors be paid in full before equity security holders are

7    allowed to retain any ownership interest in the debtor. See In re Ambanc La Mesa

8    Ltd. P'ship, supra, 115 F.3d at 654; In re Bonner Mall P'ship, supra, 2 F.3d at

9    906-07.

10        There is a corollary to the absolute priority rule known as the "new value

11   exception." The new value exception to the absolute priority rule allows junior

12   interest holders (e.g. shareholders of a corporate debtor) to receive a distribution of

13   property under a plan if they offer "value" to the reorganized debtor that is: (1) new;

14   (2) substantial; (3) money or money's worth; (4) necessary for a successful

15   reorganization; and (5) reasonably equivalent to the value or interest received. In re

16   Ambanc La Mesa Ltd. P'ship, supra, 115 F.3d at 654 (citing In re Bonner Mall

17   P'ship, supra, 2 F.3d at 908).

18        In 1999 the United States Supreme Court had an opportunity to discuss both

19   the absolute priority rule and the new value corollary to that rule in Bank of America

20   Nat'l Trust and Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434 (1999) ("203

21   N. LeSalle"). The Court determined that old equity could acquire or retain its equity

22   interest only if it paid full value, meaning "top dollar" for that property interest. But,

23

24        [27] Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck

25   Co.), 800 F.2d 581, 588 (6th Cir.1986); Prudential Ins. Co. v. F.A.B. Indus. (In re F.A.B. Indus.),
     147 B.R. 763, 768–69 (C.D.Cal.1992), appeal docketed, No. 93–55055 (9th Cir. Jan. 13, 1993);

26   In re Pullman Construction Indus, 107 B.R. 909, 944 (N.D. Ill.1989).

1  old equity could not satisfactorily demonstrate that it had paid top dollar for the

2  property under a plan giving it exclusive rights to buy such equity and absent a

3  competing plan of some sort. The court noted that "... the best way to determine

4  value is exposure to a market." 203 N. LeSalle, supra, 526 U.S. at 458.

5      The Court stopped short of saying how the market-based valuation should be

6  discerned. The Court did, however, note that "plans providing junior interest

7  holders with exclusive opportunities free from competition and without benefit of

8  market valuation fall within the prohibition of § 1129(b)(2)(B)(ii)." 203 N. LeSalle,

9  supra, 526 U.S. at 458.

10     The Second Amended Plan does not establish a market value for the equity

11  being retained. The Plan gives Abelson and Patel an exclusive right to retain/acquire

12  the equity. The Plan does not otherwise propose to test the "market" to see if there is

13  any interest by third parties in acquiring the equity.

14     The insider Guaranty is not (1) new value (the Guaranty is contingent so there

15  is no guarantee that any funds will be paid); (2) substantial (the Guaranty is

16  contingent there is no guarantee that anything will ever be paid to the estate); (4)

17  necessary for a successful reorganization (the Guaranty is contingent and may never

18  be called upon by the Reorganized Debtor; even if called upon it does not address

19  the balloon payments at the end of the Plan period); and (5) reasonably equivalent to

20  the value or interest received (Debtor has made no effort to establish a value on the

21  equity). In re Ambanc La Mesa Ltd. P'ship, supra, 115 F.3d at 654 (citing In re

22  Bonner Mall P'ship, supra, 2 F.3d at 908).

23     Debtor's Plan provides junior interest holders with exclusive opportunities

24  free from competition and without benefit of market valuation to retain their equity

25  position. This clearly falls within the prohibition of Section 1129(b)(2)(B)(ii).

26

31

**Section 1129(c) - only one Plan of Reorganization may be confirmed.**

Pursuant to Section 1129 (c), the court may confirm only one plan.  11 U.S.C. § 1129(c).  If subsections (a) and (b) are met as to more than one plan, the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm.[28]  Id.  As noted above, Debtor's Second Amended Plan is not confirmable, so Section 1129(c) does not apply in this case.

**Section 1129(d) - Avoidance of Taxes or Application of the Securities Act of 1933**

Pursuant to Section 1129 (d), the court may not confirm a plan if the principal purpose of the plan is to avoid taxes or avoid application of Section 5 of the Securities Act of 1933.  11 U.S.C. § 1129(d).  No such issues have been raised in this case and Section 1129(d) does not apply in this case.

**Section 1129(e) - Small Business Case.**

The instant case is not a small business case, so Section 1129 (e) does not apply in this case.

**CONCLUSION**

Debtor's Second Amended Plan of Reorganization cannot be confirmed because of numerous failures to comply with the requirements of sections 1129(a)

---

[28] In cases with multiple confirmable plans, the court "shall consider the preferences of creditors and equity security holders in determining which plan to confirm." 11 U.S.C. § 1129(c). In other cases involving multiple confirmable plans, courts have applied a four-factor analysis, considering "(1) the type of plan; (2) the treatment of creditors and equity security holders; (3) the feasibility of the plan; and (4) the preferences of creditors and equity security holders." In re ASARCO LLC, 420 B.R. 314, 326-27 (Bankr.S.D.Tex.2009) (citing, In re Internet Navigator Inc., 289 B.R. 128, 131 (Bankr. N.D. Iowa 2003)); In re Holley Garden Apartments, Ltd., 238 B.R. 488, 493 (Bankr. M.D. Fla.1999).

1  and (b) of the Bankruptcy Code.

2       The plan fails to comply with the applicable provisions of the Bankruptcy

3  Code.  §1129(a)(1).  This will be explained in detail, below.

4       Debtor, the plan proponent, has failed to comply with applicable provisions of

5  the Bankruptcy Code.  §1129(a)(2).  Debtor has not disclosed "adequate

6  information" regarding Debtor's Second Amended Plan, as required by §1125.

7       The belated filing of the Second Amended Plan and the placing of all risk of

8  loss, in the event of plan failure, upon Lender provide evidence that the plan was not

9  proposed in good faith, as required by §1129(a)(3).

10       The plan does not meet the 'best interests of creditors' requirement, because it

11  fails to give Lender, on account of its Class 1A claim, as much as it would receive in

12  a Chapter 7 liquidation.

13       The requirements of §1129(a)(8) are not met, because Lender's Class 1A

14  claim is impaired and has been voted against the plan.

15       The plan is not feasible, because Debtor will be unable to make the balloon

16  payment that will come due at the end of the seven-year note period, and further

17  reorganization of Debtor will be necessary.  §1129(a)(11).

18       The plan is not 'fair and equitable' with respect to Lenders Class 1A

19  SECURED claim.  §1129(b)(1).  Because of the too low 5% interest rate in the plan,

20  Lender does not receive the value of its secured claim as of the effective date of the

21  plan.  The plan also shifts the risk of the probability of failure of the Plan to Lender,

22  while saving the possible benefits of success for Debtor's insiders, who do not

23  contribute value for the retention of their equity interests and have not exposed

24  equity to competing bids.  Failure is probable, because Debtor will be unable to

25  make the balloon payment due at the end of the seven-year note period.

26       The plan is not 'fair and equitable' with respect to Lender's Class 1B

1  UNSECURED claim.  §1129(b)(2).  The 5% interest rate is too low and the plan

2  violates the 'absolute priority rule' of section 1129(b)(2)(ii) by allowing the junior

3  interests of the equity holders to be retained, when Class 1B is impaired.

4       Unfortunately, Debtor and its insiders lack any resources to contribute toward

5  a successful Chapter 11 plan of reorganization.

6       Orders will be entered denying approval of Debtor's disclosure statement and

7  denying confirmation of Debtor's Second Amended Plan of Reorganization.

8

9  **IT IS SO ORDERED**

10

11              Copies noticed through ECF to:

12  DOROTHY G. BUNCE on behalf of Interested Party Rick Abelson

13       1bankruptcy@cox.net

14

15  TALITHA GRAY KOZLOWSKI on behalf of Debtor HORIZON RIDGE
         MEDICAL & CORPORATE CENTER, LLC

16       bankruptcynotices@gordonsilver.com; bknotices@gordonsilver.com

17  KIRK D. HOMEYER on behalf of Debtor HORIZON RIDGE MEDICAL &
         CORPORATE CENTER, LLC

18

19  BANKRUPTCYNOTICES@GORDONSILVER.COM,

20

21  BKNOTICES@GORDONSILVER.COM

22

23  TERESA M. PILATOWICZ on behalf of Debtor HORIZON RIDGE MEDICAL
         & CORPORATE CENTER, LLC Bankruptcynotices@gordonsilver.com,

24       bknotices@gordonsilver.com

25  U.S. TRUSTEE - LV - 11, 11

26

                                    34

USTPRegion17.lv.ecf@usdoj.gov

JOHN ROBERT WEISS on behalf of Interested Party BANK OF AMERICA,
     N.A. AS SUCCESSOR BY MERGER TO LASALLE BANK NATIONAL
     ASSOCIATION, AS TRUSTEE jrweiss@duanemorris.com,
     maolins@duanemorris.com; jjohnson3@duanemorris.com

MATTHEW C. ZIRZOW on behalf of Debtor HORIZON RIDGE MEDICAL &
     CORPORATE CENTER, LLC mzirzow@lzlawnv.com, susan@lzlawnv.com;
     tiffany@lzlawnv.com; carey@lzlawnv.com; mary@lzlawnv.com

and sent to BNC to:

     All parties on BNC mailing list


# # #

# EXHIBIT "3"



_Lloyd King_

Honorable Lloyd King
United States Bankruptcy Judge

**Entered on Docket**
**March 05, 2014**

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

\* \* \* \* \* \*

In re:                                    )   Case No.: BK-S-12-13906 -btb
                                          )
HORIZON RIDGE MEDICAL &                   )   Chapter 11
CORPORATE CENTER, L.L.C.,                 )
                                          )   Hearing Date: February 06, 2014
                     Debtor.              )   Hearing Time:  11:00 a.m.
                                          )

### ORDER DENYING APPROVAL
### OF DEBTOR'S DISCLOSURE STATEMENT

For the reasons set forth in the Memorandum Decision Granting In Part Debtor's Motion to Amend or Vacate Orders and to Reopen Evidence Pursuant to Fed. R. Bankr. P. 9023 and 9024 but Denying Confirmation of Debtor's Second Amended Plan of Reorganization entered concurrently herewith, final approval of the Disclosure Statement to Accompany Debtor's Amended Plan of Reorganization [ECF No. 116] is **DENIED**.

**IT IS SO ORDERED**

Copies noticed through ECF to:

1

DOROTHY G. BUNCE on behalf of Interested Party Rick Abelson
    1bankruptcy@cox.net

TALITHA GRAY KOZLOWSKI on behalf of Debtor HORIZON RIDGE
    MEDICAL & CORPORATE CENTER, LLC
    bankruptcynotices@gordonsilver.com; bknotices@gordonsilver.com

KIRK D. HOMEYER on behalf of Debtor HORIZON RIDGE MEDICAL &
    CORPORATE CENTER, LLC

BANKRUPTCYNOTICES@GORDONSILVER.COM,

BKNOTICES@GORDONSILVER.COM

TERESA M. PILATOWICZ on behalf of Debtor HORIZON RIDGE MEDICAL
    & CORPORATE CENTER, LLC Bankruptcynotices@gordonsilver.com,
    bknotices@gordonsilver.com

U.S. TRUSTEE - LV - 11, 11

USTPRegion17.lv.ecf@usdoj.gov

JOHN ROBERT WEISS on behalf of Interested Party BANK OF AMERICA,
    N.A. AS SUCCESSOR BY MERGER TO LASALLE BANK NATIONAL
    ASSOCIATION, AS TRUSTEE jrweiss@duanemorris.com,
    maolins@duanemorris.com; jjohnson3@duanemorris.com

MATTHEW C. ZIRZOW on behalf of Debtor HORIZON RIDGE MEDICAL &
    CORPORATE CENTER, LLC mzirzow@lzlawnv.com,
    susan@lzlawnv.com; tiffany@lzlawnv.com; carey@lzlawnv.com;
    mary@lzlawnv.com

and sent to BNC to:

    All parties on BNC mailing list

2

# # #

# EXHIBIT "4"



_Lloyd King_

Honorable Lloyd King
United States Bankruptcy Judge

**Entered on Docket**
**March 05, 2014**

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

\* \* \* \* \* \*

In re:                                          )        Case No.: BK-S-12-13906 - btb
                                                )
HORIZON RIDGE MEDICAL &                         )        Chapter 11
CORPORATE CENTER, L.L.C.,                       )
                                                )        Hearing Date: February 06, 2014
                Debtor.                         )        Hearing Time: 11:00 a.m.
                                                )

**MEMORANDUM DECISION GRANTING IN PART
DEBTOR'S MOTION TO AMEND OR VACATE ORDERS
AND TO REOPEN EVIDENCE PURSUANT TO FED. R. BANKR.
P. 9023 AND 9024 BUT DENYING CONFIRMATION
OF DEBTOR'S SECOND AMENDED
PLAN OF REORGANIZATION[1]**

## I.      INTRODUCTION

A plan confirmation hearing ("Confirmation Hearing") concerning two

competing reorganization plans in the above-referenced case was conducted on

---

[1] In this Order, all references to "Section" or "Code" shall be to provisions of the
Bankruptcy Code, 11 U.S.C. §§ 101 11532, unless otherwise indicated. All references to
'FRCP' shall be to the Federal Rules of Civil Procedure. All references to "FRBP", "Rule", or
"Rules" shall be to the Federal Rules of Bankruptcy Procedure.

1

1    September 16 and 17, 2013.[2]  On December 20, 2013, the court docketed a

2    Memorandum Decision Concerning Denial of Confirmation of Debtor's Second

3    Amended Plan of Reorganization ("Memorandum Decision") (Memorandum

4    Decision, Dkt. #349), as well as an Order Denying Confirmation of Debtor's

5    Second Amended Plan ("Order Denying Confirmation") (Dkt. #353), and an Order

6    Denying Approval of Debtor's Disclosure Statement.  (Dkt. #351).

7          On January 3, 2014, Debtor filed a Motion To Amend or Vacate Orders and

8    to Reopen Evidence Pursuant to Fed. R. Bankr. P. 9023 and 9024 ("Motion to

9    Amend") (Motion to Amend, Dkt. #360).  Debtor's Motion to Amend seeks to

10   have the court amend or vacate the Memorandum Decision, the Order Denying

11   Approval of Debtor's Disclosure Statement, and the Order Denying Confirmation.

12   (Dkt. ##349, 351, and 353, respectively).  Bank of America, N.A.[3] ("Lender")

13   docketed its response to Debtor's Motion to Amend on January 24, 2014.

14   (Response, Dkt. #392).  Debtor filed its Reply on January 31, 2014. (Reply, Dkt.

15   #416).

16         On February 6, 2014, the court conducted a hearing regarding Debtor's

17   _____

18         [2] Three disputed matters were considered at the Confirmation Hearing:
      (i) Final approval of the Debtor's Disclosure Statement (Dkt. #116) that was conditionally
19       approved on November 14, 2012 (Dkt. #159);
      (ii) Confirmation of Debtor's Second Amended Plan of Reorganization (Dkt. #284), Ex. 2; and
20      (iii) Confirmation of Bank of America, N.A. as Trustee's Plan of Liquidation for the Property
         (Dkt. #126), Ex. 7.
21    After the filing of post-hearing memoranda, final arguments were heard on October 22, 2013.
22    On that date, the Court advised counsel that confirmation of Debtor's Second Amended Plan of
      Reorganization ("Second Amended Plan") would be denied, and that Lender's Plan of
23    Liquidation for the Property would be confirmed.  Counsel for Lender was told to file proposed
24    findings of fact and conclusions of law.

25         [3] Bank of America, N.A. is the successor by merger to LaSalle Bank National
      Association, as trustee for the registered holders of GMAC Commercial Mortgage Securities,
26    Inc., Commercial Mortgage Pass-Through Certificates, Series 2003-C1.

1    Motion to Amend.  Talitha Gray Kozlowski, Esq., of Gordon Silver, appeared for

2    Debtor.  John Robert Weiss, Esq., of Duane Morris, appeared for Lender.  This

3    Memorandum Decision resolves the issues raised in the Motion to Amend.

## II.    FACTS

Debtor owns and operates the Horizon Ridge Medical & Corporate Center,

an office building located at 2610 W. Horizon Ridge Parkway, Henderson, NV (the

"Property").[4]

Debtor filed a voluntary Chapter 11 petition on April 2, 2012.  (Dkt. #1).

The Court determined the value of Debtor's Property to be $3,975,000.

(Order Determining Value of Debtor's Real Property for Purposes of

Confirmation, Dkt. #223).  Consistent with that determination, the court concluded

that Lender holds a secured claim in the amount of $3,975,000 and an unsecured

claim in the amount of $369,314,[5] totaling $4,344,314.  (Findings of Fact and

Conclusions of Law and Order Regarding Debtor's Objection to Proof of Claim,

etc., Dkt. #313).  Debtor appealed the court's Findings of Fact and Conclusions of

---

[4] Debtor is a single-asset real estate entity: its sole asset is the Property and improvements comprising the Medical Center building.  The Property is managed by Dr. Rick Abelson, an optometrist..  (Second Amended Plan, ¶ 5.7, p. 22).

The "Property is approximately 2.2 acres of land, and the Center consists of a two-story office building situated on the Real Property with approximately 29,142 sq. ft., containing six first-floor suites, and 7 second-floor suits, one of which has been subdivided into nine suites, for a total of twenty-one suites. Debtor maintains its management office in one of the eight subdivided suites, as well as a community conference room, thereby leaving nineteen leasable suites." (Disclosure Statement at p. 15).

[5] Lender has since docketed a Second Motion to Supplement its Claim seeking to increase its unsecured claim by $279,752.01, for additional attorneys' fees, the interest rate expert, and out of pocket expenses incurred from August 1, 2013 through November 31, 2013. (Motion to Supplement Claim, Dkt. #365).  Debtor opposed the Motion to Supplement Claim. (Dkt. #398).  The court heard arguments and took the motion under submission on February 6, 2014.

3

Law and Order Regarding Debtor's Objection to Proof of Claim.  (Dkt. #317).

Chandrakant Patel ("Patel") and Dr. Rick Abelson ("Abelson") own the equity interests in Debtor.  Abelson manages the Property.

## III.    DEBTOR'S PLANS AND DISCLOSURE STATEMENT

On October 12, 2012, Debtor filed an Amended Plan of Reorganization, (Dkt. #115), and a Disclosure Statement.  (Disclosure Statement, Dkt. #116).

On November 14, 2012, pursuant to Local Rule 3017, the court entered an Order conditionally approving the Debtor's Disclosure Statement.[6]  The court found that Debtor's Disclosure Statement contained "adequate information" within the meaning of Section 1125 of the Code and established procedures for the Debtor's solicitation of votes on Debtor's then-existing reorganization plan ("Original Reorganization Plan").[7]  (Disclosure Statement Order, Dkt. #159). After substantial delay, a confirmation hearing was set for September 16, 2013.

On September 13, 2013, one business day before the Confirmation Hearing, Debtor filed its Second Amended Plan of Reorganization ("Second Amended Plan").  (Second Amended Plan, Dkt. #284).  The Second Amended Plan was not accompanied by a new or amended disclosure statement.  The Second Amended Plan was the subject of the court's Memorandum Decision (Memorandum Decision, Dkt. #349).[8]

---

[6] The Disclosure Statement provides that Lender's claim is secured.  (Disclosure Statement at p. 11).  Debtor disputed the scope of Lender's secured claim, and reserved the right to object to the claim amount.  (Id.).

[7] Debtor's Amended Plan of Reorganization. (Dkt. #115).

[8] When Debtor's Second Amended Plan was filed, discovery had already closed, and the parties had filed trial memoranda concerning confirmation of the Original Reorganization Plan, which had been filed nearly a year earlier on October 10, 2012. (Dkt. #115).

4

As more fully discussed below, the Court determined that the Disclosure Statement was inaccurate in several respects. (Memorandum Decision at pp. 4, 10-14). Tenant occupancy was overstated, long-term occupancy was not discussed, the scope and number of unsecured claims were understated, and administrative claims were understated.

The Second Amended Plan differs from the Original Reorganization Plan in two significant respects. The Second Amended Plan subdivides Lender's Class 1 into two separate classes: Class 1A and Class 1B. Class 1A includes only Lender's secured claim. Class 1B includes only Lender's unsecured deficiency claim. (Second Amended Plan at pp. 11-12). Debtor's Second Amended Plan proposes to pay Lender's Class 1A secured note and Class 1B unsecured note on the same 7 year schedule. That payment schedule call for interest-only payments for the first two years, with principal and interest payments thereafter on a thirty-year amortization schedule for the next 5 years, with a final balloon payment at the end of year 7. (Second Amended Plan, Section 4.1 and 4.2, at pp. 12-15).

The Second Amended Plan also includes a new, contingent[9] guaranty ("Guaranty") by Patel and Abelson regarding the payment of monthly debt service on the Class 1A and Class 1B promissory notes (the "Notes" or "Lender's Notes") and the payment of the Reorganized Debtor's Property's operating expenses during the 7-year term of the Plan.[10] (Second Amended Plan, Sections 1.1.40, and 3.2.2). The obligation to make the debt service payments and/or pay the operating expense payments is triggered by a written payment request from the Reorganized Debtor.

---

[9] If the Reorganized Debtor does not make a request for payment, Patel and Abelson have no obligation to contribute any funds to the Reorganized Debtor.

[10] The 7-year term of the Plan is referred to as the "Plan Period."

1 The Guaranty does not guarantee payment of the unpaid principal balance or

2 balloon amount of the Notes on the Maturity Date.

3      Pursuant to its Second Amended Plan, Debtor intends to retain the Property.

4 Debtor proposes to finance the first 7 years of the reorganization process with

5 monthly income from the rent revenues obtained from the tenants of the Property.

6 (Second Amended Plan, Sections 5.1-5.11).  At the end of the Plan Period, when

7 the large balloon payment to Lender comes due, Debtor hopes to refinance that

8 debt or to sell the property in order to repay Lender.  (Second Amended Plan,

9 Sections 4.1.1.(g), and 4.2.1(g)).

10      Patel and Abelson will retain their equity interest in the Reorganized Debtor.

11 (Second Amended Plan, Section 4.6).  The Second Amended Plan gives Patel and

12 Abelson the exclusive right to acquire the equity.  The Plan does not establish a

13 market value for the equity being retained by Patel and Abelson, nor does it

14 otherwise propose to test the "market" to see if there is any interest by third parties

15 in acquiring the equity.

16      The Debtor intends to sell or to refinance the Property prior to the Maturity

17 Date. (Second Amended Plan, Sections 4.1.1.(g), and 4.2.1(g), at pp. 13-14).  Mr.

18 Nelson, Debtor's interest rate expert, noted in his Report that:

19
20     Although there is substantial lender activity in connection with
    multi-family commercial properties, including ones of this nature,
21     those loans usually consist of private party loans and commercial
    loans limited to qualified borrowers, with good credit, appropriate
    loan to value ratios (typically around 70-75% or lower), with
22     substantial down payments. (Nelson Report, Ex. 11 at p. 5).

23 Debtor asserts that the Property will have a loan-to-value ratio of just under

24

25

26

6

ninety percent (90%)[11] of the court-established value of the Property on the Maturity Date. (Post Hearing Brief at p. 6). Debtor's loan-to-value computation is incorrect.[12] Unfortunately, the Nelson Report provides little guidance in this regard. The Report's computation fails to take into consideration the Lender's $369,314.00 unsecured claim, and the Report was based entirely upon the now-obsolete payment schedule contained in the Debtor's Original Reorganization Plan. (Dkt. #115).[13]

During the course of the Confirmation Hearing, Mr. Nelson revised his computations to reflect the new payment schedule as well as Lender's unsecured claim, and acknowledged that the unpaid principal balance of the combined Class 1A and Class 1B Notes would be roughly $3.9 million at the end of the 7-year Plan

---

[11] Mr. Nelson's Report, dated September 3, 2013, uses a payment amortization schedule comprising 36 months of interest-only payments followed by 48 monthly payments of principal plus interest (based upon a 30-year amortization), leaving a sizable balloon payment at the end of the Plan. This schedule results in a loan-to-value ratio of 93.6% at the end of the Plan Period. (Nelson Report, Ex. 11 at p. 14).

[12] Debtor starts its calculation using a total claim balance of $4,299,305, then reduces this amount to $3,947,981 after making principal payments of $351,324 during the 7-year Plan Period. Debtor states that this produces a loan-to-value ratio of 89.6%. (Post Hearing Brief at p. 6-7). The court previously held that Lender's secured claim was $3,975,000 and that its unsecured claim was $369,314 for a total claim was $4,344,314. (Dkt. #313). Following the Second Amended Plan's payment schedule and using the Debtor's proposed 5% interest rate, the court finds a principal balance at the end of the 7-year Plan Period of $3,650,192.10 for the Lender's secured claim and $339,136.84 for the Lender's unsecured claim, totaling $3,989,328.94 (reflecting principal payments of $354,985.06 during the last 5 years of the Plan). This payment schedule results in a loan-to-value ratio of **100.4%** at the end of the plan period.

Even if the court were to use the $4,299,305 starting combined principal value identified in Debtor's Post-Hearing Brief (Post Hearing Brief, at p. 6), the remaining unpaid principal balance of $3,947,981, results in a loan-to-value ratio of **99.32%**.

[13] Mr. Nelson's Report includes in Class 1 only the Lender's secured claim. (Nelson Report, Ex. 11, at pp. 4, 14). Debtor's Second Amended Plan bifurcated Class 1 into two separate claims the secured claim in Class 1A and the unsecured Claim in Class 1B. (Second Amended Plan).

1    Period.[14]  Debtor's Post Hearing Brief establishes this amount to be $3,947,981 at

2    the end of the Plan Period.[15]  (Post Hearing Brief at pp. 6-7).  Comparing a

3    remaining principal balance of $3,947,981 with the Property value of $3,975,000

4    results in a loan-to-value ratio of 99.32%, not the 89.6% asserted by Debtor.[16]

5         Abelson's optimistic testimony about future rents and operation expenses

6    was unsupported.  No tenant on a month-to-month lease testified or gave a

7    declaration that it would stay in the Property for an extended period of time.  No

8    tenant with a lease expiring in the next two years testified or gave a declaration that

9    it intended to renew its lease when it expired.

10        Debtor's cash flow projections (Ex. 4) for the Property are unreasonable.

11   Debtor projects an increase in rental income by 6.66% in 2014 and by 4.63% in

12   2015,[17] while operating expenses only increase 1.23% and 1.24% during those same

13   years.  (Nelson Report, Ex. 11 at p. 11).  The projections also assume that property

14

15

16   ─────────────────────

17   [14] "Additionally, the lender's claim at $4,299,000 would be decreased by principle
     payments of $351,000 over the plan term leaving their balance at the end of year 7 at $3.9
18   million." (Transcript, Dkt. #336, at p. 34, lns 12-14).

19   [15] The court reaches a loan-to-value ratio of **100.4%**, based upon the court's use of a
     different starting point.  See, footnote 12, supra, for the court's calculation.
20
     [16] Debtor incorrectly attempts to use more than $400,000 in expected Plan Period profits
21   and some of Debtor's current cash on hand to reduce the remaining principal balance on the
     Class 1A and Class 1B Notes on the Maturity Date, and generate a lower loan-to-value ratio.
22   (Ex. 80). Lender correctly argues that the Debtor's Second Amended Plan contains no such
     payment requirements. As such, a promise to make such payments cannot be relied upon since it
23   is not compulsory under the Second Amended Plan. (Response at p. 4).

24   [17] As more fully explained below, the court will not reopen the Confirmation Hearing to
25   allow Debtor to add the two new leases into the record in this case. Had the court allowed such a
     supplement to the record, the leases in question would have contradicted Mr. Nelson's
26   projections for the Property. (Response at p. 9).

1    taxes would remain the same during the 7-year Plan Period.[18]  The projections were

2    not altered after the loss of the Property's largest tenant.

3        Debtor proposes a Till-based[19] interest rate of 5% for the Plan, comprised of

4    the Prime Rate (3.25%) and a risk premium of 1.75%.[20]  (Nelson Report, Ex. 11 at

5    pp. 7-10).

6        Debtor sought out commercial lenders concerning loans on the Property to

7    pay Lender in full and exit the bankruptcy case.  Debtor acknowledged that no

8    lender was willing to lend the Debtor the funds to pay off the Lender's Notes.  One

9    of those lenders succinctly stated the problem facing the Debtor:

> With over 50% of your building's leases expiring in 2014 and
> over 70% expiring in 2015, there is no way I could even get a
> short-term loan approved.  Especially given the uncertainty of
> where market rates may be over the next few years upon lease
> renewal. (Ex. 17).

13    The testimony and other evidence reflected that commercial lenders are

14    charging nearly 5% interest on loans to clients with good credit ratings, sizable

15    down payments and a 70% to 75% loan-to-value ratio.  (Nelson Report, Ex. 11 at p.

---

[18] Debtor's projections include increasing property values, without increasing real estate taxes.  Debtor's projections for increasing rent revenues is also unsupported.

[19] Till v. SCS Credit Corp., 541 U.S. 465, 474 (2004).

[20] The evidence introduced at the Confirmation Hearing established that currently there is no efficient marketplace in the Las Vegas region for loans similar to that sought by the Debtor in this case.  Lenders are not lending to borrowers like the Debtor due to its bankruptcy status, loan-to-value ratio, and long-term occupancy levels.  Thus, pursuant to Till, supra, 541 U.S. at 474, and consistent with other Ninth Circuit decisions like Farm Credit Bank of Spokane v. Fowler (In Re Fowler), 903 F.2d 694, 697-99 (9th Cir. 1990); United States v. Camino Real Landscape Maint. Contractors, Inc. (In re Camino Real Landscape Maint. Contractors, Inc.), 818 F.2d 1503, 1508 (9th Cir. 1987), where there is no efficient marketplace to establish the interest rate in a cramdown, the court will use the current Prime Rate and add basis points to the extent that the loan is determined to be risky, and in a number sufficient to compensate for the unusual risk.

9

7).  The Reorganized Debtor meets none of these criteria.  The Reorganized Debtor is not a qualified borrower, does not have good credit, does not have a sizable down payment, and the Property is going to have a loan-to-value ratio significantly above 75% at the end of the Plan Period.

Distressed property lenders are charging 10% to 11% on loans with a 65% loan-to-value ratio.  (Ex. #18)  Again, Debtor does not qualify for these loans. Debtor's Property will have a loan-to-value ratio significantly above 65% at the end of the Plan Period.

The court finds that the Lender's projections for the Property are more realistic than Debtor's, reflecting lower rent rate increases as well as higher increases in operating expenses and taxes than are proposed by Debtor.  (Keith Bierman Report, Ex. #12).

Lender proposed a Till-based interest rate of 6.75% for the Plan, based upon the Prime Rate (3.25%) plus a risk premium of 3.50% (composed of default risk, interest rate and loan duration risk, and security risk).  (Keith Bierman Report, Ex. #12 at p. 10).

Debtor's proposed 5% interest rate is not adequate to compensate Lender for all of the risks incumbent in the Debtor's 100+% financed reorganization plan. Lender's suggested 6.75% interest rate is unreasonably high.  Based upon the testimony and evidence adduced at the Confirmation Hearing, and presented in both the Nelson Report and the Bierman Report, the court finds that an appropriate interest rate in this case is between 6% and 6.25%, based upon the Prime Rate (3.25%) plus a risk premium of 2.75% to 3.0% (composed of default risk, interest rate, loan duration risk, and security risk).

**IV.    DISCUSSION**

1     Debtor's Motion to Amend was brought pursuant to Rules 9023 and 9024.

2  Rule 9023 incorporates FRCP 59; Rule 9024 incorporates FRCP 60. Debtor's

3  motion was docketed on the 14th day following the court's release of the

4  Memorandum Decision.[21]  Where a party files a motion for reconsideration within

5  14 days after the entry of judgment, the motion is treated as a motion to alter or

6  amend judgment under Civil Rule 59(e).[22]  <u>Am. Ironworks & Erectors, Inc. v. N.</u>

7  <u>Am. Constr. Corp.</u>, 248 F.3d 892, 898-99 (9th Cir. 2001) (citation omitted);

8   Fed. R. Bankr. P. 9023.  FRCP 59(e) allows for reconsideration if the bankruptcy

9  court "(1) is presented with newly discovered evidence, (2) committed clear error or

10  the initial decision was manifestly unjust, or (3) if there is an intervening change in

11  controlling law.  There may also be other, highly unusual circumstances warranting

12  reconsideration." <u>School District No. 1J v. AC & S, Inc.</u>, <u>supra</u>, 5 F.3d at 1262.

13  (internal citation omitted).

14         Although Rule 59(e) permits a district court to reconsider
       and amend a previous order, the rule offers an "extraordinary
15       remedy, to be used sparingly in the interests of finality and
       conservation of judicial resources." 12 James Wm. Moore et al.,
16       supra § 59.30[4].  Indeed, "a motion for reconsideration should not
       be granted, absent highly unusual circumstances, unless the district
17       court is presented with newly discovered evidence, committed
       clear error, or if there is an intervening change in the controlling
18       law." <u>389 Orange Street Partners</u>, 179 F.3d at 665. A Rule 59(e)
19

20

_____

21     [21] The Memorandum Decision was docketed on Friday, December 20, 2013 (Dkt. #349),
   and the Motion to Amend was docketed on Friday, January 3, 2014 (Dkt. #360).
22

23     [22] Motions filed beyond the 14-day period are treated as a motion for relief from a
   judgment or order under Rule 60(b). <u>Am. Ironworks & Erectors, Inc. v. N. Am. Constr. Corp.</u>,
24  248 F.3d 892, 898-99 (9th Cir. 2001).  FRCP 60(b) allows for reconsideration "only upon a
   showing of (1) mistake, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud;
25  (4) a void judgment; (5) a satisfied or discharged judgment; or (6) extraordinary circumstances
   which would justify relief." <u>School District No. 1J v. AC & S, Inc.</u>, 5 F.3d 1255, 1253 (9th Cir.
26  1993) (citation omitted, internal quotation marks omitted).

1
2

motion may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation. See id.

3
4
5
6
7
8

Kona Enters., Inc. v. Estate of Bishop, 229 F.3d 877, 890 (9th Cir. 2000).  Courts need to "preserve the delicate balance between the sanctity of final judgments and the incessant command of a court's conscience that justice be done in light of all the facts."  In re Walker, 332 B.R. 820, 832 (Bankr. D. Nev. 2005) (quoting Kieffer v. Riske (In re Kieffer-Mickes, Inc.), 226 B.R. 204, 209 (B.A.P. 9th Cir. 1998)) (internal quotation marks omitted).

9
10
11
12
13
14
15
16
17

Within this framework, Debtor argues that the Memorandum Decision contains factual errors related to both the court's Disclosure Statement analysis and its analysis of Debtor's Second Amended Plan under Section 1129.  (Motion to Amend at pp. 5-6).  Additionally, Debtor asks the court to reopen the evidence for the Confirmation Hearing to allow Debtor to supplement the record in that hearing with two leases that did not exist at the time of the Confirmation Hearing.  Finally, Debtor asks the court to reconsider three of its legal conclusions on the basis that the court misunderstood the Debtor's Second Amended Plan.  (Id. at p. 6).

18

     1.    **Newly Discovered Evidence**.

19
20
21
22
23
24

Debtor does not argue that the two new leases constitute "newly discovered" evidence within the meaning of FRCP 59(e).  Even if it did, in order for evidence to qualify as "newly discovered" for purposes of a motion for new trial, "the evidence must be in existence at the time of the trial."  N.L.R.B. v. Jacob E. Decker and Sons, 569 F.2d 357, 364 (5th Cir. 1978).  The proposed evidence must be "newly discovered" rather than "newly created."  See Biesek v. Soo Line R.R. Co., 440

25
26

12

F.3d 410, 412 (7th Cir. 2006).[23]  In this case, the leases at issue did not exist at the time of the Confirmation Hearing.[24]  Thus, the leases do not qualify as "newly discovered" for purposes of the court's Rule 9023 analysis.

### 2. **Factual errors**.

A Rule 9023 motion may be granted "to correct manifest errors of law or to present newly discovered evidence." Phelps v. Hamilton, 122 F.3d 1309, 1324 (10th Cir. 1997) (internal quotation marks omitted).  Relief is appropriate when "the court has misapprehended the facts, a party's position, or the controlling law." Servants of the Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000).  Thus, the court may correct misapprehended or incorrect facts contained within its Memorandum Decision.

Debtor raises three separate factual issues related to the Memorandum Decision:

- The Memorandum states that occupancy was 77% as of the Confirmation Hearing [See Memorandum, p. 4:13]; however, as demonstrated above, the lease and occupancy rate was 83% as of the Confirmation Hearing ... .

- The Memorandum further states that there is only "seven percent guaranteed occupancy beyond 2015" [See id., p.

---

[23] See also Betterbox Comm. Ltd. v. BB Tech., Inc., 300 F.3d 325, 331 (3rd Cir. 2002) ("newly discovered evidence must concern facts in existence at the time of trial"); Davis by Davis v. Jellico Cmty. Hosp. Inc., 912 F.2d 129, 136 (6th Cir. 1990) (discussing "well-conceived rule that newly discovered evidence for motions under Rule 59 or Rule 60(b)(2) must pertain to evidence which existed at the time of trial"); Rivera v. M/T Fossarina, 840 F.2d 152, 156 (1st Cir. 1988) (evidence that came into existence after the court's judgment is not newly discovered evidence within the meaning of Rules 59 and 60); Repurchase Corp. v. Bodenstein, 2008 WL 4379035, *8 (N.D. Ill. 2008) ("Rule 59 motions are not intended to give parties the opportunity to relitigate issues with newly created evidence").

[24] One lease, for suite 102, was signed on December 4, 2013; the other lease, for suite 105, was signed on December 21, 2013.

13

13:16-17]; however, this fails to account for the R2H Engineering lease for Suite 205 entered into prior to the Confirmation Hearing, which increases the percentage of leases extending into and past 2017 to 16%, ...

• The Memorandum also incorrectly states that Dr. Abelson testified that the administrative claims are about $350,000 [See id., p. 4:16-17]. Dr. Abelson actually testified that the administrative claims were around "$150,000 to $175,000"... .

(Motion to Amend at p. 5.)  The court, having scrutinized the record and transcript, finds that Debtor's arguments regarding these three factual points are well-taken, and incorporates the 83% occupancy rate, 16% guaranteed occupancy beyond 2015, and the $150,000 to $175,000 administrative claims facts identified above into its analysis below.

However, as more fully discussed below, incorporation of these three amended or modified facts into the court's analysis does not, alone, alter the court's findings or conclusion regarding its determination that 1) Debtor's Disclosure Statement is inaccurate in numerous respects or 2) Debtor's Plan cannot be confirmed for numerous reasons.

**3.    Reopen the Record of the Confirmation Hearing to Allow Newly Created Evidence?**

In the Ninth Circuit a party seeking to reopen a proceeding to introduce evidence regarding post-trial events do so under a motion to reopen. Contempo Metal Furniture Co. of Calif. v. East Tex. Motor Freight Lines, Inc., 661 F.2d 761, 767 (9th Cir. 1981).  "[A] motion to reopen to submit additional evidence is addressed to the sound discretion of the trial judge." Berns v. Pan Am. World Airways, Inc., 667 F.2d 826, 829 (9th Cir. 1982); First Beverages, Inc. of Las Vegas v. Crown Royal Cola Co., 612 F.2d 1164, 1172 (9th Cir. 1980), cert. denied,

447 U.S. 924 (1980); Thomas v. SS Santa Mercedes, 572 F.2d 1331, 1336 (9th Cir. 1978); see also Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 331 (1971) ("Like a motion under Rule 15(a) to amend the pleadings, a motion to reopen to submit additional proof is addressed to the [trial judge's] sound discretion.").

> This is so because of bedrock principles of finality and certainty of judicial proceedings. Evidence which has only come into existence after the conclusion of a trial cannot justify the granting of a new trial "for the obvious reason that to allow such a procedure could mean the perpetual continuation of all trials." Jacob E. Decker, 569 F.2d at 364 (citation omitted); see also State of Washington v. United States, 214 F.2d 33, 46 (9th Cir. 1954) ("The policy of law in having an end to litigation, would in most cases prevent the reopening of a case because of after-occurring events."); Hudson's Bay Co. Fur Sales v. American Legend Co-op., 115 F.R.D. 337, 341 (D. N.J. 1987) (cautioning that to allow new trial based on evidence that was new, not newly discovered, would be to "assure unending litigation and the demise of the concept of finality").

Baucom v. Sisco Stevedoring, LLC, 2008 WL 2428930, *4 (S.D. Ala. 2008).

Debtor asserts that the Property had occupancy rates "between 83% and 97%" for all but a two-month period of time during the pendency of this case, and that the court's reliance upon the 77% occupancy rate was a short-term aberration. (Motion to Amend, p. 9). Debtor goes on to argue:

> The Court, in large part, found the Plan to be unconfirmable based on this informed business judgment because it resulted in a two month lease occupancy rate decline (notwithstanding the more than 83% lease occupancy rate during the other nineteen months of the Chapter 11 Case and the fact that Debtor's informed business judgment resulted in a larger, stronger, and more attractive tenant.[25]

---

[25] Debtor misreads the Memorandum Decision. The court determined that Debtor's Second Amended Plan could not be confirmed on several independent bases, each of which would individually have prevented confirmation of Debtor's Plan. Debtor's current and long-term occupancy rate was only a single factor in that analysis.

(Id.).  Debtor thereafter asks the court to reopen the record in these proceedings to allow Debtor to place into evidence two leases that did not exist until approximately two months after the close of evidence in the Confirmation Hearing.  (Id.).  Debtor argues that justice demands the court allow the new evidence.  (Id.)

Not surprisingly, Lender disagrees.  Lender opposes reopening the Confirmation Hearing record, in part, on the basis that reopening the proceedings to include such evidence potentially creates the situation where the record will never be closed.  Lender asserts that:

> granting the Motion would not be as simple as taking the time to read and consider the new leases.  The Debtor's projections of future performance were based on the leases that the Debtor said existed at the time of trial.  Those projections, which form the basis for any conclusions as to feasibility and value, would have to be re-run and the creditors' votes re-solicited.  In fact, the entire trial record was based on the facts that existed at the time of trial.  Both fact witnesses testified about those circumstances, not the circumstances that exist today.  Both expert witnesses researched and drafted their reports, and gave testimony about their conclusions, based on those circumstances.  If the Court were to re-open the record to allow the new leases to be introduced into evidence, the Court would also have to order an entirely new trial, with new discovery allowed to both sides.  The cost in time and money would be enormous.  Finally, by the time the new trial were to be held, there may be entirely new circumstances to consider in the event that any other tenants were to have moved in or out or if other circumstances were to have changed.

(Response at p. 6).  The court agrees with Lender.

If the court reopens the Confirmation Hearing to allow Debtor to inject new evidence related to the occupancy rate effects of Debtor's two new leases and or a new Property value,[26] the court likewise would be compelled to allow discovery[27]

---

[26] Debtor has docketed a newly obtained appraisal for the Property. (Dkt. #397).

[27] Debtor's two new leases are worse than many of the existing leases. (Response at p. 9).  They contradict the projected rent increases that form the basis of Mr. Nelson's cash flow

1  on that new evidence and essentially restart the entire confirmation hearing

2  process.[28]  Restarting this process will, as suggested by Lender, be both hugely

3  expensive[29] and time consuming.  (Response at p. 6).  This the court will not do.

4      The instant case is nearly two years old.  Reorganization seeks finality, with

5  reasonable promptness, of the debtor-creditor relationships.  Lender's plan has been

6  confirmed, and the question of the value of the Property and the number and

7  duration of the various tenant leases in the building will not be reopened.  If

8  alleged changes in the number or duration of the various tenant leases or of the real

9  property value become grounds for undoing confirmed plans of reorganization,

10  finality will become impossibly elusive.

11
12  **V.    DEBTOR'S SECOND AMENDED PLAN CANNOT BE CONFIRMED**

13      Confirmation of a plan of reorganization is governed by Section 1129 of the

14  Bankruptcy Code.  11 U.S.C. § 1129.  Under Section 1129, the court has an

15  affirmative duty to ensure that the plan satisfies all of the requirements for

16  confirmation.  Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc

17  La Mesa), 115 F.3d 650, 653 (9th Cir. 1997), cert denied, 522 U.S. 1110 (1998).

18      In determining whether the standard has been met, the court may take into

19

20

21  projections.  (Nelson Report, Ex. 11 at p. 11).  Lender would certainly demand the opportunity to test Mr. Nelson's projections and assumptions in light of the terms of the newest leases on the Property.

22

23  [28] It is highly likely that Debtor would seek to distribute a new disclosure statement and possibly a new plan.

24

25  [29] When the court considers Lender's current and second proposed request for costs and fees, together with Debtor's current and expected attorneys fees, the court sees professional fees, expenses, and administrative claims that are roughly 25% of the value of the Property.  A second

26  confirmation hearing, with its additional fees and expenses, can only make the situation worse.

1  account all previous proceedings and matters on record in the case. See In re

2  Acequia, Inc., 787 F.2d 1352, 1358 (9th Cir. 1986).

3      Generally, a plan of reorganization can be confirmed in one of two ways.

4  Initially, if all sixteen subsections of Section 1129(a) are satisfied by the plan

5  proponent, a plan can be confirmed consensually under Section 1129(a). RadLAX

6  Gateway Hotel, LLC v. Amalgamated Bank ("RadLAX"), 132 S.Ct. 2065, 2069,

7  182 L.Ed.2d 967 (2012). See also United States ex rel. Farmers Home Admin. v.

8  Arnold & Baker Farms (In re Arnold & Baker Farms), 177 B.R. 648, 654 (B.A.P.

9  9th Cir. 1994).

10      In the instant case, Lender voted against confirmation in Class 1A.[30] (Ballot

11  Summary, Dkt. #192). Accordingly, Debtor's Second Amended Plan cannot be

12  confirmed consensually under Section 1129(a).

13      If a plan proponent satisfies all paragraphs of Section 1129(a) except the

14  unanimous voting requirement of Section 1129(a)(8), then the court may still

15  confirm the plan as long as the plan "does not discriminate unfairly" against and

16  "is fair and equitable" towards each impaired class that has not accepted the plan.

17  11 U.S.C. § 1129(b)(1). RadLAX, supra, 132 S.Ct. at 2069; Bank of America

18  Nat'l Trust Ass'n v. 203 North LaSalle St. P'ship ("203 North LaSalle"), 526 U.S.

19  434, 441 (1999); In re Ambanc La Mesa, supra, 115 F.3d at 653. This second,

20  nonconsensual, method of confirmation is commonly referred to as "cramdown."[31]

21

22      [30] Class 1B, Lender's unsecured deficiency claim, appears for the first time in Debtor's

23  Second Amended Plan. As such, Class 1B did not exist at the time Debtor's ballots were
distributed to creditors. Lender voted against confirmation for Class 1A, and it is reasonable to

24  presume that Lender would have voted similarly if had been able to separately vote Class 1B.

25      [31] "Courts use "cramdown" and "cram down" and "cram-down" interchangeably to refer
to nonconsensual confirmation. Indeed, Justice Douglas once combined different forms in the

26  same paragraph. Blanchette v. Connecticut Gen. Ins. Corps., 419 U.S. 102, 167 (1974)

18

1    RadLAX, supra, 132 S.Ct. at 2069; 203 North LaSalle, 526 U.S. at 441.

2        Given that Lender's Class 1A[32] rejected the Debtor's Second Amended Plan,

3    the only method of confirmation available to the Debtor is nonconsensual

4    cramdown under 11 U.S.C. § 1129(b).

5        Although Lender does not attack the Debtor's Second Amended Plan

6    regarding each element of Section 1129(a), the court has a duty to consider each

7    element of Section 1129 when considering a plan for confirmation.  In re Ambanc

8    La Mesa, supra, 115 F.3d at 653.

9        Under Section 1129(a), the court shall confirm a plan only if each of the

10    sixteen subsections are met.  11 U.S.C. § 1129(a).  Sections 1129(a)(1) and (a)(2)

11    require the court to consider whether the Debtor's Second Amended Plan and the

12    Debtor have complied with the Code.  11 U.S.C. §§ 1129(a)(1) & (2).

13
        **Section 1129(a)(1) - Plan compliance with applicable provisions of
14        the Bankruptcy Code.**

15        Pursuant to Section 1129(a)(1), the court may not confirm a plan unless

16    "[t]he plan complies with the applicable provisions of this title."  11 U.S.C. §

17    1129(a)(1).  Stated differently, if the court finds any of Lender's Plan objections

18    meritorious, the Plan would also have violated Section 1129(a)(1) and cannot be

19    confirmed.

20    _____

21    (Douglas, J., dissenting).  The hyphenated version appears to have been the first locution used by
      a court. New England Coal & Coke Co. v. Rutland R.R. Co., 143 F.2d 179, 189 n. 36 (2d Cir.
22    1944).  The earliest print references to the term use either the two-word or the hyphenated form.
      Compare Robert T. Swaine, Present Status of Railroad Reorganizations And Legislation
23    Affecting Them, AM. BAR ASS'N, PROCEEDINGS OF THE SECTION ON COMM. LAW 15,
      15 (1940) (two-word form) and Warner Fuller, The Background and Techniques of Equity and
24    Bankruptcy Railroad Reorganizations-A Survey, 7 Law & Contemp. Probs. 377, 389, 390 (1940)
25    (hyphenated form)."  In re Shat, 424 B.R. 854, 585 fn. 7 (Bankr. D. Nev. 2012).

26        [32] As noted earlier in fn. 30, Lender never had a chance to vote its Class1B claim.

**Section 1129(a)(2) - Plan proponent's (Debtor's) compliance with applicable provisions of the Bankruptcy Code.**

Pursuant to Section 1129(a)(2) the court may not confirm a plan unless "[t]he proponent of the plan complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(2). "The legislative history of the Section indicates that Congress was concerned "that the proponent of the plan must comply with the applicable provisions of title 11, such as ... disclosure and solicitation requirements of sections 1125 and 1126." 7 COLLIER ON BANKRUPTCY ¶ 1129.02[2], at p. 1129-19 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.2009); see also, In re Idearc, Inc., 423 B.R. 138, 163 (Bankr. N.D. Tex. 2009).

Section 1125 requires the disclosure statement to provide "adequate information" to the creditors in order for them to make an "informed judgement about the plan." 11 U.S.C. § 1125(a)(1).

"While including false information is a more serious matter than a mere lack of information, 'the determination of what is adequate information is subjective and made on a case by case basis. This determination is largely within the discretion of the bankruptcy court.' " Computer Task Gp., Inc v. Brotby (In re Brotby), 303 B.R. 177, 193 (B.A.P. 9th Cir. 2003) (quoting, In re Texas Extrusion Corp., 844 F.2d 1142, 1157 (5th Cir. 1988)).

The adequacy of the disclosure statement information has been evaluated using numerous factors, including the present condition of the debtor while in Chapter 11, the classes and claims within the reorganization plan, the estimated administrative expenses (including attorneys' fees), financial information and projections relevant to the decision to accept or reject the debtor's plan, information relevant to the risks posed to creditors under the debtor's plan. In re Reilly, 71 B.R. 132, 1334-35 (Bankr. D. Mont. 1987). 7 COLLIER ON

BANKRUPTCY ¶ 1125.2[2], at p. 1125-10 to 1125-11 (Resnick & Henry J. Sommer eds., 16th ed. rev.2010).

Class 2, Other Secured Claims, and Class 5, Membership Interests in the Debtor,[33] are unimpaired.  (Second Amended Plan, Section 3.1 at p. 11).  Pursuant to Section 1126(f), the members of Classes 2 and 5 are conclusively presumed to have accepted the Plan.  11 U.S.C. § 1126(f).

Members of Class 1, Lender's Claim, and Class 4, General Unsecured Claims, are impaired, receive distributions under the plan, and were solicited to vote on Debtor's then-existing plan of reorganization.

Classification of claims is governed by Section 1122(a).[34]  11 U.S.C. § 1122(a).  The Code does not mandate that all similar claims be classified together, provided that there is a reasonable basis for not doing so.[35]  However, Section 1122(a) requires that dissimilar claims cannot be placed into the same class.  The bankruptcy court has broad discretion in classifying claims under Section 1122(a). Wells Fargo Bank v. Loop 76, LLC (In re Loop 76), 465 B.R. 525, 536 (B.A.P. 9th Cir. 2012).  A bankruptcy court's finding that a claim is or is not substantially similar to other claims constitutes a question of fact reviewable under the "clearly

---

[33] Abelson controls the Debtor.  As such, Abelson is an "insider" pursuant to Section 101(31)(B)(iii), and is not permitted to vote on Debtor's plan.  11 U.S.C. § 1129(a)(10).

[34] Section 1122(a) provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a).

[35] "The separate classification of otherwise substantially similar claims and interests is acceptable as long as the plan proponent can articulate a 'reasonable' justification for separate classification."  7 COLLIER ON BANKRUPTCY ¶ 1122.03[1][a], at p. 1122-7 (Resnick & Henry J. Sommer eds., 16th ed. rev.2010).  In re Adelphia Comm. Corp., 368 B.R. 140, 246-247 (Bankr. S.D.N.Y. 2007) (separate classification of substantially similar claims is permissible if there is a reasonable basis for doing so).

21

1    erroneous" standard. Id.

2    Debtor failed to properly separate Lender's claim into its secured and

3    unsecured components, lumping them together under the Original Reorganization

4    Plan and for voting purposes.[36]  11 U.S.C. § 506(a)(1).  However, once Debtor

5    separated the Lender's Claims into its secured and unsecured parts, it was not error

6    to separately classify Lender's unsecured claim.[37]

7    Notwithstanding the classification question related to Lender's Claim 1A

8    and Claim 1B, Debtor's Disclosure Statement is inaccurate in numerous other

9    respects. Tenant occupancy was overstated.[38] The Disclosure Statement failed to

10   provide information regarding the Property's long-term occupancy rate or the risk

11   to creditors that is posed by the 16% guaranteed occupancy beyond 2015.[39]  Both

12

13

14

15

16

17       [36] Debtor failed to send Lender a ballot to vote its unsecured claim.

18       [37] A third-party source of funding will render a lender's deficiency claim dissimilar to the
     unsecured trade creditor claims.  In re Loop 76, supra, 465 B.R. at 536; Barakat v. Life Ins. Co.
19   of Va. (In re Barakat), 99 F.3d 1520, 1526 (9th Cir. 1996).  Given the Guaranty, Lender's
     unsecured deficiency claim is not substantially similar to the unsecured claims comprising Class
20   4, General Unsecured Claims, so separately classifying the claims was not improper.

21
         [38] The Disclosure Statement reported 97% occupancy.  (Dkt. #116 at p. 2).  At the
22   Confirmation Hearing Debtor's then most recently filed Monthly Operating Report, for the
     period ending July 2013, reflected the occupancy rate was 77%.  (Dkt. #288 at p. 6).  Just prior
23   to the Confirmation Hearing, Debtor entered into a new lease that increased the Property's
     occupancy rate to 83%.  (Motion to Amend at p. 2).  Debtor's September 2013 Monthly
24   Operating Report, docketed December 4, 2013, reflects the occupancy rate was 86% at the end
25   of September.  (Dkt. #332 at p. 6).

26       [39] (Motion to Amend at pp. 5, 11; Abelson Declaration, Dkt. #361 at pp. 2-3 ).

22

1   unsecured claims[40] and administrative claims were dramatically understated.[41]

2

3        Given these factual misstatements and omissions, the court concludes that

4   Debtor's Disclosure Statement does not contain "adequate information" that would

5   enable a hypothetical investor to make an informed judgment about the Debtor's

6   Second Amended Plan and that Debtor has not complied with the applicable

7   provisions of section 1125 of the Bankruptcy Code.

8        Because Debtor has not complied with Section 1125 of the Code, and the

9   requirements for adequate disclosure, the Debtor's Second Amended Plan is not

10  confirmable under section 1129(a)(2).   Regardless, the court will review the

11  remaining aspects of Plan under Section 1129.

12
13  **Section 1129(a)(3) - Plan proposed in good faith and not by any means forbidden by law.**

14       Section 1129(a)(3) requires that "[t]he plan has been proposed in good faith

15  and not by any means forbidden by law."   11 U.S.C. § 1129(a)(3).   Section

16  1129(a)(3) does not define good faith.[42]   Platinum Capital, Inc. v. Sylmar Plaza,

17

18       [40] The Disclosure Statement incorrectly stated that unsecured claims were approximately
19  $9,000. (Dkt. #116 at p. 11).  The stated amount failed to take account Lender's unsecured claim
    in excess of $369,314.
20
        [41] The Disclosure Statement incorrectly stated that administrative claims are $29,000.
21  (Dkt. #116 at p. 10).  At the confirmation hearing, Abelson testified that such claims are about
    $150,000 to 175,000.  The Joint Pretrial Statement reflects Debtor's professional fees and
22  expenses to be $165,000.  (Dkt. #280 at p. 6).  The Memorandum Decision incorrectly stated this
    amount was $350,000.  (Memorandum Decision at p. 4).
23
        [42]A legal distinction exists "between the good faith that is a prerequisite to filing a
24  Chapter 11 petition and the good faith that is required to confirm a plan of reorganization."
    Pacific First Bank v. Boulders on the River, Inc.(In re Boulders on the River, Inc.), 164 B.R. 99,
25  103 (B.A.P. 9th Cir. 1994); In re Stolrow's Inc., 84 B.R. 167, 171 (B.A.P. 9th Cir. 1988).  Under
    § 1112(b), a Chapter 11 petition may be dismissed for cause "if it appears that the petition was
26

1  L.P. (In re Sylmar Plaza, L.P.), 314 F.3d 1070, 1074 (9th Cir. 2002), cert. denied,

2  538 U.S. 1035 (2003). Beal Bank USA v. Windmill Durango Office, LLC (In re

3  Windmill Durango Office, LLC), 481 B.R. 51, 68 (B.A.P. 9th Cir. 2012).

4      A plan is proposed in good faith where it achieves a result consistent with

5  the objectives and purposes of the Code. In re Sylmar Plaza, L.P., supra, 314 F.3d

6  at 1074; In re Windmill Durango Office, LLC, supra, 481 B.R. at 68. "Good faith"

7  under Section 1129(a)(3) is determined on a case-by-case basis, taking into account

8  the totality of the circumstances of the case. In re Sylmar Plaza, L.P., supra, 314

9  F.3d at 1074-75;[43] In re Windmill Durango Office, LLC, supra, 481 B.R. at 68; In

10  re Stolrow's, Inc., supra, 84 B.R. at 172.

11      The creation of an impaired class in "an attempt to gerrymander a voting

12  class of creditors is indicative of bad faith" for purposes of § 1129(a)(3). In re

13  Windmill Durango Office, LLC, supra, 481 B.R. at 68 (citing Conn. Gen. Life Ins.

14  Co. v. Hotel Assocs. of Tucson (In re Hotel Assocs. of Tucson), 165 B.R. 470, 475

15  (B.A.P. 9th Cir. 1994)).

16      Prior to the creation of Class 1B in the Second Amended Plan, Debtor had

17  no impaired accepting class. Lender's unsecured deficiency claim would have

18  dominated and controlled the vote of the General Unsecured Creditor Class, Class

19

20  ────────────

   filed in bad faith." In re Stolrow's Inc., supra, 84 B.R. at 170. "Bad faith [in filing a Chapter 11

21  petition] exists if there is no realistic possibility of reorganization and the debtor seeks merely to
   delay or frustrate efforts of secured creditors." In re Boulders on the River, supra, 164 B.R. at

22  103.

23      [43] In Sylmar Plaza, the Ninth Circuit rejected the use of per se rules in determining

24  whether good faith exists, and upheld a finding of good faith where the debtor invoked a
   provision of the Code preventing a creditor from receiving a higher default interest rate under a

25  loan agreement. In re Sylmar Plaza, L.P., supra, 314 F.3d at 1074–76. The court in Sylmar
   concluded that the debtor's filing for bankruptcy relief was consistent with the objectives and

26  purposes of the Code, even though the case dealt primarily with a single creditor. Id.

4. The sequence of events related to the last minute timing of the creation of Lender's Class 1B unsecured deficiency claim and the filing of the Second Amended Plan constitutes indicia of bad faith.

Furthermore, Debtor has shifted virtually all of the risk of failure of the Property's reorganization to Lender. Lender's combined claims exceed the value of the Property both on the effective date and on the Maturity Date. If the Debtor's reorganization efforts fail, Lender will shoulder all of the loss. If, however, the reorganization succeeds, the Reorganized Debtor and its insiders will benefit. Shifting the risk of loss in such a manner is evidence of bad faith.

The combination of the timing of Debtor's docketing of its Second Amended Plan and the allocation of substantially all of the risk of failure of that Plan to Lender results in the conclusion that the Debtor did not file its Second Amended Plan in good faith.

Since Debtor's Second Amended Plan has not been proposed in good faith, the Second Amended Plan does not comply with Section 1129(a)(3). 11 U.S.C. § 1129(a)(3). Because Debtor has not complied with Section 1129(a)(3) of the Code, and proposing a plan in good faith, the Debtor's Second Amended Plan is not confirmable under section 1129(a)(3). Nevertheless, the court will review the remaining aspects of Plan under Section 1129.

### Section 1129(a)(4) - Payments to professionals and others.

Section 1129(a)(4) requires that fees for those working on a debtor's case be submitted to the court and be approved as reasonable. 11 U.S.C. § 1129(a)(4). See also, 11 U.S.C. § 330. Debtor's Plan includes these provisions, and all fees approved to date have been allowed as interim, not final. Future requests will likewise be submitted to the court for approval. This section of the Code was

1    satisfied.

2    ### Section 1129(a)(5) - Debtor's future officers and directors.

3    A Chapter 11 plan may not be confirmed if the continuation in management

4    of the persons proposed to serve as officers or managers of debtor is not in the

5    interests of creditors and public policy. 11 U.S.C. § 1129(a)(5)(A)(ii). See, e.g., In

6    re Beyond.com Corp., 289 B.R. 138, 145 (Bankr. N.D. Cal. 2003). Continued

7    service by prior management may be inconsistent with the interests of creditors and

8    public policy if it "directly or indirectly perpetuates incompetence, lack of

9    discretion, inexperience or affiliations with groups inimical to the best interests of

10    the debtor." In re Linda Vista Cinemas, L.L.C., 442 B.R. 724, 735-36 (Bankr. D.

11    Ariz. 2010) (citing In re Beyond.com Corp., supra, 289 B.R. at 145).

12    Section 1129(a)(5)[44] compels a number of disclosures relating to post

13    confirmation management of the reorganized debtor. "Section 1129(a)(5)(A)(i)

14    requires the plan proponent to disclose two attributes of post confirmation

15    management: their identity; and their 'affiliations.' ... The required disclosure must

16    be of the 'director[s], officer[s], or voting trustee[s].' This leaves out analogous

17    management for partnerships or limited liability companies." 7 COLLIER ON

18    BANKRUPTCY ¶ 1129.02[5][b], p. 1129-31 (Alan N. Resnick & Henry J. Sommer

19

20

21    [44] 11 U.S.C.§ 1129(a)(5) provides that:
       (A)(i) The proponent of the plan has disclosed the identity and affiliations of any
22    individual proposed to serve, after confirmation of the plan, as a director, officer, or
       voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the
23    debtor, or a successor to the debtor under the plan; and
       (ii) the appointment to, or continuance in, such office of such individual, is consistent
24    with the interests of creditors and equity security holders and with public policy; and
       (B) the proponent of the plan has disclosed the identity of any insider that will be
25    employed or retained by the reorganized debtor, and the nature of any compensation for
       such insider.
26

eds., 16th ed. rev.2009).

According to Debtor's Second Amended Plan:

> Reorganized Debtor will continue to be managed by Debtor's
> pre-petition manager, Dr. Rick Abelson, which management may
> subsequently be modified to the extent provided by Reorganized
> Debtor's articles of organization, by-laws, and operating agreement
> (as amended, supplemented, or modified).  Dr. Rick Abelson may also
> retain a property management company to assist in Reorganized
> Debtor's day-to-day operations.

(Second Amended Plan at p. 17).

There has been no proof of mismanagement by Abelson.  The disclosure is adequate.

### Section 1129(a)(6) - Regulatory bodies.

Section 1129(a)(6) does not apply to Debtor's Plan.

### Section 1129(a)(7) - Best interests of creditors.

Under Section 1129(a)(7), creditors with impaired claims must either accept the proposed Plan or receive as much from the Plan as they would under liquidation. 11 U.S.C. § 1129(a)(7)(A).  The Debtor's Plan includes four impaired classes, classes 1A, 1B, 3, and 4. (Second Amended Plan at p. 11).  Only Class 4 accepted the proposed Plan.  Classes 1B, 3, and 4 receive at least as much through the Plan as they would from liquidation.  As more fully explained below, Class 1A does not retain under Debtor's Second Amended Plan on account of its claim property of a value as of the effective date of the Debtor's Revised Plan that is not less than the amount that the Lender would receive if the Debtor were liquidated under Chapter 7.

Class 4, General Unsecured Creditors, will be paid 100% of its allowed claims within six months the effective date of the Plan.  Class 4 voted 100% to

1  accept the Plan. In a liquidation, Class 4 would likely receive nothing. Members

2  of Class 4 will receive more under the Plan than they would under liquidation.

3      Class 3, Priority Unsecured Creditors, will be paid in full within roughly

4  ninety days (90) from the effective date of the Plan. (Second Amended Plan,

5  Section 4.4 at p. 15). In a liquidation, Class 3 would likely receive nothing.

6  Members of Class 3 will receive more under the Plan than they would under

7  liquidation.

8      Class 1A, Lender's secured claim, will not be paid in full under the Plan, as

9  the Debtor's proposed 5% interest rate does not provide Lender with the present

10  value of the amount of its claim.[45] Lender's Class 1A claims receives even less if

11  the court analyzes the situation using its designated 6% or 6.25% interest rates.[46]

12  Class 1A, Lender's secured claim, will not receive as much under the Plan as it

13  would on liquidation.

14

15      [45] The court previously articulated that Lender's secured claim was $3,975,000 and that

16  its unsecured claim was $369,314 for a total claim was $4,344,314. (Dkt. #313). Following the
    Second Amended Plan's payment schedule and using the Debtor's proposed 5% interest rate, the

17  court finds a principal balance at the end of the 7-year plan period of $3,650,192.10 for the
    Lender's secured claim and $339,136.84 for the Lender's unsecured claim, totaling

18  $3,989,328.94 (reflecting principal payments of $354,985.06 during the last 5 years of the Plan).
    This amount results in a loan-to-value ratio of 100.4% at the end of the plan period.

19

20      [46] The court previously articulated that Lender's secured claim was $3,975,000 and that
    its unsecured claim was $369,314 for a total claim was $4,344,314. (Dkt. #313). Using the

21  court determined interest rate of 6%, the court finds a principal balance at the end of the 7-year
    plan period of $3,698,910.68 for the Lender's secured claim and $343,663.25 for the Lender's

22  unsecured claim, totaling $4,042,573.45 (reflecting principal payments of $301,740.7 during the
    last 5 years of the Plan). This amount results in a loan-to-value ratio of 101.2% at the end of the

23  plan period.
        Using the court determined interest rate of 6.25%, the court finds a principal balance at

24  the end of the 7-year plan period of $3,710,155.35 for the Lender's secured claim and
    $344,707.99 for the Lender's unsecured claim, totaling $4,054,862.85 (reflecting principal

25  payments of $301,740.7 during the last 5 years of the Plan). This amount results in a
    loan-to-value ratio of 102.00% at the end of the plan period.

26

1   Class 1B, Lender's unsecured claim, will not be paid in full under the Plan,

2   as the Debtor's proposed 5% interest rate does not provide Lender with the present

3   value of the amount of its claim.  In a liquidation, Lender's unsecured claim would

4   receive nothing.  Class 1B will realize more under the Plan than it would on

5   liquidation.

6   Since the Second Amended Plan does not provide Lender with the present

7   value of its Class 1A claim, the Plan fails to comply with Section 1129(a)(7).

8   Because Debtor has not complied with Section 1129(a)(7) of the Code, the

9   Debtor's Second Amended Plan is not confirmable under section 1129(a)(7).  Even

10  so, the court will review the remaining aspects of Plan under Section 1129.

### Section 1129(a)(8) - Impairment and Acceptance

12  Under Section 1129(a)(8), for a plan to be confirmed, each class of claims or

13  interests must either be unimpaired by the proposed plan, or it must accept the

14  treatment proposed by the plan.  Lender voted its Class 1A claim against

15  confirmation of Debtor's Plan.  (Ballot Summary).  Accordingly, Section

16  1129(a)(8) has not been met in this case.

17  A plan may be confirmed even where Section 1129(a)(8) is not met, if "the

18  plan does not discriminate unfairly, and is fair and equitable, with respect to each

19  class of claims or interests that is impaired under, and has not accepted, the plan."

20  11 U.S.C. § 1129(b)(1).  Whether the Debtor's Plan is "fair and equitable" under

21  Section 1129(b)(1) is discussed below.

22

### Section 1129(a)(9) - Administrative Claims

24  "Section 1129(a)(9)(A) requires that holders of administrative claims and

25  gap claims be paid 'cash equal to the allowed amount of such claim' on the

26  'effective date of the plan[.]' " 7 COLLIER ON BANKRUPTCY ¶ 1129.02[9][a], p.

1129-43 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.2010) (footnotes omitted). The Plan pays all administrative claim arising under Section 507(a)(1) in full on the effective date of the Plan or as soon as practicable thereafter, unless the claimant elected some alternative treatment. (Second Amended Plan, Section 2.2 at p. 10). Accordingly, Section 1129(a)(9) has been satisfied.

### Section 1129(a)(10) - Acceptance by at Least One Impaired Class

The General Unsecured Creditor class, Class 4, unanimously accepted the Debtor's Plan. Accordingly, Section 1129(a)(10) has been satisfied.

### Section 1129(a)(11) - Feasibility/Future Liquidation

Section 1129(a)(11) requires that confirmation of the plan is not likely to be followed by liquidation, or the need for further financial reorganization of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan. 11 U.S.C. § 1129(a)(11). Sherman v. Harbin (In re Harbin), 486 F.3d 510, 517 (9th Cir. 2007). Section 1129(a)(11) essentially looks at the feasibility of the Debtor's Plan.

The feasibility requirement set forth in Section 1129(a)(11) requires that:

> "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor ... unless such liquidation or reorganization is proposed in the plan." In re Harbin, 486 F.3d 510, 517 (9th Cir. 2007); In re Roberts Rocky Mountain Equip. Co., Inc., 76 B.R. 784, 790 (Bankr. D. Mont. 1987). The Ninth Circuit BAP has defined feasibility as a factual determination, and "as whether the things which are to be done after confirmation can be done as a practical matter under the facts."

In re Jorgensen, 66 B.R. 104, 108 (B.A.P. 9th Cir. 1986) (citing In re Clarkson, 767 F.2d 417 (8th Cir. 1985)); see also In re Ambanc La Mesa Ltd. P'ship, supra, 115 F.3d at 657.

1    Debtor bears the burden of establishing the feasibility of its Plan by a

2  preponderance of the evidence.  In re Indian Nat'l Finals Rodeo, 453 B.R. 387, 402

3  (Bankr. D. Mont. 2011); Danny Thomas Prop. II Ltd. P'ship v. Bank (In re Danny

4  Thomas Prop. II Ltd. P'ship), 241 F.3d 959, 963 (8th Cir. 2001); see also In re

5  Young Broadcasting Inc.,430 B.R. 99, 128 (Bankr. S.D.N.Y. 2010).

6    The Court has a duty under Section 1129(a)(11) to protect creditors against

7  "visionary schemes."  Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii,

8  Inc.), 761 F.2d 1374, 1382 (9th Cir. 1985); In re Linda Vista Cinemas, L.L.C.,

9  supra, 442 B.R. at 737; In re Las Vegas Monorail, 462 B.R. 795, 801 (Bankr. D.

10  Nev. 2011); In re Windmill Durango Office, LLC, supra, 481 B.R. at 67; In re Loop

11  76, LLC, supra, 465 B.R. at 544.

12    While a reorganization plan's success need not be guaranteed, the court

13  cannot confirm a plan unless it has at least a reasonable chance of success.  In re

14  Danny Thomas Prop. II Ltd. P'ship, supra, 241 F.3d at 963; In re Acequia, Inc.,

15  supra, 787 F.2d at 1364; In re Brotby, supra, 303 B.R. at 191-92.[47]  "Some

16  possibility of liquidation or further reorganization is acceptable and often

17  unavoidable."  In re DBSD N. Am., Inc., supra, 634 F.3d at 106-7.

18    To establish the feasibility of a plan, the debtor must present proof through

19  reasonable projections that there will be sufficient cash flow to fund the plan.

20  However, such projections cannot be speculative, conjectural, or unrealistic.  M & S

21  Assocs., supra, 138 B.R. at 849.  A plan proponent, however, need only

22  demonstrate that there exists a reasonable probability that the plan provisions can be

23  performed.  T-H New Orleans, supra, 116 F.3d at 801 (quoting Landing Assocs.,

24

25    [47] See also In re DBSD N. Am., Inc., supra, 634 F.3d at 106-7, In re T-H New Orleans
Ltd. P'ship, supra, 116 F.3d at 801; United States v. Haas (In re Haas), 162 F.3d 1087, 1090

26  (11th Cir. 1998).

31

1   supra, 157 B.R. at 820).

2       Just as speculative prospects of success cannot sustain feasibility, speculative

3   prospects of failure cannot defeat feasibility.  Cajun Elec., supra, 230 B.R. at 745.

4   The mere prospect of financial uncertainty cannot defeat confirmation on feasibility

5   grounds since a guarantee of the future is not required.  Cajun Elec., supra, 230 B.R.

6   at 745; In re U.S. Truck Co., Inc., 47 B.R. 932, 944 (E.D. Mich. 1985), aff'd, 800

7   F.2d 581 (6th Cir. 1986).

8       Reorganization plans:

9       need not completely amortize reorganization debt to be confirmed.
        But if refinancing is anticipated, the plan proponent has to produce
10      some credible evidence about the likelihood of that refinancing.
        "[S]ection 1129(a)(11) requires the plan proponent to show concrete
11      evidence of a sufficient cash flow to fund and maintain both its
        operations and obligations under the plan."  S & P, Inc. v. Pfeifer, 189
12      B.R. 173, 183 (N.D. Ind. 1995) (quoting In re SM 104 Ltd., 160 B.R.
        202, 234 (Bankr. S.D. Fla.1993)).  Against this background, courts
13      have refused to confirm plans whose feasibility turned on future sales
        of property, or future refinancings, absent an adequate showing that
14      such sales or refinancings would be likely to occur.
15

16  In re Las Vegas Monorail, supra, 462 B.R. at 800; In re Vanderveer Estates

17  Holding, LLC, 293 B.R. 560 (Bankr. E.D.N.Y. 2003).[48]

18      The likelihood of a future sale can be demonstrated by other evidence in

19  certain circumstances.  See In re Made in Detroit, Inc., 299 B.R. 170, 179–80

20  (Bankr. E.D. Mich. 2003) (plan not confirmed when proponent made inadequate

21  showing of ability to obtain financing); In re Walker, 165 B.R. 994 (E.D. Va. 1994)

22

23      [48] Even so, there are decisions finding proposed plans feasible without evidence of
24  marketing efforts or a firm offer to purchase.  See, e.g., In re T–H New Orleans Ltd. P'ship,
    supra, 116 F.3d at 801–02 (plan proposing to repay secured creditor out of revenues, with a sale
25  of collateral if in default, was feasible without evidence of a sale offer or marketing efforts); In
    re Barnes, 309 B.R. 888, 895 (Bankr. N.D. Tex. 2004) (plan calling for future sale of assets was
26  feasible when those assets had been increasing in value).

1 (similar regarding future sale of property).

2     Bankruptcy courts consider several factors when evaluating whether a

3 particular plan is feasible, including: (1) the adequacy of the capital structure; (2)

4 the earning power of the business; (3) economic conditions; (4) the ability of

5 management; (5) the probability of the continuation of the same management; and

6 (6) any other related matters which determine the prospects of a sufficiently

7 successful operation to enable performance of the provisions of the plan. In re

8 Linda Vista Cinemas, L.L.C., supra, 442 B.R. at 738; In re Las Vegas Monorail,

9 supra, 462 B.R. at 802; 7 COLLIER ON BANKRUPTCY ¶ 1129.02[11], p. 1129-52

10 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.2009).

11     It is likely that the Reorganized Debtor would be able to obtain the capital it

12 needs to operate the Property during the Plan period. Although the Reorganized

13 Debtor does not have earning power beyond its tenant rent revenues, the Guaranty

14 provides some level of assurance that the Reorganized Debtor can obtain operating

15 capital if it needs to do so during the Plan Period.

16     Although it is likely that the Reorganized Debtor will be able to obtain the

17 operating capital it needs during the course of the Plan Period, it is very unlikely

18 that the Debtor will be able to find a lender to refinance Lender's Notes at the end

19 of the Plan Period. Absent an unforeseen significant real estate property value

20 recovery in the region, the Property will have a loan-to-value ratio of over 100%

21 when the balloon payment on the Notes comes due. As noted above, commercial

22 lenders are unwilling to refinance properties with such heavy debt burdens.[49] The

23 Debtor's capital structure is inadequate to negotiate reorganization successfully.

24 _____

25     [49] Even if the Debtor attempts to sell the Property, reducing the sale proceeds by the real
estate commissions will make it highly unlikely that Debtor can sell the Property and pay off the
26 Lender's Notes.

1    Debtor attributes the inability of the Property to generate a profit to the

2  economic downturn that overwhelmed the Las Vegas area. The Debtor is confident

3  that existing management can manage the Property in such a manner that it will be

4  profitable going forward during the course of the 7-year Plan. Although the court is

5  not as confident as the Debtor about the economic recovery, the court finds that the

6  problems leading up to Debtor's bankruptcy filing were not directly attributable to

7  poor management.

8    Debtor leaves open the possibility of bringing in an outside manager to

9  manage the Property. While this may be a good idea, especially when compared

10  with Abelson engaging in long-distance property management from California, the

11  cost of such a manager is not otherwise accounted for in Debtor's Plan. Thus,

12  hiring outside management would likely make the Debtor's Plan even more

13  financially untenable. Although the problems leading up to Debtor's bankruptcy

14  filing were not directly attributable to poor management, the court is not as

15  confident as the Debtor that Abelson can manage the Property remotely from

16  California.

17    The court finds the Reorganized Debtor's prospects of successful operations

18  unlikely. The Debtor has underestimated both the likely operating cost increases

19  that it faces and the interest expense reasonably necessary to compensate Lender for

20  the risk of financing the Property for another 7 years. More importantly, Debtor's

21  current tenant occupancy situation is perilous. Debtor's largest tenant recently

22  moved out. Several other tenants are on month-to-month leases and can leave on

23  short notice. When the leases that expire in 2014 and 2015 are included in the

24  analysis, the Property will have only 16% guaranteed tenancy at the end of 2015.

25  Even if the existing tenants all decide to stay, Debtor has provided no information

26  regarding the likely rent revenues that the Property can be expected to generate after

34

1  2015.[50]  Thus, the court concludes that Debtor has not demonstrated its ability to

2  generate sufficient cash flow to meet the payments required during the Plan period.

3       Even assuming Debtor's proposed cost structure and interest rate were

4  adopted as reasonable, which they were not, Debtor has little more than a slim

5  chance of finding a lender willing to refinance the Lender's Notes that will come

6  due at the end of the Plan Period.  Even if the Debtor opts to sell the Property

7  outright, adding the real estate commissions to the existing debt will make it highly

8  unlikely that Debtor can sell the Property and pay of the Lender's Notes.  The

9  Debtor has not demonstrated its ability to make these two balloon payments.

10      The Guaranty provides some level of assurance that the Reorganized Debtor

11 can obtain operating capital if it needs to do so during the Plan period.  However, at

12 the end of that time frame, there will remain a loan-to-value ratio exceeding 100%

13 of the Property's value.[51]  Given the testimony that commercial lenders are not

14 willing to make such loans, allowing the Debtor's Second Amended Plan to go

15 ─────────────────────

16      [50] The Guaranty's monthly payment backstop, alone, does not satisfy the court that the
Reorganized Debtor will generate sufficient rent revenues to stay in business during the 7-year

17 Plan period.

18      [51] Using the Debtor's proposed 5% interest rate, the court finds a principal balance at the
end of the Plan Period of $3,650,192.10 for the Lender's secured claim and $339,136.84 for the

19 Lender's unsecured claim, totaling $3,989,328.94 (reflecting principal payments of $354,985.06
during the last 5 years of the Plan).  This amount results in a loan-to-value ratio of 100.4% at the

20 end of the plan period.
     Using the court determined interest rate of 6%, the court finds a principal balance at the

21 end of the Plan Period of $3,698,910.68 for the Lender's secured claim and $343,663.25 for the

22 Lender's unsecured claim, totaling $4,042,573.45 (reflecting principal payments of $301,740.7
during the last 5 years of the Plan).  This amount results in a loan-to-value ratio of 101.2% at the

23 end of the plan period.
     Using the court determined interest rate of 6.25%, the court finds a principal balance at

24 the end of the Plan Period of $3,710,155.35 for the Lender's secured claim and $344,707.99 for

25 the Lender's unsecured claim, totaling $4,054,862.85 (reflecting principal payments of
$301,740.7 during the last 5 years of the Plan).  This amount results in a loan-to-value ratio of

26 102.00% at the end of the plan period.

1   forward merely acts to delay the inevitable sale of the Property in order to pay off

2   the two Lender's Notes. Lender correctly argues that there will be a cost to

3   advertising and selling the Property, and that real estate commissions will likely

4   exceed 5% of the sale price. As such, absent considerable appreciation in the

5   Property's value, which the courts finds to be unlikely, Debtor will very likely be

6   unable to pay off the Lender's Notes when it sells the Property at the end of the

7   Plan Period.

8         When the court is dealing with an intermediate time frame like the 7 years

9   after which the balloon payment comes due in this case, the level of proof required

10  from the Debtor will be somewhat less than that necessary to show it can operate

11  the property during the next two years, but more than that when trying to

12  extrapolate to financing twenty-years into the future. Here the court has evidence

13  concerning the value of the property, the loan-to-value ratio of the Property during

14  the Plan Period, and the views of commercial lenders when considering the

15  refinancing of the Property at the end of 7 years. In this context, the court bases its

16  feasibility finding on sufficiently specific proof to conclude that Debtor would be

17  unlikely to avoid reorganization or liquidation after the 7 year Plan Period. See,

18  e.g., In re DBSD N. Am., Inc., supra, 634 F.3d at 106-108.

19        Debtor's Second Amended Plan is not feasible. There is a probability

20  of default on Debtor's secured and unsecured obligations to Lender, and any such

21  default would lead to the type of liquidation or financial reorganization that

22  Section 1129(a)(11) seeks to avoid. Because Debtor has not complied with Section

23  1129(a)(11) of the Code, the Debtor's Second Amended Plan is not confirmable

24  under section 1129(a)(11). The court will, however, review the remaining aspects

25  of Plan under Section 1129.

26

**Section 1129(a)(12) - Fees**

All required court and U.S. Trustee fees have been paid and are current. Thus, Section 1129(a)(12) has been satisfied.

**Sections 1129(a)(13), (14), (15), and (16) - Retirement Benefits, Domestic Support Obligations, Individual Debtors, Transfers of Property.**

These provisions do not apply in this case.

**Section 1129(b)(1) - 'Unfair Discrimination' and 'Fair and Equitable'**

A plan is "fair and equitable" under Section 1129(b)(1) if:

(A) With respect to a class of secured claims, the plan provides--

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A)(i) - (iii).  The Debtor did not attempt to confirm the

37

1    Second Amended Plan under Section 1129(b)(2)(A)(ii) or (iii).

2    Debtor's Plan purports to employ the first alternative means of fair and

3    equitable treatment, making deferred cash payments equal to the present value at the

4    effective date.[52]  11 U.S.C. § 1129(b)(2)(A)(i)(II).

5    Lender argues, and the court agrees, that Debtor's Plan is not fair and

6    equitable to Lender's *secured* claim because it does not provide Lender with the

7    present value of the amount of its secured claim and because it unfairly shifts the

8    risk of failure of the Plan to Lender while preserving the benefits for success for the

9    Debtor's insiders.  Thus, Debtor's Plan does not meet the requirements of Section

10    1129(b)(2)(A)(i)(II).  11 U.S.C. § 1129(b)(2)(A)(i)(II).

11    As reflected above, Debtor's proposed 5% interest rate does not provide

12    Lender with deferred cash payments totaling at least the allowed amount of such

13    claim, of a value, as of the effective date of the plan, of at least the value of such

14    holder's interest in the estate's interest in such property.  11 U.S.C. §

15    1129(b)(2)(A)(i)(II).

16    As noted above, two experts testified regarding the appropriate interest rate.

17    The court finds that Lender's expert, Mr. Bierman,[53] has considerably more

18    experience and was more persuasive than the Debtor's expert, Mr. Nelson.[54]  Mr.

19    Nelson proposed an interest rate of 5%, while Mr. Bierman proposed an interest rate

20    of 6.75%.  The court concludes that an appropriate interest rate would be 6.0% to

---

22    [52] The proper date to value collateral for purposes of plan confirmation is the date of
confirmation.  See 11 U.S.C. § 506(a); Yaissle and Cornerstone Invest. v. Unsecured Creditors
23    Comm. (In re Heritage Highgate, Inc.), 449 B.R. 451, 457-58 (D. N.J. 2011), aff'd, 679 F.3d
132, 143 n. 9 (3d Cir. 2012). See also 4 COLLIER ON BANKRUPTCY 506.03[10], p. 506-92 to 506-
24    94 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.2013).

25    [53] Keith Bierman Report, Ex. 12.

26    [54] Timothy W. Nelson Report, Ex. 11.

1    6.25%.

2        The Plan's insider Guaranty provides some level of assurance that the

3    Reorganized Debtor can make the required debt service and operating expense

4    payments during the 7-year Plan Period.  However, the debt load is significant at

5    the Maturity Date.  On the Maturity Date, the Property will have a loan-to-value

6    ratio of more than 100%.[55]  Given the testimony that commercial lenders are

7    generally not willing to make loans with such heavy loan-to-value ratios, the risk of

8    nonpayment on the Notes when they come due on the Maturity Date is shifted to

9    Lender.  No new lender can reasonably be expected to lend the Debtor enough to

10   refinance Lender's Notes on the Maturity Date.

11       Additionally, Debtor's Plan is not fair and equitable to Lender's ***unsecured***

12   claim because it fails to meet the requirements of Section 1129(b)(2)(B) and

13   provide Lender with the present value of the amount of its unsecured claim.  11

14   U.S.C. § 1129(b)(2)(B).

15       A plan is "fair and equitable" under Section 1129(b)(2)(B)(i) if it provides for

16   deferred cash payments equal to the present value of the claim at the effective date.

17   11 U.S.C. § 1129(b)(2)(B)(i).  As with the Lender's Secured Note, Debtor's Second

18   Amended Plan purports to pay Lender deferred cash payments equal to the present

19   value of the claim at the effective date.

20       The Debtor's Second Amended Plan does not provide that Lender will receive

21   or retain on account of its unsecured claim property of a value, as of the effective

22   date of the plan, equal to the allowed amount of such claim.  The 5% interest rate

23   proposed for the Class 1B Note is too low to make the present value of the proposed

24

25   _____

26   [55] The loan-to-value ratio becomes even higher when the Debtor's projected cash flow is
     analyzed in the context of 6% of 6.25% interest on both Lender's Notes.

1  payments under the Class 1B Note equal to the allowed amount of the Lender's

2  Unsecured Claim.  As noted above, the court concludes that 6% to 6.25% is a fair

3  and reasonable interest rate.  Using the court's 6% to 6.25% interest rate the Class

4  1B Note receives even less than it does with the Debtor's proposed 5% interest rate.

5  No new lender can reasonably be expected to lend the Debtor enough to refinance

6  Lender's Notes on the Maturity Date.  Accordingly, the Plan fails to meet the

7  requirements of Section 1129(b)(2)(B)(i).  11 U.S.C. § 1129(b)(2)(B)(i).

8       The Second Amended Plan does not meet the requirements of Section

9  1129(b)(2)(B)(ii).

10      Section 1129(b)(2)(B)(ii) requires that "the holder of any claim or interest

11  that is junior to the claims of such class will not receive or retain under the plan on

12  account of such junior claim or interest any property, except that in a case in which

13  the debtor is an individual, the debtor may retain property included in the estate

14  under section 1115, subject to the requirements of subsection (a)(14) of this

15  section."  11 U.S.C. § 1129(b)(2)(B)(ii)

16      "In plainer English the provision bars old equity from receiving any property

17  via a reorganization plan 'on account of' its prior equitable ownership when all

18  senior claim classes are not paid in full."  Bonner Mall P'ship v. U.S. Bancorp

19  Mortg. Co. (In re Bonner Mall P'ship), 2 F.3d 899, 908 (9th Cir. 1993), mot. to

20  vacate denied and cert. dismissed, 513 U.S. 18 (1994) (citing Snyder v. Farm Credit

21  Bank of St. Louis (In re Snyder), 967 F.2d 1126, 1130 (7th Cir. 1992)).[56]

22      This provision is known as the "absolute priority rule," and it generally

23

24      _____

   [56] Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck

25  Co.), 800 F.2d 581, 588 (6th Cir. 1986); Prudential Ins. Co. v. F.A.B. Indus. (In re F.A.B.
   Indus.), 147 B.R. 763, 768–69 (C.D. Cal. 1992), appeal docketed, No. 93–55055 (9th Cir. Jan.

26  13, 1993); In re Pullman Constr. Indus, 107 B.R. 909, 944 (N.D. Ill. 1989).

1    requires that all unsecured creditors be paid in full before equity security holders are

2    allowed to retain any ownership interest in the debtor.  See In re Ambanc La Mesa

3    Ltd. P'ship, supra, 115 F.3d at 654; In re Bonner Mall P'ship, supra, 2 F.3d at

4    906-07.

5        Debtor argues that its Plan does not violate the absolute priority rule because

6    it pays all unsecured claims in full during the Plan Period.  (Motion to Amend at p.

7    14).  As reflected above, Debtor is incorrect.  Lender's Class 1B claim will not be

8    paid in full during the Plan Period.  Accordingly, Debtor's Plan must comply with

9    the absolute priority rule in order to satisfy Section 1129(b)(2)(B)(ii).  As reflected

10   below, Debtor's Plan makes no effort to meet these requirements.

11       There is a corollary to the absolute priority rule known as the "new value

12   exception."  The new value exception to the absolute priority rule allows junior

13   interest holders (e.g. shareholders of a corporate debtor) to receive a distribution of

14   property under a plan if they offer "value" to the reorganized debtor that is: (1) new;

15   (2) substantial; (3) money or money's worth; (4) necessary for a successful

16   reorganization; and (5) reasonably equivalent to the value or interest received.  In re

17   Ambanc La Mesa Ltd. P'ship, supra, 115 F.3d at 654 (citing In re Bonner Mall

18   P'ship, supra, 2 F.3d at 908). ·

19       In 1999, the United States Supreme Court had an opportunity to discuss both

20   the absolute priority rule and the new value corollary to that rule in Bank of Am.

21   Nat'l Trust and Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434 (1999) ("203

22   N. LaSalle").  The Court determined that old equity could acquire or retain its

23   equity interest only if it paid full value, meaning "top dollar" for that property

24   interest.  But old equity could not satisfactorily demonstrate that it had paid top

25   dollar for the property under a plan giving it exclusive rights to buy such equity and

26   absent a competing plan of some sort.  The court noted that "... the best way to

41

1    determine value is exposure to a market." 203 N. LaSalle, supra, 526 U.S. at 458.

2    The Court stopped short of saying how the market-based valuation should be

3    discerned.  The Court did, however, note that "plans providing junior interest

4    holders with exclusive opportunities free from competition and without benefit of

5    market valuation fall within the prohibition of § 1129(b)(2)(B)(ii)." 203 N. LaSalle,

6    supra, 526 U.S. at 458.

7    The Second Amended Plan does not establish a market value for the equity

8    being retained.  The Plan gives Abelson and Patel an exclusive right to retain or

9    acquire the equity.  The Plan does not otherwise propose to test the "market" to see

10   if there is any interest by third parties in acquiring the equity.

11   The insider Guaranty is not (1) new value (the Guaranty is contingent, so

12   there is no guarantee that any funds will be paid); (2) substantial (the Guaranty is

13   contingent, so there is no guarantee that anything will ever be paid to the estate); (4)

14   necessary for a successful reorganization (the Guaranty is contingent and may never

15   be called upon by the Reorganized Debtor; even if called upon, it does not address

16   the balloon payments at the end of the Plan period); and (5) reasonably equivalent

17   to the value or interest received (Debtor has made no effort to establish a value on

18   the equity).  In re Ambanc La Mesa Ltd. P'ship, supra, 115 F.3d at 654 (citing In re

19   Bonner Mall P'ship, supra, 2 F.3d at 908).

20   Debtor's Plan provides junior interest holders with exclusive opportunities

21   free from competition and without benefit of market valuation to retain their equity

22   position.  This clearly falls within the prohibition of Section 1129(b)(2)(B)(ii).

23   **Section 1129(c) - only one Plan of Reorganization may be confirmed.**

24   Pursuant to Section 1129(c), the court may confirm only one plan.  11 U.S.C.

25   § 1129(c).  In the instant case, the court has confirmed the Lender's Plan of

26

42

1    Liquidation. (Dkt. ##356, 366). Although Debtor has taken an appeal from that

2    confirmation order,[57] its implementation has not been stayed by Debtor.

3        If subsections (a) and (b) of Section 1129 are met as to more than one plan,

4    the court shall consider the preferences of creditors and equity security holders in

5    determining which plan to confirm.[58]  11 U.S.C. § 1129(c).  As noted above,

6    Debtor's Second Amended Plan is not confirmable, so Section 1129(c) does not

7    apply in this case.

8
          ### Section 1129(d) - Avoidance of Taxes or Application of the Securities
9            Act of 1933

10       Pursuant to Section 1129(d), the court may not confirm a plan if the principal

11   purpose of the plan is to avoid taxes or avoid application of Section 5 of the

12   Securities Act of 1933.  11 U.S.C. § 1129(d).  No such issues have been raised in

13   this case and Section 1129(d) does not apply in this case.

14
          ### Section 1129(e) - Small Business Case.

15       The instant case is not a small business case, so Section 1129(e) does not

16   apply.

17

18   **CONCLUSION**

19

20   _____

     [57] (Dkt. #379).

21

22       [58] In cases with multiple confirmable plans, the court "shall consider the preferences of
     creditors and equity security holders in determining which plan to confirm." 11 U.S.C. §
23   1129(c). In other cases involving multiple confirmable plans, courts have applied a four-factor
     analysis, considering "(1) the type of plan; (2) the treatment of creditors and equity security
24   holders; (3) the feasibility of the plan; and (4) the preferences of creditors and equity security
     holders." In re ASARCO LLC, 420 B.R. 314, 326-27 (Bankr. S.D. Tex. 2009) (citing In re
25   Internet Navigator Inc., 289 B.R. 128, 131 (Bankr. N.D. Iowa 2003)); In re Holley Garden
     Apartments, Ltd., 238 B.R. 488, 493 (Bankr. M.D. Fla.1999).

26

43

1    Debtor's Second Amended Plan of Reorganization cannot be confirmed

2  because of numerous failures to comply with the requirements of sections 1129(a)

3  and (b) of the Bankruptcy Code.

4    The plan fails to comply with the applicable provisions of the Bankruptcy

5  Code, Section 1129, as shown below.

6    Debtor, the plan proponent, has failed to comply with applicable provisions

7  of the Bankruptcy Code. 11 U.S.C. § 1129(a)(2). Debtor has not disclosed

8  "adequate information" regarding Debtor's Second Amended Plan, as required by

9  Section 1125. 11 U.S.C. § 1125.

10    The belated filing of the Second Amended Plan and the placing of all risk of

11  loss, in the event of plan failure, upon Lender provides the court with evidence that

12  the plan was not proposed in good faith, as required by Section 1129(a)(3). 11

13  U.S.C. § 1129(a)(3).

14    The plan does not meet the 'best interests of creditors' requirement, because

15  it fails to give Lender, on account of its Class 1A claim, as much as it would receive

16  in a Chapter 7 liquidation.

17    The requirements of §1129(a)(8) are not met, because Lender's Class 1A

18  claim is impaired and has been voted against the plan. 11 U.S.C. § 1129(a)(8).

19    The plan is not feasible, because Debtor will be unable to make the balloon

20  payment that will come due at the end of the 7-year note period, and further

21  reorganization of Debtor will be necessary. §1129(a)(11). 11 U.S.C. §

22  1129(a)(11).

23    The plan is not 'fair and equitable' with respect to Lenders Class 1A Secured

24  claim. 11 U.S.C. § 1129(b)(1). Because of the too-low 5% interest rate in the plan,

25  Lender does not receive the value of its secured claim as of the effective date of the

26  plan. Lender receives even less when the court-approved interest rate of 6.0 or

6.25% is used for the analysis. The plan also shifts the risk of the probability of failure of the Plan to Lender, while saving the possible benefits of success for Debtor's insiders, who do not contribute value for the retention of their equity interests and have not exposed equity to competing bids. Failure is probable, because Debtor will be unable to make the balloon payment due at the end of the 7-year note period.

The plan is not "fair and equitable" with respect to Lender's Class 1B Unsecured claim. 11 U.S.C. §1129(b)(2). The 5% interest rate in the plan is too low, and Lender does not receive the value of its secured claim as of the effective date of the plan. Lender receives even less when the court-approved interest rate of 6.0 or 6.25% is used for the analysis. The plan violates the "absolute priority rule" of section 1129(b)(2)(ii) by allowing the junior interests of the equity holders to be retained, when Class 1B is impaired. 11 U.S.C. § 1129(b)(2)(ii).

Debtor and its insiders lack any resources to contribute toward a successful Chapter 11 plan of reorganization.

Orders will be entered 1) approving in part and denying in part the motion to amend or vacate orders and to reopen evidence, and denying confirmation of Debtor's Second Amended Plan of Reorganization, and (2) denying approval of Debtor's disclosure statement.

Copies noticed through ECF to:

DOROTHY G. BUNCE on behalf of Interested Party Rick Abelson
    1bankruptcy@cox.net

TALITHA GRAY KOZLOWSKI on behalf of Debtor HORIZON RIDGE

45

MEDICAL & CORPORATE CENTER, LLC
bankruptcynotices@gordonsilver.com; bknotices@gordonsilver.com

KIRK D. HOMEYER on behalf of Debtor HORIZON RIDGE MEDICAL &
    CORPORATE CENTER, LLC

BANKRUPTCYNOTICES@GORDONSILVER.COM,

BKNOTICES@GORDONSILVER.COM

TERESA M. PILATOWICZ on behalf of Debtor HORIZON RIDGE MEDICAL
    & CORPORATE CENTER, LLC Bankruptcynotices@gordonsilver.com,
    bknotices@gordonsilver.com

U.S. TRUSTEE - LV - 11, 11

USTPRegion17.lv.ecf@usdoj.gov

JOHN ROBERT WEISS on behalf of Interested Party BANK OF AMERICA,
    N.A. AS SUCCESSOR BY MERGER TO LASALLE BANK NATIONAL
    ASSOCIATION, AS TRUSTEE jrweiss@duanemorris.com,
    maolins@duanemorris.com; jjohnson3@duanemorris.com

MATTHEW C. ZIRZOW on behalf of Debtor HORIZON RIDGE MEDICAL &
    CORPORATE CENTER, LLC mzirzow@lzlawnv.com,
    susan@lzlawnv.com; tiffany@lzlawnv.com; carey@lzlawnv.com;
    mary@lzlawnv.com

and sent to BNC to:

    All parties on BNC mailing list

# # #

46